**Document Electronically Filed**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SPY PHONE LABS LLC, | ) |
| | ) |
| Plaintiffs, | ) Civil Action No. 2:14-cv-06565-<br>) MCA-MF |
| | ) |
| v. | ) |
| | ) ECF Case |
| GOOGLE INC. and ANDREI CIUCA, | ) |
| d/b/a CAD COMPLAINT | ) **Motion Return Date:** |
| DESIGN, and JOHN DOES 1-49, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT GOOGLE INC.'S MOTION TO TRANSFER VENUE OR
## DISMISS THE AMENDED COMPLAINT

HERRICK, FEINSTEIN LLP
210 Carnegie Center
Princeton, New Jersey  08540
Tel: (609) 452-3800
Fax: (609) 452-3816

*Attorneys for Defendant Google Inc.*

On the Brief:

   Barry Werbin, Esq. (admitted *pro hac vice*)
   bwerbin@herrick.com
   Patricia M. Graham, Esq.
   pgraham@herrick.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES.................................................................................ii

PRELIMINARY STATEMENT ........................................................................ 1

FACTS.................................................................................................................. 4

    A.    The Parties ...................................................................................... 4

    B.    Plaintiff Accepted the Terms of the Google Play DDA .................. 5

    C.    Google Acted on Plaintiff's Trademark Infringement
           Complaints ...................................................................................... 7

    D.    Google Terminated, and Later Reinstated, Plaintiff's Account ...... 8

    E.    Plaintiff Submitted Complaints of Alleged Policy Violations ........ 9

    F.    Google Suspends Plaintiff's account ............................................ 10

ARGUMENT ..................................................................................................... 12

    POINT I    THE DDA'S FORUM SELECTION CLAUSE
                  REQUIRES TRANSFER OF PLAINTIFF'S CLAIMS
                  AGAINST GOOGLE .......................................................... 12

    POINT II    RULE 12(b)(6) STANDARD OF REVIEW........................ 15

    POINT III    PLAINTIFF'S CLAIM FOR CONTRIBUTORY
                  TRADEMARK INFRINGEMENT SHOULD BE
                  DISMISSED ........................................................................ 16

    POINT IV    PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE
                  WITH PROSPECTIVE ECONOMIC ADVANTAGE
                  SHOULD BE DISMISSED.................................................. 28

          A.    The Claim Is Barred Under Section 230 of the CDA ......... 28

                  1.    Google Play is an "Interactive Computer Service" .. 29

                  2.    Google Blocked Material that is "Objectionable" .... 30

                  3.    Google Acted in Good Faith ..................................... 32

           B.    Plaintiff Has Failed to State a Tortious
                  Interference Claim ............................................................... 33

CONCLUSION .................................................................................................. 40

## TABLE OF AUTHORITIES

**Page**

### Federal Cases

*A.J. Canfield Co. v. Honickman,*
  808 F. 2d 291 (3d Cir.1986)...................................................................23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ..............................................................16

*Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.,*
  __ U.S. __, 134 S. Ct. 568 (2013).............................................................12

*Baztel v. Smith*, 333 F. 3d 1018 (9th Cir. 2003)..................................................29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................16, 36

*Carafano v. Metrosplash.com Inc.*, 339 F. 3d 1119 (9th Cir. 2003)..................29

*Checkpoint Systems, Inc. v. Check Point Software Technologies, Inc.,*
  269 F. 3d 270 (3d Cir. 2001)....................................................................26

*Coast Cities Truck Sales, Inc. v. Navistar Intern. Transp. Co.,*
  912 F. Supp. 747 (D.N.J. 1995) ..............................................................14

*Dawes v. Publish America LLP*, 563 F. Appx. 117 (3d Cir. 2014) ...................14

*Dillon v. Ski Shawnee, Inc.*, 2014 WL 3900877, No. 13-7155
  (D.N.J. Aug. 11, 2014)............................................................................13

*e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605
  (N.D. Ill. 2008)................................................................................passim

*Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735 (E.D. Pa. 2011)..............14

*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (E.D. Pa. 2007) ........................14

*Green v. Am. Online*, 318 F.3d. 465 (3d. Cir. 2003).........................................31

*Hebert v. Rapid Payroll, Inc.,*
  2005 WL 6172659 (C.D. Cal. 2005)........................................................40

*Hoffer v. InfoSpace.com, Inc.* 102 F. Supp. 2d 556 (D.N.J. 2000.....................13

*Holomaxx Techs. v. Yahoo!, Inc.,* 2011 WL 865794
  (N.D. Cal. Mar. 11, 2011) ........................................................28, 29, 30

*Howmedica Osteonics Corp. v. Zimmer, Inc.,*
  2012 WL 5554543 (D.N.J. 2012) ............................................................38

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983) ..............................26

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844
(1982) ............................................................................................*passim*

*Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010)........................... 29

*Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007) ..............29, 30, 32

*Leong v. MySpace, Inc.*, 2011 WL 7808208 (C.D. Cal. Mar. 11, 2011) ........... 14

*Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980
(9th Cir.1999).................................................................................................. 20

*Louis Vuitton Malletier v. Akanoc Solutions*, 658 F.3d 936 (9th Cir. 2011) ..... 22

*Mmubango v. Google Inc.*, 2013 WL 664231 (E.D. Pa. Feb 22, 2013)............. 30

*Nat'l Rural Telecomms. v. DIRECTV, Inc.*,
319 F. Supp. 2d 1040 (C.D. Cal. 2003) ...................................................... 39

*Novak v. Overture Services, Inc.*, 309 F. Supp. 2d 466 (E.D.N.Y. 2004) ......... 28

*Parker v. Google, Inc.*, 422 F.Supp 2d 492 (E.D. Pa. 2006).............................. 29

*Peek & Cloppenburg KG v. Revue, LLC*, 2012 WL 4470556
(S.D.N.Y. Sept. 19, 2012) ........................................................................... 22

*Rudgayzer v. Google, Inc.*, 986 F. Supp. 2d 151 (E.D.N.Y. 2013).................... 14

*Samuels v. Medytox Solutions, Inc.*, 2014 WL 1441943 , No. 13-7212,
(D.N.J. Sept. 8, 2014)................................................................................... 12

*Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*,
2011 WL 900096 (D.N.J. Mar. 15, 2011).....................................29, 30, 31

*Song Fi, Inc. v. Google Inc.*,
2014 WL 5472794 (D.D.C. 2014) .............................................................. 14

*Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93 (2d Cir. 2010) .......................*passim*

*Tradecomet.com LLC v. Google, Inc.*,  693 F. Supp.2d 370 (S.D.N.Y.
2010)............................................................................................................. 14

*Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*,
140 F.3d 478 (3d Cir. 1998)........................................................................ 15

*Warth v. Seldin*, 422 U.S. 490 (1975) ............................................................... 15

*WeBoost Media S.R.L. v. LookSmart Ltd.*,
2014 WL 824297 (N.D. Cal. 2014) ............................................................ 38

*Wexco Ind. v. ADM21 Co., Ltd.*, 2008 WL 5427867
(D.N.J. 2008)........................................................................................... 34, 35

*Zango, Inc. v. Kaspersky Lab, Inc.*, 2007 WL 5189857 (W.D. Wash. 2007)..............................................................................30

*Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169 (9th Cir. 2009) ............28, 31

*Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997)....................................31

## State Cases

*Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557 (D.N.J. 2002) ..........................................................38

*Caspi v. Microsoft Network, LLC,* 323 N.J. Super. 118 (App. Div. 1999)........14

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P. 2d 740 (CA 1995) ....34

*E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 307 N.J.Super. 546 (Ch.Div.1996) ......................................................34

*Korea Supply Co. v. Lockheed Martin Corp.*, 63 P. 3d 937 (Cal. 2003)..............................................................................34, 37

*Nostrame v. Santiago*, 213 N.J. 109 (2013) ................................................34, 36

*Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739 (1989) ......................................................................................33, 37

*Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297 (2002)..........................................................................38

