DURIE TANGRI LLP
MICHAEL H. PAGE (SBN 154913)
mpage@durietangri.com
JOSEPH C. GRATZ (SBN 240676)
jgratz@durietangri.com
217 Leidesdorff Street
San Francisco, CA  94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Attorneys for Defendant
GOOGLE INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| SPY PHONE LABS LLC,<br><br>              Plaintiff,<br><br>      v.<br><br>GOOGLE INC. and ANDREI CIUCA,<br><br>              Defendants. | Case No. 5:15-cv-03756-PSG<br><br>**DEFENDANT GOOGLE INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AS TO GOOGLE**<br><br>Date:    November 24, 2015<br>Time:    10:00 a.m.<br>Ctrm:    5 – 4th Floor<br>Judge:  Honorable Paul Singh Grewal |

1

## NOTICE OF MOTION AND MOTION

2

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3

PLEASE TAKE NOTICE THAT on November 24, 2015 at 10:00 a.m., in Courtroom 5 of the

4

above-entitled court, located at 280 South 1st Street, San Jose, CA 95113, Defendant Google Inc.

5

("Google" or "Defendant") by its attorneys Durie Tangri LLP, will move and hereby moves, pursuant to

6

Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing Plaintiff's Amended

7

Complaint against Google with prejudice.

8

This Motion is based upon this Notice of Motion and Memorandum of Points and Authorities in

9

support thereof, the Declaration of Michael H. Page filed herewith, the Amended Complaint and other

10

pleadings on file in this matter, the arguments of counsel, and all other material which may properly

11

come before the Court at or before the hearing on this Motion.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT GOOGLE INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT AS TO GOOGLE / CASE NO. 5:15-CV-03756-PSG

## <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION AND FACTUAL SUMMARY.................................................................1

    A.    The Parties ....................................................................................................................1

    B.    Plaintiff Accepted the Terms of the Google Play DDA ...............................................2

    C.    Google Acted on Plaintiff's Trademark Complaints .....................................................3

    D.    Google Terminated, and Later Reinstated, Plaintiff's Account.....................................3

    E.    Plaintiff Submitted Complaints of Alleged Policy Violations.......................................4

    F.    Google Suspended Plaintiff's Account.........................................................................5

    G.    The District of New Jersey Transfers the Case to This Court .......................................6

II.   ARGUMENT .........................................................................................................................6

    A.    PLAINTIFF'S CLAIM FOR CONTRIBUTORY TRADEMARK
        INFRINGEMENT SHOULD BE DISMISSED .........................................................6

    B.    Section 230 of the Communications Decency Act Bars Plaintiff's Claim for
        Tortious Interference.....................................................................................................10

        1.    Google Play is an "Interactive Computer Service".........................................10

        2.    Google Blocked Material that Is "Objectionable" .........................................11

        3.    Google Acted in Good Faith ...........................................................................12

    C.    Plaintiff has Failed to State a Tortious Interference Claim...........................................13

III.  CONCLUSION....................................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.J. Canfield Co. v. Honickman,*
   808 F.2d 291 (3d Cir.1986)...................................................................................................8

*Baztel v. Smith,*
   333 F.3d 1018 (9th Cir. 2003) ...........................................................................................10

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)...........................................................................................................14

*Carafano v. Metrosplash.com Inc.,*
   339 F.3d 1119 (9th Cir. 2003) ...........................................................................................10

*Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.,*
   912 F. Supp. 747 (D.N.J. 1995) ........................................................................................13

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
   11 Cal 4th. 376 (1995) .......................................................................................................13

*E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.,*
   704 A.2d 1364 (N.J. Super. Ct. Ch. Div. 1996),
   *aff'd,* 704 A.2d 1309 (N.J. Super. Ct. App. Div. 1997) ....................................................14

*e360Insight, LLC v. Comcast Corp.,*
   546 F. Supp. 2d 605 (N.D. Ill. 2008) ...............................................................10, 11, 12, 13

*Fonovisa, Inc. v. Cherry Auction, Inc.,*
   76 F.3d 259 (9th Cir. 1996) .................................................................................................7

*Green v. Am. Online (AOL),*
   318 F.3d. 465 (3d. Cir. 2003)............................................................................................11

*Hebert v. Rapid Payroll, Inc.,*
   No. CV 02-4144 DT (PJXw), 2005 WL 6172659 (C.D. Cal. Feb. 9, 2005) ......................15

*Holomaxx Techs. v. Yahoo!, Inc.,*
   No. CV-10-4926-JF, 2011 WL 865794 (N.D. Cal. Mar. 11, 2011) .......................10, 11, 12

*In re Google Inc. Privacy Policy Litig.,*
   No. C–12–01382–PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013).............................11

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,*
   456 U.S. 844 (1982).................................................................................................6, 7, 8

*Jurin v. Google Inc.,*
   695 F. Supp. 2d 1117 (E.D. Cal. 2010).............................................................................11

*Korea Supply Co. v. Lockheed Martin Corp.,*
   29 Cal. 4th 1134 (2003) .....................................................................................................13

*Langdon v. Google, Inc.*,
    474 F. Supp. 2d 622 (D. Del. 2007)............................................................................11, 12

*Lockheed Martin Corp. v. Network Solutions, Inc.*,
    194 F.3d 980 (9th Cir. 1999) ......................................................................................6, 8

*Lowell v. Mother's Cake & Cookie Co.*,
    79 Cal. App. 3d 13 (1978) ..............................................................................................14

*Mmubango v. Google Inc.*,
    No. 12-1300, 2013 WL 664231 (E.D. Pa. Feb. 22, 2013) ..............................................11

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    319 F. Supp. 2d 1040 (C.D. Cal. 2003) ..........................................................................15

*Nostrame v. Santiago*,
    213 N.J. 109 (N.J. 2013) ................................................................................................14