## STATUTES AND RULES

15 U.S.C. § 1114(1)...............................................................................27

15 U.S.C. § 1115(b)(4) ..........................................................................22

28 U.S.C. § 1404(a)............................................................................1, 12

47 U.S.C. § 230 ....................................................................................28

47 U.S.C. § 230(c)(2) ...........................................................................29

47 U.S.C. § 230(c )(2)(A)..............................................................*passim*

47 U.S.C. § 230(f)(2)............................................................................29

Fed. R. Civ. P. 12(b)(6) .....................................................................1, 15

## PRELIMINARY STATEMENT

Defendant Google Inc. ("Google") respectfully submits this memorandum of law in support of its motion (i) to transfer this case to the Northern District of California under 28 U.S.C. § 1404(a) based on the mandatory forum selection clause in the underlying Developer Distribution Agreement ("DDA") between Google and plaintiff Spy Phone Labs, LLC ("Plaintiff"); or, alternatively, (ii) to dismiss the Amended Complaint pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

This action arises from Plaintiff's DDA with Google pursuant to which it distributed applications ("apps") for mobile devices through a digital distribution platform known as Google Play. Plaintiff alleges that other app developers – one newly named defendant and various "John Does" (collectively, the "Individual Defendants") – distributed apps on Google Play that allegedly infringed Plaintiff's registered trademark, SPY PHONE. Plaintiff asserts claims of trademark infringement and tortious interference with prospective economic advantage against the Individual Defendants and, as against Google, contributory infringement and tortious interference with prospective economic advantage.

Because the unambiguous mandatory forum selection clause in the DDA requires that Plaintiff's claims be litigated exclusively in the courts in Santa Clara County, California, this action must be transferred to the Northern District of

California pursuant to 28 U.S.C. § 1404(a). Nevertheless, if this Court retains the action, Plaintiff's claims should be dismissed because Plaintiff has failed to state any claim against Google as a matter of law.

*Contributory Trademark Infringement.* Plaintiff fails to plead a viable claim for contributory infringement because Plaintiff has not alleged that Google either (i) intentionally induced another to infringe Plaintiff's trademark, or (ii) had the requisite specific knowledge of infringing activity required to impose liability. Plaintiff alleges at most that Google may have had general knowledge of allegedly infringing activity on Google Play and not the type of specific knowledge required to impose contributory infringement liability upon an online service provider. Furthermore, although Plaintiff claims that it identified multiple apps on Google Play that allegedly infringed its mark, Plaintiff admits that despite Google having responded to, and taken action with respect to, specific claims of alleged trademark infringement, Plaintiff later chose not to report additional alleged infringements to Google via Google's trademark complaint process.

*Tortious Interference.* Plaintiff's tortious interference claim is premised upon Google's suspension of Plaintiff's count and removal of its Spy Phone app from the Google Play online marketplace for violations of Play policies and the DDA. As such, the claim falls within Section 230(c)(2)(A) of the Communications Decency Act ("CDA"), 47 U.S.C. § 230(c)(2)(A), which affords Google statutory

immunity from Plaintiff's state law tort claims that are founded on Google's decision to restrict access to certain content. Apart from Google's CDA immunity, Plaintiff's claim also fails because Plaintiff has not pled facts sufficient to allege tortious interference with prospective economic advantage. Plaintiff has not alleged that Google acted with the requisite "malice" in removing Plaintiff's app, terminating and suspending Plaintiff's account, and allegedly failing to remove other developers' apps. All this challenged conduct is within Google's rights under the DDA and as such, pursuant to New Jersey's economic loss doctrine cannot be the basis of a tort claim independent of the contract.

Furthermore, by simply exercising its contract rights, Google has not acted wrongfully or without justification; indeed, Plaintiff does not claim that Google even breached the DDA. Nor has Plaintiff alleged that Google knew of the alleged prospective economic advantage — that Plaintiff would lose ancillary advertising revenue from its independent website if fewer consumers downloaded Plaintiff's app. Indeed, such claim for damages is further barred by the liability limitations clause in the DDA, which precludes any claims for lost profits or consequential damages. As such, the Complaint fails to state a claim for tortious interference.

Accordingly, if not transferred to the Northern District of California, Plaintiff's claims against Google should be dismissed with prejudice.

3

# FACTS

### A.    The Parties

Plaintiff allegedly owns the registered trademark SPY PHONE[1] and developed an app ("Plaintiff's App") for free download to mobile phones that use the Android operating system. (AC[2] ¶¶29,32,37) When installed on a mobile phone, Plaintiff's App allows the user or an authorized third party to obtain extensive information about the phone's usage, including the phone's location, the phone number of the sender or recipient of incoming and outgoing messages, and Internet usage. (AC ¶33) Plaintiff allegedly generates revenue from Plaintiff's App through advertisements placed on its website, which is located at <spyphone.com>. (AC ¶37)[3]

Google owns Google Play, a digital distribution platform for developers that serves as a marketplace for users to download apps to their Android devices. (AC

---

[1] Although not alleged in the Amended Complaint, Plaintiff is the purported assignee of those trademark rights, pursuant to a *nunc pro tunc* assignment dated October 20, 2014, and recorded with the U.S. Patent & Trademark Office on October 31, 2014. Google reserves its right to challenge the *bona fides* of this assignment, which states it is based on a 2012 "unwritten agreement." A certified copy of this recorded assignment is annexed as Exhibit B to the Declaration of Patricia M. Graham ("PG Decl."), submitted herewith.

[2] As used herein, "AC" refers to the Amended Complaint, which is Exhibit A to the PG Decl. "DDA" refers to the Developer Distribution Agreement, which is Exhibit A to the accompanying Declaration of Bryan Woodward ("BW Decl.").

[3] Plaintiff alleges that advertisements are placed on its website by third parties using Google's AdSense program, but the Amended Complaint does not allege any claim against Google relating to the AdSense service itself. (AC ¶¶37-39)

¶12; BW Decl., ¶3) End users can also post ratings of and comments about particular apps. (AC ¶¶13-14)

The Amended Complaint also alleges that the Individual Defendants one Andrei Ciuca ("Ciuca") and John Does 1-49 (the "Doe Defendants"), are app developers who have infringed on Plaintiff's trademark and/or interfered with Plaintiff's prospective business relations. (AC ¶¶-6) Although Plaintiff alleges that it complained to Google about the alleged conduct of these app developers, Plaintiff also contends that it does not know the names or legal capacities of the Doe Defendants. (AC ¶¶6,49)

**B.    Plaintiff Accepted the Terms of the Google Play DDA**

To distribute apps on Google Play, Plaintiff first had to create a Google Play developer account, pay a registration fee, and agree to the DDA (and the policies incorporated therein). (BW Decl., ¶8(b)) To complete registration, Plaintiff was required (1) to acknowledge that it had agreed to the DDA by clicking a box below the window displaying the DDA and (2) confirm that it agreed to the DDA by clicking a hyperlink at the bottom of the page. (BW Decl., ¶8(d)) On August 1, 2012, Plaintiff completed its Google Play registration, having electronically "clicked" that it agreed to and accepted the terms of the DDA. (BW Decl., ¶¶8-9) Plaintiff published its first app on Google Play on August 13, 2012, which it could not have done unless it had accepted the DDA. (BW Decl., ¶9) The DDA makes

clear that Plaintiff's relationship to Google is contractual:

> This [DDA] <u>forms a legally binding contract between you and Google in relation to your use of the Market to distribute Products.</u> In order to use the Market to distribute Products, you must first agree to this [DDA] by clicking to accept where this option is made available to you.  You may not distribute products on the market if you do not accept this Agreement.