*Novak v. Overture Servs., Inc.*,
    309 F. Supp. 2d 446 (E.D.N.Y. 2004) ............................................................................10

*Parker v. Google, Inc.*,
    422 F. Supp. 2d 492 (E.D. Pa. 2006),
    *aff'd*, 242 Fed. App'x 833 (3d Cir. 2007) ......................................................................11

*Peek & Cloppenburg KG v. Revue, Inc.*,
    No. 11 Civ. 5967 (DAB), 2012 WL 4470556 (S.D.N.Y. Sept. 19, 2012)..........................8

*Petroliam Nasional Berhad v. GoDaddy.com, Inc.*,
    897 F. Supp. 2d 856 (N.D. Cal. 2012),
    *aff'd*, 737 F.3d 546 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 55 (2014) ........................6

*Printing Mart-Morristown v. Sharp Elecs. Corp.*,
    116 N.J. 739 (N.J. 1989) ..........................................................................................13, 14

*Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*,
    No. 09-4567 (RBK/KMW), 2011 WL 900096 (D.N.J. Mar. 15, 2011) ..................10, 11, 12

*Strassle v. Bimbo Foods Bakeries Distrib., Inc.*,
    No. 12-3313 (RBK/AMD), 2013 WL 1007289 (D.N.J. Mar. 13, 2013) ............................15

*Svenson v. Google Inc.*,
    65 F. Supp. 3d 717 (N.D. Cal. 2014) ..............................................................................10

*Tiffany (NJ) Inc. v eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)............................................................................................7, 8

*Wexco Indus. v. ADM21 Co.*,
    No. 04-5244 (JLL), 2008 WL 5427867 (D.N.J. Dec. 30, 2008)..................................13, 14

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009) ..................................................................................10, 12

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    No. C07-0807-JCC, 2007 WL 5189857 (W.D. Wash. Aug. 28, 2007)..............................11

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327 (4th Cir. 1997) ..................................................................................................11

**<u>Statutes</u>**

15 U.S.C. § 1115(b)(4) ....................................................................................................................8

28 U.S.C. § 1404 ............................................................................................................................6

47 U.S.C. § 230..............................................................................................................10, 11, 12, 13

**<u>Rules</u>**

Fed. R. Civ. Proc. 12(b)(6) ............................................................................................................6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND FACTUAL SUMMARY

This case, recently transferred to this Court from the District of New Jersey, seeks to hold Google responsible for alleged trademark infringement by others, and for the alleged failure by Google to enforce its own content guidelines on its own website.  Specifically, the Plaintiff seeks to hold Google liable for contributory trademark infringement (Count 2) and for tortious interference with prospective advantage (Count 3).[1]

Both claims fail.  The Amended Complaint affirmatively pleads that Google, upon receipt of valid trademark complaints, responded to those complaints by removing the allegedly infringing third-party content, meaning Google cannot be held liable for contributory infringement.  The interference claim fails doubly:  it is barred by the Communications Decency Act, and even were it not, it would fail on the merits, as there is no allegation that Google's alleged interference was independently wrongful.  Accordingly, the claims against Google should be dismissed.

### A.   The Parties

Plaintiff allegedly owns the registered trademark SPY PHONE[2] and developed an app ("Plaintiff's App") for free download to mobile phones that use the Android operating system.  Am. Compl.[3] ¶¶ 29, 32, 37.  When installed on a mobile phone, Plaintiff's App allows the user or an authorized third party to obtain extensive information about the phone's usage, including the phone's location, the phone number of the sender or recipient of incoming and outgoing messages, and Internet usage.  *Id*. ¶ 33.  Plaintiff allegedly generates revenue from Plaintiff's App through advertisements placed on its website located at www.spyphone.com.  *Id*. ¶ 37.

---

[1] Count 1 is not pled against Google.

[2] Although not alleged in the Amended Complaint, Plaintiff is the purported assignee of those trademark rights, pursuant to a *nunc pro tunc* assignment dated October 20, 2014, and recorded with the U.S. Patent & Trademark Office on October 31, 2014.  Google reserves its right to challenge the *bona fides* of this assignment, which states it is based on a 2012 "unwritten agreement."  A certified copy of this recorded assignment is attached as Exhibit A to the Declaration of Michael H. Page ("Page Decl."), submitted herewith.

[3] The Amended Complaint ("Am. Compl.") is attached as Exhibit B to the Page Declaration.  "DDA" refers to the Developer Distribution Agreement, which was an exhibit to the previously filed Declaration of Bryan Woodward in Support of Defendant Google Inc.'s Motion to Transfer, or in the Alternative, to Dismiss the Complaint ("Woodward Decl.") (ECF Nos. 18-4 & 18-5).  That declaration and exhibit are also attached to the accompanying Page Declaration for the Court's convenience as Exhibit C.

Google Play is Google's digital distribution platform for app developers, serving as a marketplace for users to download apps to their Android devices. Am. Compl. ¶ 12; Woodward Decl. ¶ 3. End users can also post ratings of and comments about particular apps. Am. Compl. ¶¶ 13-14.

The Amended Complaint also alleges that the Individual Defendants, Andrei Ciuca ("Ciuca") and John Does 1-49 (the "Doe Defendants"), are app developers who have infringed on Plaintiff's trademark and/or interfered with Plaintiff's prospective business relations. *Id*. ¶¶ 5-6. Although Plaintiff alleges that it complained to Google about the alleged conduct of these app developers, Plaintiff also contends that it does not know the names or legal capacities of the Doe Defendants. *Id*. ¶¶ 6, 49.