(DDA, §2.1[emphasis added]) Section 7.2 of the DDA authorizes Google, in its

sole discretion, to remove apps (referred to as "Products") from Google Play for

several reasons, including if Google deems a Product to be spyware:

> **Google Takedowns.**  <u>While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features:</u> (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized Carriers; (f) is deemed by Google to have a virus or is <u>deemed to be malware, spyware or have an adverse impact on Google's or an Authorized Carrier's network;</u> (g) <u>violates the terms of this [DDA] or the Developer Program Policies for Developers;....Google may remove the Product from the Market or reclassify the product at its sole discretion.  Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.</u>

(DDA, §7.2 [emphasis added]) Plaintiff admits that the DDA also incorporates by

reference Google's Developer Program Policies and Google's Privacy Policy. (AC

¶20; DDA, §§4.11,9.2;)

The DDA also includes an exclusive California choice of law provision and

forum selection clause:

> This [DDA], and your relationship with Google under this [DDA] shall be governed by the laws of the State of California without regard to conflict of laws provisions. <u>You and Google agree to submit to the exclusive jurisdiction of the courts located within the county of Santa Clara, California to resolve any legal matter arising from this [DDA]</u>. Notwithstanding this, you agree that Google shall still be allowed to apply for injunctive remedies (or an equivalent type of urgent legal relief) in any jurisdiction.

(DDA, §15.7 [emphasis added])

## C.     Google Acted on Plaintiff's Trademark Complaints

In or about November 2012, Plaintiff discovered that other developers, including some of the Individual Defendants, offered apps on Google Play "that copied or incorporated Plaintiff's SPY PHONE trademark and that performed the same or similar functions as Plaintiff's App." (AC ¶48) Using Google Play's online form, Plaintiff submitted trademark complaints to Google respecting such developers. (AC ¶49) If an app were suspended from Google Play based on an infringement complaint, Google would notify the allegedly infringing developer, stating why its app had been removed and providing the name and address of the complainant. (AC ¶50)Accordingly, when Google removed the allegedly infringing apps from Google Play, Ciuca and other app developers would have been notified that Plaintiff had submitted trademark infringement complaints against them. (AC ¶54-55, 64)

Plaintiff admits that from November 2012 through May 2013, in response to

7

Plaintiff's trademark complaints, Google removed apps listed on Google Play by other developers. (AC ¶51) In June 2013, in response to a specific trademark complaint by Plaintiff, Google allegedly also removed an app listed by defendant Ciuca. (AC ¶54) In only one instance in June 2013 did Google allegedly respond to a specific trademark complaint submitted by Plaintiff by refusing to remove an app called "Reptilicus.net Brutal Spy Phone," based on Google's alleged notification to Plaintiff that it was "not in a position to mediate trademark disputes between developers and trademark owners. As a courtesy we have considered your claim, but are unable to determine its merits at this time." (AC ¶¶58-59)  Plaintiff does not allege that it again filed any further trademark complaints with Google.

## D.   Google Terminated, and Later Reinstated, Plaintiff's Account

On June 28, 2013, Google notified Plaintiff that the SPY PHONE app had been removed from Google Play and Plaintiff's developer account had been terminated. (AC ¶60) Plaintiff was advised that the app had been removed because "it violated Google's 'spyware' policy." (AC ¶61) Plaintiff alleges the suspension was the result of false third party complaints submitted to Google about Plaintiff's app were submitted by one or more of the Individual Defendants to Google. (AC ¶¶63-64)

Plaintiff appealed Google's decision to remove its app and terminate its Google Play account. (AC ¶68) Google denied the appeal and initially did not

reinstate Plaintiff's developer account. (AC ¶69) After discussions with Plaintiff's representatives and after Plaintiff made changes to the app consistent with Google's policies, Google informed Plaintiff that its violation of certain aspects of Google Play's spyware policy had been addressed, but that Plaintiff's developer account could be reinstated only if Plaintiff stopped using the name SPY PHONE to identify Plaintiff's App. (AC ¶¶72-73) Google advised:

> While providing additional disclosure in the app description and regular notification to targeted phones are crucial steps to accomplishing policy compliance, the Google Play Team believes the app is still in violation of policy because of the app's title. App titles should not be misleading or represent the product as being spyware and/or capable of surreptitious tracking.[4] (AC ¶73)

Plaintiff alleges that Google stated that developers would thereafter be prohibited from using the word "spy" in the title of their apps listed on Google Play. (AC ¶75) Based upon these alleged discussions, Plaintiff agreed to change the name of its app to "Phone Tracker" and Plaintiff's account was reinstated in October 2013. (AC ¶¶76-78)

## E.   Plaintiff Submitted Complaints of Alleged Policy Violations

Plaintiff alleges that after its account was reinstated, the number of downloads of Plaintiff's App declined, resulting in a reduction in Plaintiff's advertising revenue through its separate website located at spyphone.com. (AC ¶¶39,79-80) While Plaintiff alleges that "dozens and dozens" of parental

---

[4] The Complaint does not attach a copy of this alleged communication.

monitoring and "other" apps continued to use names that contained "spy," only "several" apps contained Plaintiff's actual trademark, and Plaintiff refers to only two specific apps that included the words "spy phone" in their names. (AC ¶¶81-84)  Plaintiff alleges that due to the "ease with which" Google could monitor Google Play content, Google must have known (or was willfully blind to the fact) that other developers, including the Individual Defendants, continued to use Google Play to distribute apps that infringed on Plaintiff's SPY PHONE trademark. (AC ¶86)

In or about January 2014, Plaintiff began submitting complaints about other developers' apps that contained the word "spy" in their names and competed with Plaintiff. (AC ¶89) Plaintiff admits, however, that these were not trademark complaints like those that Google had acted on previously; instead, Plaintiff submitted complaints of alleged spyware policy violations that did not require that Plaintiff's identity be revealed. (AC ¶90) The DDA, however, expressly provides that Google does not undertake an obligation to monitor the content of Google Play. (DDA §7.2).

## F.   Google Suspended Plaintiff's Account

In early July 2014, Plaintiff's representative allegedly submitted a spyware complaint to Google concerning Individual Defendant Ciuca. (AC ¶91-92) On or about July 16, 2014, Google notified Plaintiff that its developer account had been

suspended for violation of Google's spam policy and Plaintiff's Phone Tracker app was removed from Google Play. (AC ¶93)  Plaintiff alleges that this suspension was precipitated by complaints that Google received from Ciuca and/or other Google Play developers and that Google knew or should have known that the complaints were false or fraudulent. (AC ¶96) Plaintiff alleges that after its account was suspended, Ciuca listed an app containing the name "Spy Phone," although Plaintiff does not allege that it filed any trademark complaint with Google in connection with such app. (AC ¶¶98-99)

Approximately 30 days later, Plaintiff allegedly received an anonymous letter purportedly from "'a concerned' member" of the Google Play team. (AC ¶103) The letter, which is <u>not</u> attached to the Complaint, allegedly states that "there was no real justification" for either the 2013 or 2014 suspensions of Plaintiff's developer account, that those actions were intended to punish Plaintiff, and that the prohibition on the use of the word "spy" in an app name was being enforced only against Plaintiff. (AC ¶¶104-105) The anonymous letter also allegedly states that unidentified Google employees, who either developed their own apps or helped other developers with apps listed on Google Play, "had orchestrated" the removal of Plaintiff's App. (AC ¶106)

Google Play allegedly continues to offer apps that infringe on Plaintiff's trademark. (AC ¶¶116-20) The Amended Complaint does not allege that Plaintiff

submitted any more trademark infringement complaints to Google.[5]

## ARGUMENT

## POINT I

## THE DDA'S FORUM SELECTION CLAUSE REQUIRES TRANSFER OF PLAINTIFF'S CLAIMS AGAINST GOOGLE

A court should transfer a case to any other district where venue is proper "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. §1404(a); *see Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Tex.*, 134 S. Ct. 568 (2013); *Samuels v. Medytox Solutions, Inc.*, 2014 WL 4441943 (D.N.J. 2014). But as explained in *Samuels*, the existence of an agreed-upon exclusive forum selection clause changes the traditional Section 1404(a) analysis such that forum-selection clauses should almost always control irrespective of the parties' private interests:

> . . In *Atlantic Marine*, [134 S.Ct. 568], the Court found that the existence of such a [forum selection] clause "requires district courts to adjust their usual § 1404(a) analysis in three ways," two of which are relevant to this motion. *Id.* at 581. As for the first of these adjustments, the Court directed that the plaintiff's choice of forum be given no weight. *Id.* Instead, the Court argued, the burden shifts to the plaintiff to demonstrate "that transfer to the forum for which the

---

[5] Plaintiff alleges that as of the date of the amended complaint, an app named "SpyPhone 1.0" (AC ¶120) appeared on Google Play. Plaintiff does not allege it submitted a specific trademark complaint about the app — and it did not. But, Google nonetheless removed that app from Google Play on or about February 17, 2015, along with its newer version "SpyPhone 2.0" in response to the allegations in the amended complaint.

parties bargained is unwarranted." *Id.* In so holding, the Court reasoned that a bargained-for forum selection clause represents the plaintiff's exercise of "its 'venue privilege' before a dispute arises," and, therefore, "[o]nly that initial choice deserves deference." *Id.* at 582. Second, the Court required that the parties' private interests be completely disregarded when considering a § 1404(a) transfer motion based on a forum selection clause. <u>The Court viewed the parties' agreement as a waiver of "the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation."</u> *Id.* Therefore, only the public interest factors are relevant in the presence of a forum selection clause, and <u>since "those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."</u> *Id.*

2014 WL 4441943, at *4 (emphasis added). *See also Atlantic Marine*, 134 S. Ct. at 568 ("a proper application of § 1404(a) requires that a forum selection clause be 'given controlling weight in all but the most exceptional cases.'" (*Quotes omitted*).

"[A] forum selection clause is presumptively valid and enforceable." *Dillon v. Ski Shawnee, Inc.*, 2014 WL 3900877, at *3 (D.N.J. 2014) (enforcing forum selection clause against personal injury plaintiff and transferring action to the Middle District of Pennsylvania). That presumption can be rebutted only by "a clear showing that (i) [the clause] is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum or (3) that enforcement in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." *Id.* The party challenging the forum selection clause bears the burden of showing that the clause is unenforceable. *Hoffer v. InfoSpace.com, Inc.,* 102 F. Supp. 2d 556, 567-68

13

(D.N.J. 2000) (enforcing forum selection clause and transferring action to Western District of Washington). *See also Dawes v. Publish Am. LLP*, 563 Fed. Appx. 117, 118 n.3 (3d Cir. 2014) ("If the forum selection clause was mandatory, plaintiff would be entitled to a presumption of enforceability.").

Many courts in this Circuit and other jurisdictions have upheld forum selection clauses in online "click-wrap" agreements where, as here, the contracting party affirmatively accepted the online contract terms. *See, e.g., Evans v. Linden Research, Inc.*, 763 F. Supp. 2d 735, 740 (E.D. Pa. 2011) (enforcing forum selection clause in online terms of service agreement); *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 238 (E.D. Pa. 2007) (upholding forum selection clause included in online agreement after the plaintiff clicked his assent to all the terms); *Caspi v. Microsoft Network, LLC*, 323 N.J. Super. 118, 122 (App. Div. 1999) (enforcing forum selection clause in Microsoft online subscriber agreement).[6]

Here, the forum selection clause in the DDA unambiguously requires that

---

[6] *See also Rudgayzer v. Google, Inc.*, 986 F. Supp. 2d 151, 156-57 (E.D.N.Y. 2013) (enforcing forum selection clause in Google clickwrap agreement, noting that forum selection clauses in such agreements are "reasonably communicated"); *Tradecomet.com LLC v. Google, Inc.*, 693 F. Supp. 2d 370, 376 (S.D.N.Y. 2010), *aff'd in part*, 647 F.3d 472 (2d Cir.), *aff'd in part*, 435 Fed. Appx. 31 (2d Cir. 2011) (upholding forum selection clause in Google AdWords online agreement); *Song Fi, Inc. v. Google Inc.*, 2014 WL 547294, at *6 (D.D.C. 2014) (YouTube's forum selection clause not unconscionable under D.C. law; presumption in favor of forum selection clauses includes those in non-negotiated boilerplate contracts) *Leong v. MySpace, Inc.*, 2011WL 7808208, at *4-5 (C.D. Cal. 2011) (forum selection clause embedded within a "click-wrap" contract is enforceable).

this dispute be litigated in the courts located in Santa Clara County, California, which include the District Court for the Northern District of California.[7]  The DDA provides: "You and Google agree to submit to the exclusive jurisdiction of the courts located within the county of Santa Clara, California to resolve any legal matter arising from this [DDA]." (DDA, §15.7)

There are no extraordinary circumstances or any policy reasons to deny Google the benefit of the agreed-upon forum.  To the contrary, the parties' contractual relationship is governed by California law and, when Plaintiff accepted the DDA it had notice of the forum selection clause, which unambiguously requires that all disputes involving Plaintiff's "relationship with Google" through the DDA be litigated in California.  Indeed, Plaintiff is a merchant that apparently conducts business internationally; it has alleged no reason why it cannot press its claims in the Northern District of California.

**POINT II**

**RULE 12(b)(6) STANDARD OF REVIEW**

On a Rule 12(b)(6) motion to dismiss, the Court must take all allegations in the Complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir. 1998).  "A plaintiff's

---

[7]  *See* www.cand.uscourts.gov/about ("Today the boundaries of the Northern District of California encompasses fifteen counties:…Santa Clara….").

obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, the factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, such that it is "plausible on its face." *Id.* at 570. Those allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) *(cites omitted)*. While "[t]he plausibility standard is not akin to a 'probability requirement'... it asks for more than a sheer possibility." *Id.*

Applying these standards, the Complaint fails to state a claim against Google as a matter of law for either contributory trademark infringement or tortious interference with prospective economic advantage.  Therefore, Counts II and III of the Complaint should be dismissed in their entirety.

## POINT III

### PLAINTIFF'S CLAIM FOR CONTRIBUTORY TRADEMARK INFRINGEMENT SHOULD BE DISMISSED

Plaintiff's claim against Google for contributory trademark infringement should be dismissed as a matter of law. Under the standard established by the Supreme Court in *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 854 (1982), Google, acting in its capacity as an online service provider, is not alleged to have "intentionally induce[d] another to infringe a trademark," and the alleged facts fail

to state a claim that Google "continue[d] to supply its product to one whom it knows or has reason to know is engaging in trademark infringement."  As the Second Circuit made clear in its seminal opinion in *Tiffany (NJ), Inc. v eBay, Inc.*, 600 F.3d 93, 105 (2d Cir. 2010), in the unique context of an online marketplace, where the provision of an online service platform is analogous to the *Inwood Labs'* "product," "[f]or contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." 600 F.3d at 107 (emphasis added).

Although the Third Circuit has not yet opined on this issue in the context of an online marketplace, Google respectfully urges this Court to apply the Second Circuit's *Tiffany* rationale in this case where Plaintiff admits in its Amended Complaint that (i) Google in fact responded to every specific trademark complaint that Plaintiff submitted to Google and removed those apps listed in the Google Play store (with one exception discussed below, where Google responded that it would not remove one app because it could not determine if it was infringing), and (ii) Plaintiff nonetheless thereafter elected voluntarily not to use Google's trademark complaint reporting process to report other allegedly infringing apps. (AC ¶¶49,51,58-59,90).

Secondary liability for trademark infringement was first recognized by the Supreme Court in *Inwood Labs*.   Inwood Labs., Inc. and other petitioners manufactured generic versions of an off-patent competitive drug (cyclandelate) made by Ives Laboratories, Inc.  Ives had branded its drug with its own registered trademark.   Ives' contributory infringement claim was based on petitioners' distribution of their generic drugs to pharmacists, some of whom then mislabeled consumer prescriptions for the generic drugs using Ives' registered trademark. 456 U.S. at 850-51. The Court emphasized that "whether these petitioners were liable for the pharmacists' infringing acts depended upon whether, in fact, the petitioners intentionally induced the pharmacists to mislabel generic drugs or, in fact, continued to supply cyclandelate to pharmacists whom the petitioners knew were mislabeling generic drugs." *Id.* at 855 (emphasis added). Liability under the Lanham Act may be imposed only where a "distributor intentionally induces another to infringe a trademark, or…continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement…." *Id.* at 854.