**B.    Plaintiff Accepted the Terms of the Google Play DDA**

To distribute apps on Google Play, Plaintiff first had to create a Google Play developer account, pay a registration fee, and agree to the DDA (and the policies incorporated therein). Woodward Decl. ¶ 8(b). To complete that registration, Plaintiff was required (1) to acknowledge that it had agreed to the DDA by clicking a box below the window displaying the DDA and (2) again confirm that it agreed to the DDA by clicking a hyperlink at the bottom of the page. *Id*. ¶ 8(d). On August 1, 2012, Plaintiff completed its Google Play registration. *Id*. ¶¶ 8-9. Plaintiff published its first app on Google Play on August 13, 2012. *Id*. ¶ 9. The DDA makes clear that Plaintiff's relationship to Google is contractual:

> This [DDA] *forms a legally binding contract between you and Google in relation to your use of the Market to distribute Products.* In order to use the Market to distribute Products, you must first agree to this [DDA] by clicking to accept where this option is made available to you. You may not distribute products on the Market if you do not accept this Agreement.

DDA § 2.1(emphasis added). Section 7.2 of the DDA authorizes Google, in its sole discretion, to remove apps (referred to as "Products") from Google Play for several reasons, including if Google deems a Product to be spyware:

> **Google Takedowns.** While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features: (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized Carriers; (f) is deemed by Google to have a virus or is deemed to be malware, spyware or have an adverse

2

DEFENDANT GOOGLE INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT AS TO GOOGLE / CASE NO. 5:15-CV-03756-PSG

> impact on Google's or an Authorized Carrier's network; (g) violates the terms of this [DDA] or the Developer Program Policies for Developers; . . . .  Google may remove the Product from the Market or reclassify the product at its sole discretion.  Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.

DDA § 7.2.  Plaintiff admits that the DDA also incorporates by reference Google's Developer Program Policies and Google's Privacy Policy.  Am. Compl. ¶ 20; DDA §§ 4.11, 9.2.

### C.    Google Acted on Plaintiff's Trademark Complaints

Plaintiff alleges that third parties have offered apps on Google Play "that copied or incorporated Plaintiff's SPY PHONE trademark and that performed the same or similar functions as Plaintiff's App." Am. Compl. ¶ 48.  Using Google Play's online form, Plaintiff submitted trademark complaints to Google respecting those apps, and Google responded by removing them.  *Id*. ¶ 49.  When an app is suspended from Google Play based on an infringement complaint, Google notifies allegedly infringing developer, stating why its app had been removed and providing the name and address of the complainant.  *Id*. ¶ 50. Accordingly, when Google removed the allegedly infringing apps from Google Play, Ciuca received notice.  *Id*. ¶¶ 54-55, 64.

Plaintiff admits that from November 2012 through May 2013, in response to Plaintiff's trademark complaints, Google removed apps listed on Google Play by other developers.  *Id*. ¶ 51.  In June 2013, in response to a specific trademark complaint by Plaintiff, Google allegedly also removed an app listed by Defendant Ciuca.  *Id*. ¶ 54.  In only one instance, in June 2013, did Google allegedly respond to a specific trademark complaint submitted by Plaintiff by refusing to remove an app called "Reptilicus.net Brutal Spy Phone," based on Google's notification to Plaintiff that it was "not in a position to mediate trademark disputes between developers and trademark owners.  As a courtesy we have considered your claim, but are unable to determine its merits at this time."  *Id*. ¶¶ 58 & 59.  Plaintiff does not allege that it followed up on that notice, or that it filed any further trademark complaints with Google.

### D.    Google Terminated, and Later Reinstated, Plaintiff's Account

On June 28, 2013, Google notified Plaintiff that the SPY PHONE app had been removed from Google Play and Plaintiff's developer account had been terminated, because the app "violated Google's 'anti-spyware' policy."  *Id*. ¶¶ 60-61.  Plaintiff alleges the suspension was the result of false third-party

1    complaints submitted to Google about Plaintiff's App by one or more of the Individual Defendants.  *Id.*

2    ¶¶ 63-64.

3        Plaintiff appealed Google's decision.  *Id.* ¶ 68.  Google denied the appeal and initially did not

4    reinstate Plaintiff's developer account.  *Id.* ¶ 69.  After discussions with Plaintiff's representatives and

5    after Plaintiff made changes to the app consistent with Google's policies, Google informed Plaintiff that

6    its violation of certain aspects of Google Play's spyware policy had been addressed, but that Plaintiff's

7    developer account could be reinstated only if Plaintiff stopped using the name SPY PHONE to identify

8    Plaintiff's App.  *Id.* ¶¶ 72-73.  Google advised:

9        While providing additional disclosure in the app description and regular
         notification to targeted phones are crucial steps to accomplishing policy
10        compliance, the Google Play Team believes the app is still in violation of policy
          because of the app's title.  App titles should not be misleading or represent the
11        product as being spyware and/or capable of surreptitious tracking.[4]

12   *Id.* ¶ 73.

13       Plaintiff agreed to change the name of its app to "Phone Tracker," and Plaintiff's account was

14   reinstated in October 2013.  *Id.* ¶¶ 76-78.

15       **E.    Plaintiff Submitted Complaints of Alleged Policy Violations**

16       Plaintiff alleges that after its account was reinstated, the number of downloads of Plaintiff's App

17   declined, resulting in a reduction in Plaintiff's advertising revenue through its separate website located at

18   spyphone.com.  *Id.* ¶¶ 39, 79-80.  While Plaintiff alleges that "dozens and dozens" of parental monitoring

19   and "other" apps continued to use names that contained "spy," only "several" apps contained Plaintiff's

20   actual trademark, and Plaintiff refers to only two specific apps that included the words "spy phone" in

21   their names.  *Id.* ¶¶ 81-84.  Plaintiff alleges that due to the "ease with which" Google could monitor

22   Google Play content, Google must have known (or was willfully blind to the fact) that other developers,

23   including the Individual Defendants, continued to use Google Play to distribute apps that infringed on

24   Plaintiff's SPY PHONE trademark.  *Id.* ¶ 86.

25       In or about January 2014, Plaintiff began submitting complaints about other developers' apps that

26   contained the word "spy" in their names and competed with Plaintiff.  *Id.* ¶ 89.  Plaintiff admits that these

27

28   ─────────────────
     [4] The Complaint does not attach a copy of this alleged communication.