In the unique context of an Internet marketplace, the Second Circuit applied *Inwood Labs* in *Tiffany*, refusing to hold eBay liable for contributory trademark infringement for extensive third-party listings of counterfeit Tiffany merchandise on eBay's auction site. The Second Circuit noted that eBay undertook meaningful efforts to prevent sales of counterfeit Tiffany goods, emphasizing that every time

eBay received a complaint on a specific seller of counterfeits, that seller's listing was removed. *Id.* at 109.   Nevertheless, Tiffany had argued that eBay was a contributory infringer because it "continued to supply its services to the sellers of counterfeit Tiffany goods while knowing or having reason to know that such sellers were infringing Tiffany's mark." 600 F. 3d at 106. The Court expressly rejected this argument, holding that "[f]or contributory trademark infringement liability to lie, <u>a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary.</u>" *Id.* at 107 (emphasis added).

Tiffany alleged that eBay's online marketplace was being used continuously by others to sell counterfeit Tiffany merchandise. eBay utilized a "notice-and-takedown system" called VeRO that allowed verified "owners of intellectual property rights, including Tiffany, to 'report to eBay any listing offering potentially infringing items, so that eBay could remove [them].'...Any such rights-holder with a 'good-faith belief that [a particular listed] item infringed on a copyright or a trademark' could report the item to eBay, using a ["NOCI"] form.'" *Id.* at 99. Whenever Tiffany had submitted a NOCI to eBay, eBay removed the reported listing. *Id.* Notably, while eBay also suspended seller accounts that were used solely to sell counterfeit goods, it did not initially suspend accounts of sellers

19

of infringing products if such sellers otherwise were legitimate. *Id.* at 100. Despite "thousands" of NOCIs submitted by Tiffany and acted on by eBay, Tiffany nevertheless argued that eBay was liable for contributory trademark infringement because "eBay knew, or at least had reason to know, that counterfeit Tiffany goods were being sold ubiquitously on its website." *Id.* at 106.

Faced with a case of first impression involving an online marketplace,[8] the Second Circuit applied the *Inwood Labs* test for contributory trademark infringement. As Tiffany did not argue that eBay had intentionally induced others to infringe, the Court assessed the second prong of the *Inwood Labs'* test based on Tiffany's argument that eBay continued to provide sellers of counterfeits access to eBay "while knowing or having reason to know that such sellers were infringing

---

[8] The Court noted that the Ninth Circuit previously had addressed contributory trademark infringement in the context of an Internet service, but not a marketplace, in *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980 (9th Cir. 1999)."[T]he Ninth Circuit held that *Inwood*'s test for contributory trademark infringement applies to a service provider who exercises sufficient control over the infringing conduct." 600 F.3d at 104. In *Lockheed*, the Court nevertheless refused to find Network Solutions ("NS") — an Internet service provider that registered domain name combinations—liable for contributory trademark infringement based on third parties having registered domain names that infringed Lockheed's trademark. 194 F.3d at 984-85. In particular, the Court noted that while NS provided this service and earned fees from domain registrants, it "does not supply the domain-name combination any more than the Postal Service supplies a street address by performing the routine service of routing mail." *Id.* at 985. The Ninth Circuit also cautioned that NS' service did "not entail the kind of direct control and monitoring required to justify an extension of the 'supplies a product' requirement" and that "[s]uch a stretch would reach well beyond the contemplation of *Inwood Labs* and its progeny." *Id.*

Tiffany's mark." *Id.*

The Second Circuit held that while eBay "clearly possessed general knowledge as to counterfeiting on its website," under *Inwood Labs*, such general knowledge is insufficient to impose contributory liability on a defendant. *Id.* at 107. Rather, consistent with *Inwood Labs*, to impose such liability it must be shown that a defendant continued to supply its services, in the case of eBay, "to <u>one</u> whom it knows or has reason to know is engaging in trademark infringement." *Id.* (emphasis in original). The Court held that "[f]or contributory trademark infringement liability to lie, a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is necessary." *Id.* at 109.

Significantly, the Second Circuit emphasized that Tiffany's demand letters to eBay and other actions it took "did not identify particular sellers who Tiffany thought were then offering or would offer counterfeit goods." *Id.* Where eBay did receive notice from Tiffany identifying *specific* acts of counterfeiting, eBay removed those listings. Tiffany therefore "failed to demonstrate that eBay was supplying its service to individuals who it knew or had reason to know were selling

counterfeit Tiffany goods." *Id.* at 109.[9] *See also Peek & Cloppenburg KG v. Revue, Inc.,* 2012 WL 4470556, at *5 (S.D.N.Y. 2012) (in the context of an online service that only hosts sales of allegedly infringing goods, *Tiffany* requires "a higher standard of awareness of the infringing activity" in recognition of "the difficulties that an online auction host has in ascertaining which Tiffany-branded products were authentic and which were counterfeit when Tiffany only made general allegations of counterfeiting.") (citing *Tiffany,* 600 F.3d 105–09).

Although Google did not ignore any *specific* trademark complaint submitted by Plaintiff and removed from Google Play all but a single third party app as to which Plaintiff submitted such complaints, Plaintiff nevertheless seeks to hold Google liable for alleged infringement of which it had no specific knowledge.[10]

---

[9] For the same reason, eBay was deemed not "willfully blind" to the counterfeit sales because "eBay did not ignore the information it was given about counterfeit sales on its website." *Id.* at 110. *Cf. Louis Vuitton Malletier v. Akanoc Solutions, S.A.,* 658 F.3d 936, 940-41 (9th Cir. 2011) (18 specific notices of infringement issued by Louis Vuitton to defendants, which hosted websites selling counterfeit goods, were completely ignored and no action was taken.)

[10] Google did not remove an app named "Reptilicus.net Brutal Spy Phone" because, as Google advised Plaintiff, it could not determine that it was infringing. (AC ¶¶58-59) Indeed, this name appears to use the words "Spy Phone" merely as a descriptor and not as a trademark, as opposed to the distinctive prefix "Reptilicus.net Brutal." *See* 15 U.S.C. § 1115(b)(4)(providing defense to a trademark infringement claim when "the use of the … term … charged to be infringement is a use, otherwise than as a mark…of a term … which is descriptive of and used fairly and in good faith only to describe the goods or services of such party…."). The Third Circuit also has held that descriptive terms "'describe a characteristic or ingredient of the article to which it refers.'… *Courts and commentators have recognized the difficulties of distinguishing between*

Plaintiff alleges that Google had a general right and ability to monitor and remove third-party apps from Google Play and had general knowledge that other apps being distributed through Google Play were using names that either were the same as or confusingly similar to the "Spy Phone" name.[11] Based on these alleged facts, Plaintiff's contributory infringement claim fails under the *Inwood Labs* and *Tiffany*.

First, this case is even more compelling than *Tiffany* in favor of Google. Tiffany had issued tens of thousands of notices to eBay respecting counterfeit goods,[12] whereas here Plaintiff only submitted a handful of specific trademark infringement complaints to Google, all of which were acted upon by Google.[13] Despite this sheer numerical difference, because eBay had responded to each

---

*suggestive, descriptive, and generic marks*." *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296-97 (3d Cir.1986) (emphasis added).

[11] The DDA expressly provides that Google "<u>does not undertake an obligation to monitor Products or their content</u>" but reserves the right in its discretion to remove content based upon *notification* that another app "violates the intellectual property rights or any other rights of a third party." (DDA, § 7.2(a)) (emphasis added).

[12] From 2003 to 2007, Tiffany sent eBay nearly 285,000 listings of goods that it believed in good faith to be counterfeit. *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d at 484,487 (S.D.N.Y. 2008); *aff'd in part, rev'd in part*, 600 F.3d 93 (2d Cir. 2010).