1   were unlike the prior trademark complaints lodged by Plaintiff; instead, Plaintiff submitted complaints of

2   alleged spyware policy violations that did not require that Plaintiff's identity be revealed.  *Id.* ¶ 90.  The

3   DDA, however, expressly provides that Google does not undertake an obligation to monitor the content

4   of Google Play.  DDA § 7.2.

5   ### F.    Google Suspended Plaintiff's Account

6   In early July 2014, Plaintiff's representative allegedly submitted a spyware complaint to Google

7   concerning Individual Defendant Ciuca.  Am. Compl. ¶¶ 91-92.  On July 16, 2014, Google suspended

8   Plaintiff's developer account for violation of Google's spam policy and removed Plaintiff's Phone

9   Tracker from Google Play.  *Id.* ¶ 93.  Plaintiff alleges that this suspension was precipitated by complaints

10  that Google received from Ciuca and/or other Google Play developers and that Google knew or should

11  have known that the complaints were false or fraudulent.  *Id.* ¶ 96.  Plaintiff alleges that after its account

12  was suspended, Ciuca listed an app containing the name "Spy Phone," but Plaintiff did not file any

13  trademark complaint with Google in response.  *Id.* ¶¶ 98-99.

14  Approximately 30 days later, Plaintiff claims to have received an anonymous letter purportedly

15  from "'a concerned' member" of the Google Play team.  *Id.* ¶ 103.  The letter, which is <u>not</u> attached to

16  the Amended Complaint, allegedly states that "there was no real justification" for either the 2013 or 2014

17  suspensions of Plaintiff's developer account, that those actions were intended to punish Plaintiff, and that

18  the prohibition on the use of the word "spy" in an app name was being enforced only against Plaintiff.

19  *Id.* ¶¶ 104-105.  The anonymous letter also allegedly states that unidentified Google employees, who

20  either developed their own apps or helped other developers with apps listed on Google Play, "had

21  orchestrated" the removal of Plaintiff's App.  *Id.* ¶ 106.  Plaintiff pleads no facts to support its belief that

22  the alleged anonymous letter in fact came from Google.  Although Plaintiff alleges that Google Play

23  continues to offer apps that infringe on Plaintiff's trademark, *id.* ¶¶ 116-20, it has not submitted any

24  further trademark infringement complaints to Google.[5]

25

26  ---

[5] Plaintiff alleges that as of the date of the Amended Complaint, an app named "SpyPhone 1.0" (*id.* ¶ 120) appeared on Google Play.  Plaintiff does not allege it submitted a specific trademark complaint

27  about the app—and it did not.  But Google nonetheless removed that app from Google Play on or about February 17, 2015, along with its newer version "SpyPhone 2.0" in response to the allegations in the

28  Amended Complaint.

### G. The District of New Jersey Transfers the Case to This Court

This case was initially filed in federal court in New Jersey.  Google moved to transfer the case to this Court pursuant to 28 U.S.C. § 1404, or in the alternative to dismiss the second and third causes of action for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  On August 13, 2015, the New Jersey court granted the Section 1404(a) transfer, without ruling on Google's Rule 12(b)(6) motion.  Opinion (ECF No. 21).  In so ruling, the New Jersey Court held that Plaintiff was a party to, and subject to the provisions of, the DDA.  Google hereby renews its Rule 12(b)(6) motion.

## II.   ARGUMENT

Plaintiff's claims against Google should be dismissed.  The contributory trademark infringement claim fails to allege facts sufficient to support the claim, and the state law interference with prospective advantage claim both is barred by the Communications Decency Act and fails on the merits.

### A.   PLAINTIFF'S CLAIM FOR CONTRIBUTORY TRADEMARK INFRINGEMENT SHOULD BE DISMISSED

Plaintiff's claim against Google for contributory trademark infringement should be dismissed as a matter of law.  Under the standard established by the Supreme Court in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 854 (1982), "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorily responsible for any harm done as a result of the deceit."  While the Supreme Court's rule by its terms applies only to one who supplies a "product" to one who uses it to infringe, the Ninth Circuit has expanded the doctrine to impose liability on those who continued to supply a *service* to one known to be using it in an infringing manner, so long as the service provider is also shown to have "[d]irect control and monitoring of the instrumentality used by a third party to infringe. . . ."  *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 984 (9th Cir. 1999); *see generally Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 897 F. Supp. 2d 856, 867 (N.D. Cal. 2012), *aff'd*, 737 F.3d 546 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 55 (2014) (discussing the Ninth Circuit law of contributory infringement).  For example, the Ninth Circuit held that a complaint stated a claim against the operator of a marketplace where that operator had knowledge of the infringing nature of the goods being sold and nonetheless

1   continued to allow, support, and profit from their sale.  *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d

2   259, 265 (9th Cir. 1996).  Conversely, absent inaction in the face of express notice of specific allegations

3   of particular alleged infringements, internet marketplaces are not liable.  As the Second Circuit made

4   clear in its seminal opinion in *Tiffany (NJ) Inc. v eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010), in the

5   unique context of an online marketplace, "[f]or contributory trademark infringement liability to lie, a

6   service provider must have more than a general knowledge or reason to know that its service is being

7   used to sell counterfeit goods.  Some contemporary knowledge of which particular listings are infringing

8   or will infringe in the future *is necessary*."  (emphasis added).

9       The Amended Complaint pleads no facts meeting this standard.  Plaintiff admits in its Amended

10   Complaint that (i) Google in fact responded to every <u>specific</u> trademark complaint that Plaintiff

11   submitted to Google and removed those apps listed in the Google Play store (with one exception

12   discussed below, where Google could not determine if it was infringing), and (ii) Plaintiff nonetheless

13   thereafter elected voluntarily not to use Google's trademark complaint-reporting process to report other

14   allegedly infringing apps.  Am. Compl. ¶¶ 49, 51, 58-59, 90.