[13] Plaintiff acknowledges that "Google's developer policies and procedures further state that if Google is notified 'or otherwise becomes aware' that a developer is offering a product on Google Play [that] violates any of its developer policies, Google may remove the product from Google Play and reserves the right to suspend and/or bar the developer from Google Play." (AC ¶26) This policy makes clear that a rights owner must first provide specific notice to Google of allegedly infringing third-party content, before triggering any obligation on the part of Google to consider removal.

notice, it was not deemed to have legally sufficient notice of other alleged counterfeit goods for which no notice had been submitted and as to which eBay only had general knowledge. If Tiffany's many thousands of specific notices were not deemed legally sufficient to provide notice of other infringing activity or "red flag" knowledge," then certainly the handful of specific complaints submitted by Plaintiff that Google in fact acted upon cannot possibly create liability on the part of Google for other unidentified alleged infringing content.

Here, Plaintiff alleges that the instructions for using Google's trademark complaint form provide that "[i]f an app is removed from Google Play in response to a trademark complaint using Google's online form, the developer of the infringing app receives a notice from Google stating, among other things, why its app has been removed from Google Play, the identity of the trademark that has been infringed and the name and email address of the person who filed the infringement complaint." (AC ¶50) Plaintiff admits that Google removed the apps as to which Plaintiff provided specific notice of alleged infringement using the online complaint process; only one app was not removed for valid reasons communicated to Plaintiff. (AC ¶51; *supra,* note 13)[14]

_____

[14] To the extent Plaintiff claims Google did not completely suspend accounts of alleged infringers as to whom Plaintiff issued specific trademark complaints (*see* AC ¶136), the Amended Complaint fails to allege that Plaintiff gave any specific notice to Google of any such *repeat* trademark infringer, whose account Google might have suspended under the DDA. (DDA §7.2) Nor does the Amended

Plaintiff alleges that subsequently "dozens and dozens of other developers, including Ciuca and the Doe Defendants, were permitted to list parental monitoring and other apps on Google Play containing the word 'spy' in the name." (AC ¶81) But Plaintiff admits that it elected voluntarily not to submit any further trademark complaints and instead submitted alternative "spyware" complaints against these third party developers. (AC ¶90) Plaintiff readily admits it did this to avoid having its true identity disclosed to third party developers about whom it alleged  trademark infringement: "Instead of submitting trademark infringement complaints against those apps, however, which could result in Google revealing Plaintiff's identity to the developer against whom the complaint was made, Plaintiff's complaints asserted violations of Google's anti-spyware policy…., which could be submitted without Google revealing the complainant's identity to the other developer." (AC ¶90) Plaintiff's spyware complaints did not reference any trademark claims.

Plaintiff's intentional decision not to use Google's admittedly effective trademark complaint process should in itself bar Plaintiff's claim against Google, which otherwise had responded to Plaintiff's specific trademark complaints. As the *Tiffany* Court emphasized, *Inwood*'s standard as applied to an online marketplace

---

Complaint allege that any particular developer used Google Play solely to post infringing apps. This is further analogous to *Tiffany* where eBay also did not initially suspend accounts of otherwise legitimate sellers, as opposed to sellers who used its platform solely to sell counterfeit goods.

requires that a defendant have non-general knowledge of specific infringing third party content before liability can attach. *Tiffany*, 60 F. 3d at 109 ("Tiffany's demand letters and Buying Programs did not identify particular sellers who Tiffany thought were then offering or would offer counterfeit goods."). It would be irrational and contrary to the very policy underlying *Tiffany* — to encourage online service providers to establish reasonable processes for receiving and acting on legitimate infringement complaints from trademark rights owners — to impose liability on Google, or any other provider similarly situated, where a rights owner intentionally elects not to use that very process.

Second, a determination of trademark infringement requires a finding of likelihood of confusion, which is based on an assessment of multiple factors. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) (applying a ten-factor test); *Accord Checkpoint Sys., Inc. v. Check Point Software Techs, Inc.*, 269 F. 3d 270, 280 (3d Cir. 2001) ("[n]one of these factors is determinative in the likelihood of confusion analysis and each factor must be weighed and balanced one against the other."). To place any online service provider in the position of having to conduct its own multi-factor infringement test, a task challenging enough for courts, would be untenable, particularly here where there are no "counterfeit" products in issue and likelihood of confusion tests must be applied by courts

themselves on a case-by-case basis.[15] Requiring rights owners to file specific trademark complaints with Google about other apps therefore provides good faith grounds for Google to consider removal of those apps, especially where common words like "spy" and "phone" also can be used in a merely descriptive, non-trademark, manner. Requiring a trademark claimant to identify itself by name further provides others with an effective means of challenging the complaining party's allegations, including ownership of a mark.[16] For the same reasons, Plaintiff's allegation that Google had "red flag knowledge" of alleged infringements also fails because, as in *eBay*, Google did not ignore and responded to every specific trademark infringement complaint Plaintiff submitted.

Plaintiff cannot now use as a sword against Google its decision to not use

---

[15] No allegation of counterfeiting appears in the Amended Complaint. Instead, Plaintiff claims direct and contributory infringement tied to likelihood of confusion, not counterfeiting, where other developers are alleged to have used marks confusingly similar to, or the same as, Plaintiff's "Spy Phone" mark for similar or competing products.  (AC ¶125) ("The acts of Ciuca and the Doe Defendants ... infringe on Plaintiff's federally registered SPY PHONE® trademark in violation of § 43(a) of Lanham Act, 15 U.S.C. § 1114(a)"). Section 43(a) of the Lanham Act is reserved for claims of infringement of *unregistered* marks, whereas Section 32(1), 15 U.S.C. § 1114(1), covers counterfeits.

[16] Indeed, in this case, at all times relevant to the specific events pleaded in the Amended Complaint, Plaintiff was not the record owner of the SPY PHONE federal trademark registration. USPTO records confirm that Plaintiff recorded a "*nunc pro tunc*" assignment of that registration from another entity on October 31, 2014, after this case was filed, with an October 20, 2014 execution date. (PG Decl. Ex. B) Thus, each time Plaintiff submitted a specific trademark complaint to Google, it was not even the record owner of that registration. *See* 15 U.S.C. § 1114(1) (claims for infringement of a registered mark are limited under the Lanham Act to an action by the "registrant.").

Google's trademark complaint process. Shifting the legal obligation of assessing potentially infringing apps to Google in the context of an enormous Android app online distribution store, in the absence of a requirement for rights owners to submit complaints of specifically infringing content, would impose an unreasonable burden on Google and other online providers, and run afoul of the principles set forth in *Inwood Labs* and *Tiffany*. Accordingly, based on the facts alleged in the Amended Complaint, Plaintiff cannot sustain its burden of proving contributory infringement against Google as a matter of law and that cause of action must be dismissed.

## POINT IV

## PLAINTIFF'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE SHOULD BE DISMISSED

### A.    The Claim Is Barred Under Section 230 of the CDA

The CDA immunizes Google from Plaintiff's tortious interference with prospective economic advantage claim, which is grounded in Google's decisions to remove content on its online Google Play marketplace.[17] Section 230(c)(2)(A) grants civil immunity for blocking and screening certain content and provides:

---

[17] Courts have granted Section 230 immunity to bar state law claims of tortious interference with prospective economic advantage. *See, e.g., Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177-78 (9th Cir. 2009); *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609-10 (N.D. Ill. 2008); *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452-53 (E.D.N.Y. 2004); *Holomaxx Techs. v. Yahoo!, Inc.*, 2011 WL 865794, at *4-5 (N.D. Cal. 2011).

> No provider or user of an interactive computer service shall be held liable on account of…any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A). Thus, to assert this prong of the CDA, a movant must qualify as a provider of an "interactive computer service"; have voluntarily blocked or filtered material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable"; and have done so in "good faith." *Holomaxx*, 2011 WL 865794, at *4 (*quoting* 47 U.S.C. § 230(c)(2)(A)).