15       Plaintiff's failure to provide notice to Google of the allegedly infringing apps at issue is fatal to

16   any claim of contributory infringement.  Mere generalized knowledge that some third-party content is

17   claimed to infringe—even in cases where there have been *thousands* of notices of infringement—cannot

18   create an obligation on the service provider's part to search out and eliminate unreported infringements.

19   As the Second Circuit explained in *Tiffany*, while eBay "clearly possessed general knowledge as to

20   counterfeiting on its website," under *Inwood Labs*, such general knowledge is insufficient to impose

21   contributory liability on a defendant.  600 F.3d at 107 (citation omitted).  Rather, consistent with *Inwood*

22   *Labs*, to impose such liability it must be shown that a defendant continued to supply its services, in the

23   case of eBay, "to <u>one</u> whom it knows or has reason to know is engaging in trademark infringement."  *Id.*

24   (citation omitted).  The Court held that "[f]or contributory trademark infringement liability to lie, a

25   service provider must have more than a general knowledge or reason to know that its service is being

26   used to sell counterfeit goods.  Some contemporary knowledge of which particular listings are infringing

27   or will infringe in the future is necessary."  600 F.3d at 107.

28

1    Significantly, the Second Circuit emphasized that Tiffany's demand letters to eBay and other

2  actions it took "did not identify particular sellers who Tiffany thought were then offering or would offer

3  counterfeit goods."  600 F.3d at 109.  Where eBay did receive notice from Tiffany identifying *specific*

4  acts of counterfeiting, eBay removed those listings.  Tiffany therefore "failed to demonstrate that eBay

5  was supplying its service to individuals who it knew or had reason to know were selling counterfeit

6  Tiffany goods."  *Id.  See also Peek & Cloppenburg KG v. Revue, Inc.*, No. 11 Civ. 5967 (DAB), 2012

7  WL 4470556, at *5 (S.D.N.Y. Sept. 19, 2012) (in the context of an online service that hosts sales of

8  allegedly infringing goods, *Tiffany* requires "a higher standard of awareness of the infringing activity" in

9  recognition of "the difficulties that an online auction host has in ascertaining which Tiffany-branded

10  products were authentic and which were counterfeit when Tiffany only made general allegations of

11  counterfeiting.") (citing *Tiffany*, 600 F.3d 105-09).

12    Although Google did not ignore any *specific* trademark complaint submitted by Plaintiff, and

13  removed from Google Play all but a single third-party app as to which Plaintiff submitted such

14  complaints, Plaintiff nevertheless seeks to hold Google liable for alleged infringement of which it had no

15  specific knowledge.[6]  Plaintiff merely alleges that Google had a general right and ability to monitor and

16  remove third-party apps from Google Play and had general knowledge that other apps being distributed

17  through Google Play were using names that either were the same as or confusingly similar to the "Spy

18  Phone" name.[7]  Based on these alleged facts, Plaintiff's contributory infringement claim fails under

19  *Inwood Labs*, *Lockheed Martin*, and *Tiffany*.  Plaintiff's admission that Google removed the apps as to

20

21

22  [6] Google did not remove an app named "Reptilicus.net Brutal Spy Phone" because, as Google advised
   Plaintiff, it could not determine that it was infringing. Am. Compl. ¶¶ 58-59. Indeed, this name appears
23  to use the words "Spy Phone" merely as a descriptor and not as a trademark, as opposed to the distinctive
   prefix "Reptilicus.net Brutal." *See* 15 U.S.C. § 1115(b)(4) (providing defense to a trademark
   infringement claim when "the use of the . . . term . . . charged to be infringement is a use, otherwise than
24  as a mark . . . of a term . . . which is descriptive of and used fairly and in good faith only to describe the
   goods or services of such party, . . . ."). The Third Circuit also has held that descriptive terms "'describe
25  a characteristic or ingredient of the article to which it refers', . . . . *Courts and commentators have
   recognized the difficulties of distinguishing between suggestive, descriptive, and generic marks.*" *A.J.
26  Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir. 1986) (emphasis added).

27  [7] The DDA expressly provides that Google "does not undertake an obligation to monitor Products or
   *their content*" but reserves the right in its discretion to remove content based upon *notification* that
28  another app "violates the intellectual property rights or any other rights of a third party." DDA § 7.2(a)
   (emphasis added).

which Plaintiff provided specific notice of alleged infringement using the online complaint process is fatal to its contributory trademark claim.[8]

The fact that Plaintiff concocts an elaborate reason for *choosing* not to use Google's trademark complaint form does not change the analysis:  Whatever Plaintiff's reasons, it affirmatively pleads a deliberate choice *not* to put Google on notice.  Plaintiff was clearly aware of the procedure, having used it in the past and expressly pleading its provision.  Plaintiff alleges its familiarity with the process, noting that the instructions for using Google's trademark complaint form provide that "[i]f an app is removed from Google Play in response to a trademark complaint using Google's online form, the developer of the infringing app receives a notice from Google stating, among other things, why its app has been removed from Google Play, the identity of the trademark that has been infringed and the name and email address of the person who filed the infringement complaint."  Am. Compl. ¶ 50.

Plaintiff alleges that subsequently "dozens and dozens of other developers, including Ciuca and the Doe Defendants, were permitted to list parental monitoring and other apps on Google Play containing the word 'spy' in the name."  *Id*. ¶ 81.  But Plaintiff admits that it elected voluntarily not to submit any further trademark complaints and instead submitted alternative "spyware" complaints against these third party developers.  *Id*. ¶ 90.  Plaintiff readily admits it did this to avoid having its true identity disclosed to third-party developers about whom it alleged  trademark infringement:  "Instead of submitting trademark infringement complaints against those apps, however, which could result in Google revealing Plaintiff's identity to the developer against whom the complaint was made, Plaintiff's complaints asserted violations of Google's anti-spyware policy . . . which could be submitted without Google revealing the complainant's identity to the other developer."  *Id*. ¶ 90.  Plaintiff's spyware complaints did not reference any trademark claims.  Accordingly, based on the facts alleged in the Amended Complaint, as a matter of law Plaintiff cannot sustain its burden of proving contributory infringement against Google, and that cause of action must be dismissed.