### 1.   Google Play is an "Interactive Computer Service"

The CDA defines  an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2).[18]  Google Play, an online distribution marketplace for Android apps, falls squarely within the definition. Numerous courts have held that analogous Google online platforms are interactive computer services under 47 U.S.C. § 230. *See, e.g., Parker v. Google, Inc.*, 422 F.Supp 2d 492, 501 (E.D. Pa. 2006), *aff'd*, 242 Fed. Appx. 833 (3d Cir. 2007); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007); *Jurin v.*

---

[18]Courts generally construe "interactive computer service" broadly to include various online platforms. *See Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*, 2011 WL 900096, at *4 (D.N.J. 2011); *see also Baztel v. Smith*, 333 F. 3d 1018, 1030 (9th Cir. 2003); *Carafano v. Metrosplash.com Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003).

*Google, Inc.*, 695 F. Supp. 2d 1117, 1122 (E.D. Cal. 2010); *Mmubango v. Google Inc.*, 2013 WL 664231, at \*2 (E.D. Pa. 2013).

### 2.    Google Blocked Material that Is "Objectionable"

Section 230(c)(2)(A) of the CDA permits a provider of an interactive computer service to block or filter content that the provider considers to be "obscene, lewd, lascivious, filthy, excessively violent, harassing, or *otherwise objectionable*." *Smith*, 2011 WL 900096, at \*5 (emphasis in original) (*quoting* 47 U.S.C. § 230(c)(2)(A)). Whether material is "objectionable" is consigned to the judgment of the online service provider, which need not demonstrate whether material is in fact "objectionable." *See id.* (*citing Zango, Inc. v. Kaspersky Lab, Inc.*, 2007 WL 5189857, at \*4 (W.D. Wash. 2007)). *See also e360Insight*, 546 F. Supp. 2d at 608 ("[S]ection 230 imposes a subjective element into the determination of whether a provider or user is immune from liability.") (*citing Zango*, 2007 WL 5189857, at \*4); *Holomaxx*, 2011 WL 865794, at \*5 (referring to the determination of what is objectionable as "subjective").

Based on the facts alleged in the Amended Complaint, Section 230(c)(2)(A) immunizes Google from liability for its blocking decisions regarding content (apps) it deemed objectionable. *See Langdon*, 474 F. Supp. 2d at 631 (finding immunity for Google, Yahoo and Microsoft's editorial discretion, which included screening and deleting "objectionable" content from their networks); *see also*

*Green v. Am. Online*, 318 F.3d. 465, 471 (3d. Cir. 2003) (*citing Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). Google is not liable as a matter of law for suspending Plaintiff's App from the Google Play store in response to the App's violations of specific Google policies and Google's own assessment of such violations, which are representative of content that Google believed to be "objectionable." *See Green*, 318 F.3d at 472 (stating Section 230(c)(2) allows providers of interactive computer services "to establish standards of decency without risking liability for doing so.") As alleged in the Amended Complaint, Google suspended Plaintiff's App in response to what it believed were violations of Google's "spam" policy, which prohibits the sending of electronic messages on behalf of users without their confirmation. (AC ¶¶ 24,93) *See Smith*, 2011 WL 900096, at \*5 ("Users or providers of an interactive computer service may determine that spam is material that is harassing or otherwise objectionable under Section 230(c)(2)(A)."); *see also e360Insight*, 546 F. Supp. 2d at 607-08 (finding unsolicited and bulk-emails may be viewed as objectionable). Plaintiff's App was also suspended due to a violation of Google's "spyware" policy, which prohibits apps that collect information without the user's knowledge. (AC ¶¶23,61) *See Zango*, 568 F.3d at 1174 (suggesting that analogous malware, which can retrieve personal information, is objectionable).

These actions were taken to remove "objectionable" material from the

Google Play marketplace, whether based on third party complaints or Google's own initiative. Even if Google did err as to whether Plaintiff's App was indeed objectionable under Google's policies, as Plaintiff alleges, immunity is still appropriate. *See e360Insight*, 546 F. Supp. 2d at 609 ("To force a provider...to litigate the question of whether what it blocked was or was not spam would render § 230(c)(2) nearly meaningless"); *see also Langdon*, 474 F. Supp. 2d at 630-31 (granting section 230(c)(2) immunity where Plaintiff argued defendants created "purported reasons for not running his ads.").

### 3.   Google Acted in Good Faith

To determine whether an interactive computer service blocked or filtered content in "good faith," courts look to the pleadings. *See, e.g. Smith*, 2011 WL 900096, at *8.[19] Plaintiff fails to plead specific facts to support any bad faith action by Google itself, and thus fails to overcome the CDA immunity because Google was forthcoming with "objectionable" conduct explanations for suspending Plaintiff's App from Google Play and requiring Plaintiff change the name of its app. *Cf. id.* at *8-9 (finding bad faith where an ISP ignored repeated requests for an

---

[19]Some courts place the burden on the plaintiff to plead an absence of good faith. *See Holomaxx*, 2011 WL 865794, at *5. ("[T]he appropriate question is whether [plaintiff] has pled an absence of good faith.") (*citing e360Insight*, 546 F. Supp. 2d at 609). At least one court has not required a provider of an interactive computer service to offer reasons for blocking or filtering content. *See, e.g., id.* (finding allegations that Yahoo! refused to discuss its reasoning for filtering content insufficient to plead an absence of good faith).

explanation why it blocked plaintiff's outgoing mail). Plaintiff admits that Google notified it of the reasons for removal of its app from Google Play. (AC ¶¶61,93) Moreover, Plaintiff's unsubstantiated assertion that Google's policies were only enforced against Plaintiff and not other apps on Google Play do not justify an inference of bad faith. *See e360Insight*, 546 F. Supp. 2d at 609-10 (granting immunity where plaintiff claimed he was being "singl[ed] out" because the defendant ISP allowed other companies to send bulk emails).

Accordingly, Section 230(c)(2)(A) of the CDA requires dismissal of Plaintiff's tortious interference with prospective economic advantage claim.

**B.   Plaintiff has Failed to State a Tortious Interference Claim**

Even if the CDA did not bar the claim, Plaintiff's claim of tortious interference with prospective economic advantage fails as a matter of law. The elements of that claim are well-settled: (1) the plaintiff must have a protectable right giving rise to a reasonable expectation of economic advantage, (2) the defendant must have been aware of the prospective economic advantage, (3) the defendant must have interfered intentionally and with malice, (4) there must be a reasonable probability that the plaintiff would have received the anticipated economic benefits, but for the defendant's interference, and (5) resulting damage. *Printing Mart-Morristown v. Sharp Elec. Corp.*, 116 N.J. 739, 751-52 (1989); *see also Wexco Indus. v. ADM21 Co.*, 2008 WL 5427867, at *7 (D.N.J. 2008); *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747, 771

(D.N.J. 1995); *accord Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 950 (Cal. 2003) (listing elements of claim), *citing Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 902 P. 2d 740, 748 (CA 1995).

In this context, "malice" is defined to mean that the harm was inflicted intentionally and without justifiable excuse. *Printing Mart*, 116 N.J. at 751.[20] The test is whether the defendant "had the right to perform the act or set of actions that gave rise to the lawsuit." *Wexco*, 2008 WL 5427867, at *8. "Tort liability for interference with prospective economic benefit arises when the conduct of the defendant is not in the reasonable exercise of an equal or superior right." *Id (*quote omitted). "[O]ur courts have concluded that 'violence, fraud, intimidation, misrepresentation, criminal or civil threats, and/or violations of the law' are among the kinds of conduct that would be considered to be 'wrongful means.'" *Nostrame v. Santiago*, 213 N.J. 109, 124 (2013), quoting *E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 307 N.J.Super. 546, 559 (Ch. Div.1996), *aff'd,* 307 N.J.Super. 438 (App. Div.1997). *see also Della Penna*, 902 P.2d at 751 (plaintiff must plead and prove that defendant's conduct was "wrongful by some legal measure other than the fact of the interference itself"); *Korea*, 63 P.3d at 953-54 ("The tort of intentional interference with prospective economic advantage is not intended to punish individuals or commercial entities for their commercial

---

[20] Notably, Plaintiff only alleges that the Individual Defendants acted "intentionally and without justification or excuse" but not Google. (AC ¶¶146-47)

relationships or their pursuit of commercial objectives….[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.")