---

[8] As discussed above, the sole exception was a case in which Google determined that, based on the information provided, it did not have sufficient basis to remove the app, for valid reasons communicated to Plaintiff.  *Id*. ¶ 51.  Plaintiff does not allege it followed up with the requested additional information.

9

1

2

**B.** **Section 230 of the Communications Decency Act Bars Plaintiff's Claim for Tortious Interference**

3

4

5

6

The Communications Decency Act, 47 U.S.C. § 230 ("CDA") immunizes Google from Plaintiff's tortious interference with prospective economic advantage claim, which is grounded in Google's decisions to remove content from its online Google Play marketplace.[9]  Section 230(c)(2)(A) grants civil immunity for blocking and screening certain content and provides:

7

8

9

> No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

10

11

12

13

14

47 U.S.C. § 230(c)(2)(A).  Thus, to assert this prong of the CDA, a movant must qualify as a provider of an "interactive computer service"; have voluntarily blocked or filtered material that is "obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable"; and have done so in "good faith." *Holomaxx Techs. v. Yahoo!, Inc.*, No. CV-10-4926-JF, 2011 WL 865794, at *4 (N.D. Cal. Mar. 11, 2010) (quoting 47 U.S.C. § 230(c)(2)(A)).  Google easily satisfies all three prongs of this test.

15

**1.** **Google Play is an "Interactive Computer Service"**

16

17

18

19

20

21

22

The CDA defines an "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server."  47 U.S.C. § 230(f)(2).[10]  Google Play, an online distribution marketplace for Android apps, falls squarely within the definition.  Numerous courts have held that Google Play and other Google online platforms are interactive computer services under the CDA and other federal statutes.  *See, e.g.*, *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 726 (N.D. Cal. 2014) (Google Play is an interactive computer service); *In re Google Inc. Privacy Policy Litig.*, No. C–12–01382–PSG, 2013 WL 6248499, at *12

23

24

25

26

---

[9] Courts routinely recognize Section 230 immunity to bar state law claims of tortious interference with prospective economic advantage.  *See, e.g.*, *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177-78 (9th Cir. 2009); *e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605, 609-10 (N.D. Ill. 2008); *Novak v. Overture Servs., Inc.*, 309 F. Supp. 2d 446, 452-53 (E.D.N.Y. 2004); *Holomaxx Techs. v. Yahoo!, Inc.*, No. CV-10-4926-JF, 2011 WL 865794, at *4-5 (N.D. Cal. Mar. 11, 2011).

27

28

[10] Courts generally construe "interactive computer service" broadly to include various online platforms.  *See Smith v. Trusted Universal Stds. in Elec. Transactions, Inc.*, No. 09-4567 (RBK/KMW), 2011 WL 900096, at *4 (D.N.J. Mar. 15, 2011); *see also Baztel v. Smith*, 333 F.3d 1018, 1030 (9th Cir. 2003); *Carafano v. Metrosplash.com Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003).

1   (N.D. Cal. Dec. 3, 2013) (same); *Parker v. Google, Inc*., 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006), *aff'd*,

2   242 Fed. App'x 833 (3d Cir. 2007); *Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 631 (D. Del. 2007);

3   *Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1122 (E.D. Cal. 2010); *Mmubango v. Google Inc.*, No. 12-

4   1300, 2013 WL 664231, at *2 (E.D. Pa. Feb. 22, 2013).

5   ## 2.   Google Blocked Material that Is "Objectionable"

6   Section 230(c)(2)(A) of the CDA permits a provider of an interactive computer service to block

7   or filter content that the provider considers to be "obscene, lewd, lascivious, filthy, excessively violent,

8   harassing, or otherwise objectionable, . . . ."  47 U.S.C. § 230(c)(2)(A).  Whether material is

9   "objectionable" is consigned to the judgment of the online service provider, which need not demonstrate

10  whether material is in fact "objectionable."  *Zango, Inc. v. Kaspersky Lab, Inc.*, No. C07-0807-JCC, 2007

11  WL 5189857, at *4 (W.D. Wash. Aug. 28, 2007); *see also e360Insight*, 546 F. Supp. 2d 605, 608 (N.D.

12  Ill. 2008) ("[S]ection 230 imposes a subjective element into the determination of whether a provider or

13  user is immune from liability.") (citing *Zango*, 2007 WL 5189857, at *4); *Holomaxx*, 2011 WL 865794,

14  at *5 (referring to the determination of what is objectionable as "subjective"); *Smith v. Trusted Universal*

15  *Stds. in Elec. Transactions, Inc.*, No. 09-4567 (RBK/KMW), 2011 WL 900096, at *5 (D.N.J. Mar. 15,

16  2011).

17  Based on the facts alleged in the Amended Complaint, Section 230(c)(2)(A) immunizes Google

18  from liability for its blocking decisions regarding content (apps) it deemed objectionable.  *See Langdon*,

19  474 F. Supp. 2d at 631 (finding immunity for Google, Yahoo and Microsoft's editorial discretion, which

20  included screening and deleting "objectionable" content from their networks); *see also Green v. Am.*

21  *Online (AOL)*, 318 F.3d. 465, 471 (3d. Cir. 2003) (citing *Zeran v. Am. Online, Inc*., 129 F.3d 327, 330

22  (4th Cir. 1997)).  As a matter of law, Google is not liable for suspending Plaintiff's App from the Google

23  Play store in response to the app's violations of specific Google policies and Google's own assessment of

24  such violations, which are representative of content that Google believed to be "objectionable."  *See*

25  *Green*, 318 F.3d at 472 (stating Section 230(c)(2) allows providers of interactive computer services "to

26  establish standards of decency without risking liability for doing so.").  As alleged in the Amended

27  Complaint, Google suspended Plaintiff's App in response to violations of Google's "spam" policy, which

28  prohibits the sending of electronic messages on behalf of users without their confirmation.  Am. Compl.