Here, Google did nothing more than exercise its contract rights under the DDA — "superior" rights that cannot be the basis of a finding of malicious or tortious conduct. *Wexco*, 2008 WL 5427867, at *8. Indeed, Plaintiff's failure to plead a breach of contract claim highlights that Google acted within its contract rights under the DDA. Under the express terms of the DDA, Google, in "its sole discretion," is authorized to take down any app that Google has deemed to be spyware. (DDA §7.2(f))  Such spyware is also prohibited by Google's Developer Program Policies, which are incorporated into the DDA. (DDA §4.11; AC ¶¶20-21) Plaintiff's conclusory allegation that Google "knew that there was no real justification for either the removal of Plaintiff's App from Google Play or the termination of its developer account" is irrelevant. (AC ¶65) Google's actions were expressly permitted under the parties' contract and that, as a matter of law, precludes any tortious interference claim. For the same reason, Plaintiff's conclusory assertion that Google acted in "bad faith" is nothing more than "a formulaic recitation of the element[] of a cause of action" that does not meet the pleading standard of *Twombly*, 550 U.S. at 555.

Similarly, Google's alleged failure to remove allegedly infringing apps or to suspend other developers' accounts is completely within Google's "sole discretion" under the DDA. (DDA §7.2(f))  In choosing whether or not to suspend accounts, Google, therefore, could not have acted intentionally and with malice outside of its existing legal contract rights. Additionally, the DDA expressly provides that a violation of its terms (and the spyware and other policies incorporated by reference therein) is a ground for Google to terminate its contract with Plaintiff. (DDA §10.3(A)). Thus, Google's termination and subsequent suspension of Plaintiff's account also were completely within Google's rights under the DDA. Google's exercise of its contractual rights is not "wrongful conduct" and certainly cannot support Plaintiff's claim of tortious interference.

There are no allegations that Google acted wrongfully by doing anything that was not permitted by its contract, or that Google acted illegally, made misrepresentations to Plaintiff's customers or acted with deceit to somehow maliciously interfere with Plaintiff's customers (*i.e.*, consumers who could download Plaintiff's app for free). Plaintiff neither alleges that Google acted with "violence, fraud, intimidation,… criminal or civil threats, and/or [committed] violations of the law" or with any other kind of "wrongful means," *Nostrame*, 213 N.J. at 124 (citations omitted), nor that Google wrongfully "induced" any of Plaintiff's "customers" not to download its free app.

The alleged anonymous letter purportedly from a Google Play employee provides no factual basis for an allegation of the requisite malice or wrongful conduct.t That anonymous letter — which is not attached to the Amended Complaint — allegedly describes actions of unidentified Google employees who "orchestrated" the removal of Plaintiff's app from Google Play in order to further their own improper and plainly *ultra vires* activities. (AC ¶¶103-106) Even if these incredible "facts" are assumed to be true, they do not support any inference that Google as a corporate entity — as opposed to employees clearly acting outside their authority — committed any wrongful conduct. Moreover, there is no allegation in the Amended Complaint that such Google employees were corporate officers, had any legal right to bind Google, or that Google authorized such outrageous alleged conduct.

These alleged facts simply do not plead "malice," *i.e.*, that Google itself acted without justification or excuse, *Printing Mart*, 116 N.J. at 751, particularly when Google's alleged conduct was squarely within its rights under the DDA. For the same reason, these allegations do not plead that Google committed any wrongful act independent of the alleged interference itself. *Korea*, 63 P.3d at 953.

Plaintiff's tortious interference claim also runs afoul of the economic loss doctrine, which "prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." *Bracco Diagnostics, Inc. v.*

*Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002); *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297 (2002). Here, all the challenged conduct of Google falls within the parties 'contractual relationship and is governed by the DDA. As such, Plaintiff cannot do an end run around the terms of that contract by pleading his claim in the guise of tortious interference. *See Howmedica Osteonics Corp. v. Zimmer, Inc.*, 2012 WL 5554543, at *14 (D.N.J. 2012) ("Soliciting [Plaintiff's customers or employees] was a clear violation of the Individual Defendants' contracts with [Plaintiff], thus … the economic loss doctrine applies and the [tortious interference] claims are barred."); *Trico Equip., Inc. v. Manor*, 2011 WL 705703, at *4 (D.N.J. 2011) (dismissing tortious interference claim as barred by the economic loss doctrine). *See also WeBoost Media S.R.L. v. LookSmart Ltd.*, 2014 WL 824297, at *5 (N.D. Cal. Feb. 28, 2014) (dismissing tortious interference claim as barred by the economic loss doctrine where plaintiff "failed to allege any conduct that is independent from the promises the parties made during the course of their contractual relationship. . . .").

Nor has Plaintiff pled any recoverable damages on this claim. Plaintiff alleges that the "prospective customers" with whom Google allegedly interfered are the prospective customers who would have downloaded its app from Google Play. (AC ¶¶ 145-46). But, the Amended Complaint also alleges that those prospective customers would have downloaded Plaintiff's app for free. (AC ¶37)

38

Therefore Plaintiff could not have suffered any direct damages from the loss of such free downloads. Plaintiff seeks only consequential lost profits damages. (AC ¶115 ("Plaintiff's Internet visibility and profits have diminished….")) The alleged connection of those claimed damages to Google's allegedly "wrongful" conduct is tenuous at best. Plaintiff alleges that by suspending its Spy Phone app from Google Play — which Google was contractually entitled to do — fewer customers downloaded the free app, therefore fewer customers visited its website, in turn fewer customers clicked on advertisements on the website, and as a result Plaintiff lost revenue it would have received by virtue of the clicks.[21] (AC ¶¶39-41,79-80,147-48) Finally, the DDA expressly precludes any recovery for the consequential and lost profits damages that Plaintiff seeks. (DDA ¶12). Particularly here, where Google Play is a *free service* and Plaintiff's App was a *free* download, such contractual limitations on consequential losses and lost profits are regularly enforced by courts in both New Jersey and California. *See Nat'l Rural Telecomms. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1055 (C.D. Cal. 2003) (allowing TV service provider to invoke against distributor limitations clause that barred recovery of lost profits); *Hebert v. Rapid Payroll, Inc.*, 2005 WL 6172659, at \*7 (C.D. Cal. 2005) (limitation of damages provision in license agreement is not

---

[21] Plaintiff's revenue sharing arrangement with respect to clicks on ads on its website are governed by a separate contract with Google relating to Google's AdSense program. (AC ¶37-39)

unconscionable and bars plaintiff's recovery of lost profits as a matter of law); *Strassle v. Bimbo Foods Bakeries Distrib., Inc.*, 2013 WL 1007289, at \*5 (D.N.J. 2013) (enforcing damages limitation clause in distribution agreement barring recovery of "consequential, incidental, indirect or special damages, including lost profits and punitive damages," and finding that waiver is not unconscionable).

As a matter of both New Jersey and California law, therefore, Count III of the Amended Complaint failed to state a claim.

## CONCLUSION

For all the foregoing reasons, Google respectfully requests that (i) all claims against it be transferred to the Northern District of California; or, in the alternative, (ii) Counts II and III of the Amended Complaint be dismissed, with prejudice and with costs awarded to Google.

Dated:  February 23, 2015

Respectfully submitted

HERRICK, FEINSTEIN LLP
*Attorneys for Defendant Google Inc.*

By: *Patricia M. Graham*
        Patricia M. Graham, Esq.
        Barry Werbin, Esq. (admitted *pro hac vice*)