¶¶ 24, 93.  *See Smith*, 2011 WL 900096, at *5 ("Users or providers of an interactive computer service may determine that spam is material that is harassing or otherwise objectionable under Section 230(c)(2)(A)."); *see also e360Insight*, 546 F. Supp. 2d at 607-08 (finding unsolicited and bulk-emails may be viewed as objectionable).  Plaintiff's App was also suspended due to a violation of Google's "spyware" policy.  Am. Compl. ¶¶ 23, 61.  *See Zango*, 568 F.3d at 1174 (analogous malware, which can retrieve personal information, is objectionable).

These actions were taken to remove "objectionable" material from the Google Play marketplace, whether based on third-party complaints or Google's own initiative.  Even if Google did err as to whether Plaintiff's App was indeed objectionable under Google's policies, as Plaintiff alleges, immunity still attaches.  *See e360Insight*, 546 F. Supp. 2d at 609 ("To force a provider . . . to litigate the question of whether what it blocked was or was not spam would render § 230(c)(2) nearly meaningless"); *see also Langdon*, 474 F. Supp. 2d at 630-31 (granting section 230(c)(2) immunity where Plaintiff argued defendants created "purported reasons for not running his ads.").

### 3.      Google Acted in Good Faith

To determine whether an interactive computer service blocked or filtered content in "good faith," courts look to the pleadings, and place the burden on the plaintiff to plead an absence of good faith.  *See Holomaxx*, 2011 WL 865794, at *5 ("[T]he appropriate question is whether [plaintiff] has pled an absence of good faith.") (citing *e360Insight*, 546 F. Supp. 2d at 609) (internal quotation marks omitted); s*ee also, e.g.*, *Smith*, 2011 WL 900096, at *8.[11]  Plaintiff fails to plead any specific facts to support any bad faith action by Google, and thus fails to overcome CDA immunity.  Google (although it was under no obligation to do so) was forthcoming with "objectionable" conduct explanations for suspending Plaintiff's App from Google Play and requiring Plaintiff change the name of its app.  *Cf. Smith*, 2011 WL 900096, at *8-9 (finding bad faith where an ISP ignored repeated requests for an explanation why it blocked plaintiff's outgoing mail).  Plaintiff admits that Google notified it of the reasons for removal of its app from Google Play.  Am. Compl. ¶¶ 61, 93.  Moreover, Plaintiff's unsubstantiated assertion that

---

[11]Similarly, at least one court has made clear that a provider of an interactive computer service is under no obligation to offer reasons for blocking or filtering content.  *See, e.g.*, *id.* (finding allegations that Yahoo! refused to discuss its reasoning for filtering content insufficient to plead an absence of good faith).

1    Google's policies were only enforced against Plaintiff and not other apps on Google Play does not justify

2    an inference of bad faith.  *See e360Insight*, 546 F. Supp. 2d at 609 (granting immunity where plaintiff

3    claimed he was being "singl[ed] out" because the defendant ISP allowed other companies to send bulk

4    emails) (citation omitted).  The CDA immunizes an ISP's enforcement of its community standards

5    regardless whether the Plaintiff (or anyone else) thinks that enforcement has been evenhanded.

6    Accordingly, Section 230(c)(2)(A) of the CDA requires dismissal of Plaintiff's tortious interference with

7    prospective economic advantage claim.

8        **C.      Plaintiff has Failed to State a Tortious Interference Claim**

9        Even if the CDA did not bar the claim, Plaintiff's claim of tortious interference with prospective

10   economic advantage fails as a matter of law.  The elements of that claim are well-settled under both

11   California and New Jersey law: (1) the plaintiff must have a protectable right giving rise to a reasonable

12   expectation of economic advantage, (2) the defendant must have been aware of the prospective economic

13   advantage, (3) the defendant must have interfered intentionally and with malice, (4) there must be a

14   reasonable probability that the plaintiff would have received the anticipated economic benefits, but for

15   the defendant's interference, and (5) resulting damage.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29

16   Cal. 4th 1134, 1154 (2003) (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc*., 11 Cal 4th. 376, 378

17   (1995)) (listing elements of claim); *Printing Mart-Morristown v. Sharp Elecs. Corp.*, 116 N.J. 739, 751-

18   52 (N.J. 1989); *see also Wexco Indus. v. ADM21 Co.*, No. 04-5244 (JLL), 2008 WL 5427867, at *7

19   (D.N.J. Dec. 30, 2008); *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co.*, 912 F. Supp. 747,

20   771 (D.N.J. 1995).

21       In addition, in order to plead a claim for tortious interference, "a plaintiff must plead that the

22   defendant engaged in an act that is wrongful apart from the interference itself."  *Korea Supply*, 29 Cal.

23   4th 1158-9 ("The tort of intentional interference with prospective economic advantage is not intended to

24   punish individuals or commercial entities for their . . . commercial relationships or their pursuit of

25   commercial objectives, . . . .  [A]n act is independently wrongful if it is unlawful, that is, if it is

26   proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal

27   standard.") (citing *Della Penna*, 11 Cal. 4th at 393).  Where, as here, Google is contractually authorized

28   to exercise the editorial judgment and policing of its own website, there is no independent wrong on

1   which to rest an interference claim.  When the defendant is contractually privileged to commit the alleged

2   act, no claim for interference will lie.  *Lowell v. Mother's Cake & Cookie Co.*, 79 Cal. App. 3d 13, 17-18

3   (1978).

4        The law is the same in New Jersey, where in order to establish the required "malice" the alleged

5   harm must have been inflicted intentionally and without justifiable excuse.  *Printing Mart*, 116 N.J. at

6   751.[12]  The test is whether the defendant "had the right to perform the act or set of actions that gave rise

7   to the lawsuit."  *Wexco*, 2008 WL 5427867, at *8.  "Tort liability for interference with prospective

8   economic benefit arises when the conduct of the defendant is not in the reasonable exercise of an equal or

9   superior right."  *Id.* (citation omitted).  "[O]ur courts have concluded that 'violence, fraud, intimidation,

10  misrepresentation, criminal or civil threats, and/or violations of the law' are among the kinds of conduct

11  that would be considered to be 'wrongful means.'"  *Nostrame v. Santiago*, 213 N.J. 109, 124 (N.J. 2013)

12  (quoting *E Z Sockets, Inc. v. Brighton–Best Socket Screw Mfg. Inc.*, 704 A.2d 1364, 1370 (N.J. Super. Ct.

13  Ch. Div. 1996), *aff'd*, 704 A.2d 1309 (N.J. Super. Ct. App. Div. 1997).

14       Here, Google did nothing more than exercise its contractual rights under the DDA—"superior"

15  rights that cannot be the basis of a finding of malicious or tortious conduct.  *Wexco*, 2008 WL 5427867,

16  at *8.  Under the express terms of the DDA, Google, in "its sole discretion," is authorized to take down

17  any app that Google has deemed to be spyware.  DDA § 7.2(f).  Such spyware is also prohibited by

18  Google's Developer Program Policies, which are incorporated into the DDA.  DDA § 4.11; Am. Compl.

19  ¶¶ 20-21.  Plaintiff's conclusory allegation that Google "knew that there was no real justification for

20  either the removal of Plaintiff's App from Google Play or the termination of its developer account" is

21  irrelevant.  Am. Compl. ¶ 65.  Google's actions were expressly privileged under the parties' contract and

22  thus, as a matter of law, any tortious interference claim fails.  For the same reason, Plaintiff's conclusory

23  assertion that Google acted in "bad faith" is nothing more than "a formulaic recitation of the element[] of

24  a cause of action" that does not meet the pleading standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S.

25  544, 555 (2007).

26

27

28  ---

[12] Notably, Plaintiff only alleges that the Individual Defendants, not Google, acted "intentionally and without justification or excuse."  Am. Compl. ¶¶ 146-47.

1    Similarly, Google's alleged failure to remove allegedly infringing apps or to suspend other

2    developers' accounts is completely within Google's "sole discretion" under the DDA.  DDA § 7.2(f).  As

3    a matter of law, Google could not have acted intentionally and with malice simply by exercising that

4    express contractual right.  Additionally, the DDA expressly provides that a violation of its terms (and the

5    spyware and other policies incorporated by reference therein) is a ground for Google to terminate its

6    contract with Plaintiff.  DDA § 10.3(A).  Thus, Google's termination and subsequent suspension of

7    Plaintiff's account also were completely within Google's rights under the DDA.  Google's exercise of its

8    contractual rights is not "independently wrongful conduct" and cannot support Plaintiff's claim of

9    tortious interference.

10    Nor has Plaintiff pled any recoverable damages on this claim.  Plaintiff alleges that the

11    "prospective customers" with whom Google allegedly interfered are the prospective customers who

12    would have downloaded its app from Google Play.  Am. Compl. ¶¶ 145-46.  But the Amended

13    Complaint also alleges that those prospective customers would have downloaded Plaintiff's app for free.

14    *Id.* ¶ 37.  Plaintiff thus seeks only consequential lost profits damages.  The connection of those claimed

15    damages to Google's allegedly "wrongful" conduct is tenuous at best.  But putting aside the tenuous

16    logic of this chain, the DDA expressly *precludes* any recovery for precisely this sort of consequential and

17    lost profits damages.  DDA § 12. Particularly here, where Google Play is a free service and Plaintiff's

18    App was a free download, such contractual limitations on consequential losses and lost profits are

19    regularly enforced by courts in both New Jersey and California.  *See Nat'l Rural Telecomms. Coop. v.*

20    *DIRECTV, Inc.*, 319 F. Supp. 2d 1040, 1055 (C.D. Cal. 2003) (allowing TV service provider to invoke

21    against distributor limitations clause that barred recovery of lost profits); *Hebert v. Rapid Payroll, Inc.*,

22    No. CV 02-4144 DT (PJXw), 2005 WL 6172659, at *7 (C.D. Cal. Feb. 9, 2005) (limitation of damages

23    provision in license agreement is not unconscionable and bars plaintiff's recovery of lost profits as a

24    matter of law); *Strassle v. Bimbo Foods Bakeries Distrib., Inc.*, No. 12-3313 (RBK/AMD), 2013 WL

25    1007289, at *5 (D.N.J. Mar. 13, 2013) (enforcing damages limitation clause in distribution agreement

26    barring recovery of "consequential, incidental, indirect or special damages, including lost profits and

27    punitive damages[,]" and finding that waiver is not unconscionable).

28

1    As a matter of both California and New Jersey law, therefore, Count III of the Amended

2  Complaint fails to state a claim.

**III.    CONCLUSION**

4    Google respectfully requests that Counts II and III of the Amended Complaint be dismissed, with

5  prejudice and with costs awarded to Google.

Dated:  October 2, 2015                 DURIE TANGRI LLP

By:           */s/ Michael H. Page*
                 MICHAEL H. PAGE

Attorneys for Defendant
GOOGLE INC.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2015 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Michael H. Page*
_____
MICHAEL H. PAGE

DEFENDANT GOOGLE INC.'S RENEWED NOTICE OF MOTION AND MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT AS TO GOOGLE / CASE NO. 5:15-CV-03756-PSG