1  Neil A. Smith (SBN 63777)
   RIMON P.C.
2  One Embarcadero Center, Suite 400
   San Francisco, CA 94111
3  Phone: (415) 377-9280
   Facsimile: (800) 930-7271
4  Email: neil.smith@rimonlaw.com

5

6  Michael A. Freeman
   Attorney at Law
   GREENBERG FREEMAN LLP
7  110 East 59th Street, 22nd Floor
   New York, NY  10022
8  Telephone:   (212) 838-3121
   Fax:  (212) 838-5032
9  Email: freeman@greenbergfreeman.com
   *Pro Hac Vice, Pending*
10

11  Attorneys for Plaintiff SPY PHONE LABS LLC

         UNITED STATES DISTRICT COURT
12
       NORTHERN DISTRICT OF CALIFORNIA
13
            SAN JOSE DIVISION
14

15  SPY PHONE LABS LLC,                    Case No.:  5:15-CV-03756-PSG
    Plaintiff,
16                                          **PLAINTIFF SPY PHONE LABS, LLC'S**
                                            **OPPOSITION TO DEFENDANTS'**
    v.                                      **MOTION TO DISMISS**
17
    GOOGLE INC., ANDREI CIUCA, d/b/a
18  CAD DESIGN, and JOHN DOES 1-49,
    Defendants.
                                            Hearing Date:   November 24, 2015
19                                          Time:           10:00 am
                                            Judge:          Honorable Paul Singh Grewal
20                                          Location:       5 – 4th Floor

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ....................................................................................... iii

I.  INTRODUCTION AND COUNTERSTATEMENT OF FACTS .......................1

    A.  Google and Google Play ...........................................................................2

    B.  Plaintiff Trademark, Domain Name and App............................................3

    C.  Plaintiff's App is Listed on Google Play Under the SPY PHONE®
        Brand Name .............................................................................................3

    D.  Without Warning, Google Removes Plaintiff's App From Google Play
        and Suspends Plaintiff's Developer Account Without Cause  ...............4

    E.  Plaintiff Is Compelled to Stop Using Its Registered Trademark ............5

    F.  Despite What It Said, Google Allows Other Developers To Operate
        As Usual...................................................................................................6

    G.  Plaintiff Is Unjustifiably Suspended For a Second Time From
        Google Play .............................................................................................7

    H.  Plaintiff Receives a Letter Confirming Its Suspicions that Google Acted
        in Bad Faith in Removing Plaintiff's App From Google Play ...............8

    I.  Plaintiff Commended This Action, Gives Additional Notice of Actual
       Infringement, But Google Still Fails to Take Corrective Action.............9

    J.  Procedural History ...................................................................................9

II.      ARGUMENT ...........................................................................................10

    A.  The Complaint States a Claim Against Google For Contributory Trademark
        Infringement .........................................................................................10

    B.  The Complaint States a Claim For Tortious Interference With Prospective
        Economic Advantage, and This Claim Is Not Subject To Dismissal Based
        Upon an Affirmative Defense Arising Under the CDA ..........................16

        1.  CDA Immunity Is Both Unripe For Determination on a
           Rule 12(b)(6) Motion and Unavailable To Google ...........................16

        2.  Tortious Interference With Prospective Economic Advantage
           Has Been Adequately Pled ...............................................................18

    C.  If Any Element Of Plaintiff's Claims Has Not Been Properly Pled,
        Plaintiff Requests Leave to Amend ......................................................23

1

III.     CONCLUSION...............................................................................................24

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

Page

CASES

*Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988) ..............21

*Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025 (N.D. Cal. 2013) ...........20

*Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal.
4th 342, 372 (1992) .................................................................................22

*Clark v. LG Electronics U.S.A., Inc.*, No. 13-CV-485 JM JMA,
2013 WL 5816410 at *15 (S.D. Cal. Oct. 29, 2013) ...............................22

*CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099
(9th Cir. 2007) ........................................................................................22

*e360Insight, LLC v. Comcast Corp.*, 546 F. Supp. 2d 605 (N.D. Ill 2008)..............18, 19

*Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 4426359
(N.D. Cal. Aug. 15, 2013) .......................................................................14

*Free Kick Master LLC v. Apple Inc.,*, No. 15-CV-03403-PJH,
2015 WL 6123058 (N.D. Cal. Oct. 19, 2015) .........................................15, 23

*Gray v. BMW of North America, LLC,* No. 13–cv–3417 (WJM)(MF),
2014 WL 4723161 (D.N.J. Sep. 23, 2014) ..............................................15

*Holomaxx Technologies v. Microsoft Corp.*, 783 F. Supp. 2d 1097
(N.D. Cal. 2011) ......................................................................................16, 17, 20, 23

*Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844 (1982)....................................10

*Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal. 4th 1134 (2003) ...................19

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936
(9th Cir. 2011) ........................................................................................10, 11

*Moving and Storage, Inc. v. Panayotov*, No. 12–12262–GAO,
2014 WL 949830 (D. Mass. Mar. 12, 2014) ...........................................18

*Perfect 10, Inc. v. Google, Inc.*, 2008 WL 4217837 (C.D. Cal. 2008) .....................16

*Perez v. Van Groningen & Sons, Inc.*, 41 Cal. 3d 962, 969 (1986) .........................21

Page

*Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 5117616
(N.D. Cal. Aug. 31, 2015) ...................................................................22

*Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144 (4th Cir. 2012) ...........................15

*Saunders v. Superior Court*, 27 Cal. App. 4th 832 (1994) ........................................22

*Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*,
Civ. No. 09–4567, 2010 WL 1799456 (D.N.J. May 4, 2010) ................................18

*Swift v. Zynga Game Network, Inc.*, No. C 09-05443 SBA,
2010 WL 4569889 (N.D. Cal. Nov. 3, 2010) ........................................................17

*Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137 (9th Cir. 2008).................21

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010)......................................11-15

*Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099
(C.D. Cal. 2001)....................................................................................................22

## STATUTES

California Business & Professions Code § 17200....................................................20

California Communication Code § 2719 (West).......................................................22

California Civil Code § 1668 (West)........................................................................22

Communications Decency Act of 1996 § 230(c)(2)(A) ...........................................1, 16, 17

Federal Rules of Civil Procedure 8(a)(2) ................................................................12

**MEMORANDUM OF POINTS AND AUTHORITIES**

I.  INTRODUCTION AND COUNTERSTATEMENT OF FACTS

Plaintiff Spy Phone Labs LLC ("Plaintiff") has sued defendant Google, Inc. ("Google") for contributory trademark infringement because Google has supplied and continues to supply services that Google knows to be infringing on Plaintiff's federally registered trademark SPY PHONE®, which has caused grave damage to Plaintiff's business.  Plaintiff has also sued Google for tortious interference with economic advantage for actions that wrongfully and unfairly interfere with Plaintiff's business.

Google has moved to dismiss Plaintiff's amended complaint ("Complaint") pursuant to Fed. R. Civ. P. 12(b)(6).  That motion should be denied for the following reasons:

Contributory trademark infringement:  The question of whether Plaintiff has stated a claim against Google for contributory trademark infringement turns on whether Google had knowledge of direct infringement by others, a question ill-suited for resolution on a Rule 12(b)(6) motion. Plaintiff has already identified at least one instance (acknowledged by Google) where Google had notice of a specific infringement but failed to act, as well as several other circumstances which, if proven, would establish that Google knew about other instances of infringement but took no action. (*See* Point II.A, *infra*.)

Tortious interference with prospective economic advantage:  The question of whether Google may avoid liability based on the affirmative defense of immunity under § 230 of the Communications Decency Act of 1996 ("CDA") is likewise inappropriate for resolution on a Rule 12(b)(6) motion.  Even if the Court was presently willing to consider this defense, however, the allegations in the Complaint are sufficient to raise a question of whether Google's actions against Plaintiffs were taken in good faith, a required element for CDA immunity.  Further, as described in detail below, Plaintiff has adequately alleged the necessary elements of a claim for tortious

interference, including the requirement under California law of alleging an independent wrongful act apart from the interference itself and recoverable damages. (*See* Point II.B, *infra*.)

Nonetheless, should the Court find that any element of Plaintiff's claims has not been sufficiently pled, Plaintiff respectfully requests leave to re-plead. (*See* Point II.C, *infra*.)

A.      Google And Google Play

Google owns and operates Google Play, a digital distribution platform for software applications ("apps") that can be downloaded on smart phones and other devices that operate on the Android® operating system. (Complaint ¶ 12.) Upon information and belief, 90% of all Android®-based apps downloaded onto a mobile device are downloaded through Google Play, making it the dominant marketplace by far. (*Id*. ¶ 15.)

An app developer who seeks to offer an app for download on Google Play must agree to abide by the policies and procedures established by Google, which are incorporated into a contract prepared by Google entitled Developer Distribution Agreement ("DDA"). (*Id*. ¶ 20.)[1] Google's developer policies and procedures include prohibitions against trademark infringement as well as apps that constitute "spyware," or "malware" or that generate "spam." (*Id*. ¶¶ 21-24.) The DDA provides that if Google is notified "or otherwise becomes aware" that a developer is offering a product that violates any of its developer policies, Google may remove the product from Google Play and reserves the right to suspend and/or bar its developer from Google Play. (*Id*. ¶ 26.) A group of Google employees known as the "Google Play Team" regularly and routinely monitors the apps listed on Google Play to ensure compliance with Google policies and procedures. (*Id*. ¶¶ 27-28.) Monitoring by the Google Play Team is performed both in response to specific customer complaints and via independent investigations and quality checks. (*Id*.)

---

[1] A copy of the DDA is included with Google's moving papers as Exhibit C (Dkt. # 35-5.) The DDA includes a choice of law provision stating that Plaintiff's "relationship with Google under this [DDA] shall be governed by the laws of the State of California without regard to conflict of law provisions." (*Id*. at § 15.7.)

B.      Plaintiff's Trademark, Domain Name And App

Plaintiff is the owner of the federally registered trademark SPY PHONE® and the domain name <spyphone.com>.  (*Id*. ¶¶ 29-31.)  Plaintiff is also the developer of an downloadable app that operates on the Android® operating system ("Plaintiff's App").  (*Id*. ¶ 32.)  Plaintiff's App is what it commonly known as a parental monitoring app.  (*Id*. ¶ 33.)  When downloaded on a mobile phone, Plaintiff's App allows the user or an authorized third party, such as a parent or guardian, to track information about how the phone is being used, including the location of the phone through GPS tracking, the telephone number of the sender or recipient of messages, and Internet usage. (*Id*.)  Information obtained from a mobile phone by Plaintiff's App is transmitted from the phone to a secure server maintained by Plaintiff, and can be accessed only through a private account that can be accessed through a website operated by Plaintiff at <spyphone.com>.  (*Id*. ¶ 34.)  At all relevant times alleged in the Complaint, Plaintiff's App complied with all Google's requirements, policies and procedures.  (*Id*. ¶¶ 35-36.)

Plaintiff's App is free to download, but generates revenue through advertisements placed on the website associated with <spyphone.com>.  (*Id*. ¶¶ 37-38.)

C.      Plaintiff's App Is Listed on Google Play Under the SPY PHONE® Brand Name

In or about August 2012, Plaintiff created a developer account for Google Play.  (*Id*. ¶ 42.) At the time Plaintiff established its developer account, and at all times since then, there have been dozens of parental monitoring apps created by different developers available on Google Play that perform the same or similar functions as Plaintiff's App.  (*Id*. ¶ 43.)

After establishing its developer account, Plaintiff initially listed Plaintiff's App for download under the trademark name "SPY PHONE® Phone Tracker."  (*Id*. ¶ 44.)  By obtaining a trademark registration for SPY PHONE®, Plaintiff sought to identify and distinguish its parental monitoring app from similar functioning apps offered by other developers and to prevent other developers from copying the name, which gave Plaintiff's App a clear identification from other

parental monitoring apps.  (*Id.* ¶ 45.)   Between August 2012 and June 2013, "SPY PHONE®

Phone Tracker" was one of the most popular apps downloaded from Google Play, with over 1.1

million downloads, which created substantial revenue for Plaintiff.  (*Id.* ¶¶ 46-47.)

       D.     Without Warning, Google Removes Plaintiff's App From Google Play and
            Suspends Plaintiff's Developer Account Without Cause

Starting in or around November 2012, Plaintiff discovered that other developers were

attempting to emulate the success of Plaintiff's App by offering parental monitoring apps for

download on Google Play under names that copied or incorporated Plaintiff's SPY PHONE®

trademark.  (*Id.* ¶ 48.)  In response to the other developers' use of its SPY PHONE® trademark,

Plaintiff submitted trademark infringement complaints against these developers using Google

Play's online complaint form.  (*Id.* ¶ 49.)  From approximately November 2012 through May 2013,

in response to Plaintiff's trademark complaints, Google removed several parental monitoring apps

listed on Google Play by other developers under names that either incorporated or copied Plaintiff's

trademark.  (*Id.* ¶ 51.)

On May 17, 2013, Plaintiff's representative submitted a trademark complaint against Cad

Design, a developer which had listed a parental monitoring app on Google Play under the name

"Spy Phone App."  (*Id.* ¶ 53.)  On June 13, 2013, Google removed Cad Design's parental monitor

app from Google Play in response to Plaintiff's claim of trademark infringement.  (*Id.* ¶ 54.)  This

takedown led to a series of disturbing emails directed at Plaintiff from defendant Andrei Ciuca

("Ciuca"), who identified himself as the programmer doing business as Cad Design.  (*Id.* ¶ 55.)

Almost immediately thereafter, Google started taking actions to prevent Plaintiff from

exercising and enforcing its trademark rights.  (*Id.* ¶ 57.)  Although Plaintiff did not realize it at the

time, Plaintiff now believes, based on subsequent events, that these actions were orchestrated by

defendant Ciuca, members of the Google Play Team and possibly other Doe Defendants, and intended to intentionally harm Plaintiff's business, as described further below.  (*Id.*)[2]

The first such adverse action occurred on June 24, 2013, when Plaintiff's representative submitted an online trademark complaint form to Google against a developer who was infringing on Plaintiff's trademark by using the name "Reptilicus.net Brutal Spy Phone." (*Id.* ¶ 58.)  Instead of removing this app, as it had done with other apps that incorporated Plaintiff's trademark, the Google Play Team stated that it would take no action:

> As a preliminary matter, please note that Google is not in a position to mediate trademark disputes between developers and trademark owners. As a courtesy we have considered your claim, but are unable to determine its merits at this time.

(*Id.* ¶ 59.)[3]  Next, on June 28, 2013, the Google Play Team notified Plaintiff that Plaintiff's App had been removed from Google Play and Plaintiff's developer account had been terminated because Plaintiff's App allegedly violated Google's anti-spyware policy.  (*Id.* ¶¶ 60-61.)  Plaintiff denies that Plaintiff's App violated Google's anti-spyware policy and believes that there was no real justification for either the removal of Plaintiff's App from Google Play or the termination of its developer account.  (*Id.* ¶¶ 62-65.)

E.      Plaintiff Is Compelled To Stop Using Its Registered Trademark

After an unsuccessful appeal through Google's online appeals process, Plaintiff instructed its counsel to file an earlier lawsuit against Google demanding reinstatement of Plaintiff's App and Plaintiff's developer account.  (*Id.* ¶¶ 66-70.)  During discussions between Plaintiff's counsel and

---

[2] The "Doe Defendants" are other developers who have infringed on Plaintiff's trademark and whose real names and contact information are unknown to Plaintiff, but presumably known to Google.  (Complaint ¶ 6.)

[3] As described below at p. 12, Google's failure and refusal to take action against at least one infringing app as to which it had specific knowledge is a significant distinction between Google's conduct and the conduct of defendants in other cases who were able to avoid liability for contributory trademark infringement.  Google has attempted to explain its failure to act, but the legitimacy of Google's conduct is not ripe for determination on this motion.

representatives of Google, Google eventually acknowledged that none of the functions or features of Plaintiff's App violated Google's anti-spyware policy.  (*Id.* ¶ 72.)  Nonetheless, Google still refused to reinstate Plaintiff's App because, according to the Google Play Team, Plaintiff's use of its trademarked name SPY PHONE® to identify Plaintiff's App violated the anti-spyware policy:

> While providing additional disclosure in the app description and regular notification to targeted phones are crucial steps to accomplishing policy compliance, the Google Play Team believes the app is still in violation of policy because of the app's title. App titles should not be misleading or represent the product as being spyware and/or capable of surreptitious tracking [emphasis added].

(*Id.* ¶ 73.)

Plaintiff's counsel responded by observing that not only does Plaintiff have a federally registered trademark for the brand name SPY PHONE®, there were currently dozens of other parental monitoring apps listed on Google Play that contained the word "spy" in the title and no actions were being taken against the developers of those apps.  (*Id.* ¶ 74.)  Google's response was that, going forward, all developers would be prohibited from using the word "spy" in the title an app listed on Google Play, and that Plaintiff must stop using its SPY PHONE® trademark if Plaintiff wanted to list Plaintiff's App on Google Play. (*Id.* ¶ 75.)  In the face of this ultimatum, and in reliance on Google's statement, Plaintiff agreed to discontinue its lawsuit without prejudice and to stop using the brand name SPY PHONE® to identify Plaintiff's App on Google Play in return for Google agreeing to reinstate Plaintiff's developer account. (*Id.* ¶ 76.)

F.        Despite What It Said, Google Allows Other Developers To Operate As Usual

In October 2013, after deleting all prior customer reviews that allowed Plaintiff's App to achieve its high ranking, Google reinstated Plaintiff's developer account, and Plaintiff began offering Plaintiff's App for download on Google Play under the name "Phone Tracker."  (*Id.* ¶¶ 77-78.)  For the ten-month period between October 2013 and July 2014, the number of downloads for Plaintiff's App plummeted along with Plaintiff's revenue.  (*Id.* ¶¶ 79-80.)

Meanwhile, contrary to Google's representation that it would no longer permit developers to use the word "spy" in the name of an app list on Google Play – which would also have necessarily prevented developers from using names that infringed on Plaintiff's trademark – dozens and dozens of other developers, including defendant Ciuca and the Doe Defendants, were permitted to list parental monitoring and other apps on Google Play containing the word "spy" in the name. (*Id*. ¶ 80.)  Several of these parental monitoring apps actually used or incorporated Plaintiff's SPY PHONE® trademark, including apps named "Spy Phone" and "SpyPhone 1.0."  (*Id*. ¶¶ 82, 84.) Given Google's representation that the Google Play Team intended to take affirmative steps to prohibit developers from using the word "spy" in the name of an app and the ease with which offending apps could be located, Google knew (or was willfully blind to the fact) that developers, including Ciuca and the Doe Defendants, continued to list apps with the word "spy" in the title and that infringed Plaintiff's SPY PHONE® trademark after Plaintiff's agreement to stop using its trademarked name was made a condition of its reinstatement.  (*Id*. ¶¶ 85-86.)  Indeed, Plaintiff believes that it was the only developer who had its account terminated or suspended by Google for offering an app for download on Google Play that used the word "spy" in the name, and the only developer who was prohibited from listing an app on Google Play with the word "spy" in the name as a condition of maintaining a developer account.  (*Id*. ¶¶ 87-88.)

G.       Plaintiff Is Unjustifiably Suspended For a Second Time From Google Play

After realizing that Google, despite its prior representation, was allowing other developers to list apps on Google Play that either used the word "spy" and/or Plaintiff's SPY PHONE® trademark in its name, starting in or around January 2014, Plaintiff began submitting complaints to Google about other developers who were violating the purported policy of prohibiting apps from being listed if the word "spy" appeared in the name.  (*Id*. ¶¶ 89-90.)

On both July 2 and 10, 2014, Plaintiff's representative submitted spyware complaints to the Google Play Team about a parental monitoring app offered for download on Google Play that used

7

the word "spy" in its name.  (*Id*. ¶ 91.)  Upon information and belief, the developer of the app about which these complaints were lodged was defendant Ciuca, the same developer against whom Plaintiff had submitted a trademark infringement complaint shortly before Plaintiff's developer account was terminated in June 2013.  (*Id*. ¶ 92.)

On July 16, 2014, Google suspended Plaintiff's developer account and Plaintiff's App was removed from Google Play.  (*Id*. ¶ 93.)  The reason then given was that Plaintiff's App violated Google's "spam" policy.  (*Id*.)  Plaintiff never saw the complaint and was given no prior warning before being suspended.  (*Id*. ¶ 94.)  Contrary to the complaint that was supposedly filed, Plaintiff's App complied in all respects with Google's spam and other policies, and Google knew that there was no legitimate justification its removal.  (*Id*. ¶¶ 95, 97.)

H.  **Plaintiff Receives a Letter Confirming Its Suspicions That Google Acted in Bad Faith in Removing Plaintiff's App From Google Play**

Approximately 30 days after its developer account was suspended in July 2014, Plaintiff received an anonymous letter in the mail from a person who identified him/herself as a "concerned" member of the Google Play Team, and who was "uneasy" about the way that Plaintiff was being treated.  (*Id*. ¶ 103.)  The letter stated that: (a) "there was no real justification" for the adverse actions taken by Google against Plaintiff in 2013 and 2014, and that such actions were taken to punish Plaintiff for filing complaints to enforce its rights in SPY PHONE® (*Id*. ¶ 104); (b) Google has no actual policy against using the word "spy" in the name of an app, and that Plaintiff was the only developer that Google had ever prevented from using that name "spy phone" (*Id*. ¶ 105); and (c) many Google employees enhanced their income by either developing their own apps or helping other developers who have apps listed on Google Play, and that these employees had orchestrated the takedown of Plaintiff's App:

> When you sent in your last take down notice, you needed to be taken out.  They just got someone to send in a complaint against your app and then you [were] instantly gone.  Someone needs to do something or things will just get worse.

1   (*Id*. ¶ 106.)

2       I.      Plaintiff Commenced This Action, Gives Additional Notice of Actual Infringement,
                But Google Still Fails To Take Corrective Action

3       On September 9, 2014, Plaintiff's counsel notified Google in writing that, among other

4   things, Plaintiff's registered SPY PHONE® trademark continues to be infringed by other developers

5   listing apps for download on Google Play.  (*Id*. ¶ 116.)  Google did not respond to this letter and,

6   upon information and belief, took no action to prevent any developer from listing any app on

7   Google Play that infringed on Plaintiff's trademark.  (*Id*. ¶ 117.)

8       Accordingly, Plaintiff commenced this action on October 22, 2014.  The original complaint,

9   served on or about October 28, 2014, expressly alleged that there were still apps listed on Google

10  Play that infringed Plaintiff's registered SPY PHONE® trademark.  (*Id*. ¶ 118.)  Following service

11  of the complaint, Google took no action to remove any app or prevent any developer from listing

12  any app on Google Play that infringed Plaintiff's trademark.  (*Id*. ¶¶ 119.)

13      Plaintiff's amended Complaint, filed and served on January 23, 2015, contains three causes

14  of action: (1) direct trademark infringement against Ciuca and the Doe Defendants (*Id*. ¶¶ 122-

15  129); (2) contributory trademark infringement against Google (*Id*. ¶¶ 130-143); and (3) tortious

16  interference with prospective economic advantage against all defendants (*Id*. ¶¶ 144-150).  On the

17  date the Complaint was filed, there were still apps listed for download on Google Play that

18  infringed Plaintiff's registered SPY PHONE® trademark, including an app named "SpyPhone 1.0."

19  (*Id*. ¶¶ 120-121.) [4]

---

[4] On February 10, 2015, Google sent a notice stating that, in response to the Complaint, an app listed on Google Play had been removed for violating Google's trademark infringement policy. (*See* Declaration of Michael A. Freeman ("Freeman Decl.") at ¶ 3, which is Exhibit A to the accompanying Declaration of Neil Smith.)  On February 17, 2015, Google sent another notice stating that it had removed another infringing app without referring to the Complaint and despite Plaintiff not having filed an online complaint.  (Freeman Decl. at ¶ 4.)  This second notice, in particular, demonstrates both Google's knowledge of ongoing infringement and its ability to independently monitor the content on Google Play even in the absence of a specific complaint.

J.     Procedural History

This case was initially filed U.S. District Court for New Jersey.  Google moved to transfer the case to this Court pursuant to 28 U.S.C. § 1404 based on a forum selection clause in the DDA or, in the alternative, to dismiss the second and third causes of action for failure to state a claim. On August 13, 2015, the New Jersey District Court granted the part of the motion requesting the transfer.  The court found that, although Plaintiff's claim for contributory trademark infringement did not arise under the DDA and, thus, was not subject to the forum selection clause, Plaintiff's claim for tortious interference "originates from the DDA."  (Dkt. # 21 at pp. 6-8.)  Although observing that, in such circumstances, it will sometimes be appropriate to sever the claims and try them separately, the Court held that, in this case, the interests of judicial efficiency and economy warranted transferring the entire action.  (*Id*. at 8-9.)  The New Jersey court did not rule on Google's motion to dismiss.

## II.  ARGUMENT

A.     The Complaint States a Claim Against Google For Contributory Trademark Infringement

Google seeks dismissal of Plaintiff's claim for contributory trademark infringement under Rule 12(b)(6) on the ground that Google lacked sufficient knowledge of any direct trademark infringement by other developers.  (Google's Moving Brief ("Mov. Br.") at 6-9.)  This Court cannot and should not attempt to resolve this fact-intensive question on a pre-answer motion to dismiss, particularly without evidence of what Google knew.

To state a claim for contributory trademark infringement, a plaintiff must allege facts sufficient to show that the defendant supplied its products or services "to one whom it knows or has reason to know is engaging in trademark infringement."  *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982); *accord Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942 (9th Cir. 2011) (plaintiffs must show that "defendants provided their services with actual or

1   constructive knowledge that the users of their services were engaging in trademark infringement");

2   *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 104 (2d Cir. 2010) (plaintiff must show that "the

3   service provider . . . 'continues to supply its [service] to one whom it knows or has reason to know

4   is engaging in trademark infringement'").  In addition, under Ninth Circuit precedent, a plaintiff

5   must also allege that the defendant had "'[d]irect control and monitoring of the instrumentality used

6   by a third party to infringe'" the mark.  *Louis Vuitton*, 658 F.3d at 942 (quoting *Lockheed Martin*

7   *Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir. 1999)).

8

9          The Complaint here alleges that, since at least June 2013, Google had actual knowledge of

10   apps listed on Google Play that infringed on Plaintiff's SPY PHONE® trademark or has willfully

11   turned a blind eye to the presence of such infringing apps with knowledge that they exist.

12   (Complaint ¶ 134.)  The Complaint further alleges that Google has nonetheless continued to supply

13   its services to defendant Ciuca and the Doe Defendants.  (*Id*. ¶ 135.)  In addition, the Complaint

14   alleges that Google has direct control over the operations of Google Play, has the ability to monitor

15   the content posted on Google Play and that Google does, in fact, regularly monitor the content

16   posted on Google Play.  (*Id*. ¶¶ 27, 131-132.)  These allegations are sufficient to state a claim for

17

18   contributory trademark infringement against Google.

19          Looking past these well-pled allegations in the Complaint, Google argues that the

20   Complaint does not allege that Google had the requisite knowledge to be held liable for

21   contributory trademark infringement.  Relying heavily on the decision in *Tiffany*, which said that

22   liability for contributory infringement requires proof of specific knowledge that someone is

23   infringing, rather than just general knowledge that infringement is occurring, 600 F.3d at 105,

24   Google contends that it cannot be held liable because it "did not ignore any <u>specific</u> trademark

25   complaint submitted by Plaintiff . . . ."  (Mov. Br. at 8, emphasis in original.)  In the very next

26   breath, however, Google admits that this is not true, because there was at least one instance where

27   Google outright refused to remove an infringing app ("Reptilicus.net Brutal Spy Phone") from

28

11

Google Play following a specific trademark complaint from Plaintiff, which was made just days before Plaintiff's developer account was first terminated without justification.  (Complaint ¶¶ 58-65.)  Compare, *Tiffany* 600 F.3d at 99 ("During the relevant time period, the district court found, eBay 'never refused to remove a reported listing'" in response to a complaint by Tiffany, and always acted within 24 hours).[5]  While Google now tries to explain in its brief why it did not remove the clearly infringing app (Mov. Br. at 8, n.6), it is impossible to determine on a Rule 12(b)(6) motion whether this newly-offered explanation is credible or not.[6]  Since this incident alone, which Google acknowledges actually occurred, would be enough to hold Google liable for contributory trademark infringement, Google's motion should be denied at this early pleadings stage.

But these are not the only facts alleged in the Complaint that call into question Google's assertion that it lacked specific knowledge of direct infringement by others.  The Complaint also alleges that Plaintiff received a letter from a Google employee stating that Google employees who worked on the Google Play Team were in cahoots with other developers who were known to be infringing on Plaintiff's trademark.  (*Id.* ¶¶ 103-106.)[7]  The Complaint further identifies several

---

[5] In sharp contrast to the *Tiffany* case, where the record showed that defendant eBay usually took corrective action within 24 hours or less, Google typically took weeks to respond to a trademark infringement complaint.  (*See* Complaint ¶¶ 53-54.)

[6] In its brief, Google says that it did not remove an app called "Reptilicus.net Brutal Spy Phone" from Google Play because it was uncertain about whether the words SPY PHONE® were being used "merely as a descriptor and not as a trademark."  (Mov. Br. at 8, n.6.)  Google professed no such trouble when removing apps from Google Play in response to infringement complaints prior to June 2013 (*see* Complaint ¶¶ 49-52) and the explanation given by Google to Plaintiff at the time said nothing about any supposed uncertainty.  (Complaint ¶ 59.)  An equally plausible explanation as to why this infringing app was not removed in June 2013 is that the developer of this app had an illicit agreement with someone at Google not to remove it.  (Complaint ¶¶ 103-106.)

[7] Google attempts to cast doubt on the veracity of Plaintiff's allegations regarding the anonymous letter received from a Google employee because the letter was not attached to the Complaint. (Mov. Br. at 5.) This is improper, since the rules of procedure impose no requirement on Plaintiff to attach any documents to its pleadings. Fed. R. Civ. P. 8(a)(2).  That being said, Plaintiff can supply the letter to the Court upon request.

apps listed on Google Play in 2014 that were directly infringing Plaintiff's trademark and not removed by Google prior to the filing of the Complaint, and how Google's employees must have known about these infringing apps given Plaintiff's past complaints and the ease with which Google could have discovered them. (Complaint ¶¶ 84-86, 98-99, 111-113, 119-121.) The Complaint also explains how Google's employees regularly monitor the contents of Google Play to ensure compliance with its terms and conditions, independent of any specific complaints, thereby creating additional opportunity to acquire actual knowledge. (*Id*. ¶ 27.) These allegations, which must be accepted as true at this stage of the case, adequately allege Google's specific knowledge of infringing apps and, contrary to Google's contention (Mov. Br. at 8), go far beyond alleging simply that Google had "general knowledge" of other infringing apps on Google Play.[8]

The nature of the infringement being alleged is yet another critical distinction between this case and *Tiffany*. In *Tiffany*, a key fact lending to the decisions of both the district court and the Second Circuit was that it was not possible for defendant eBay to determine from the listing alone whether vendors were selling genuine Tiffany merchandise or counterfeits:

> Because eBay never saw or inspected the merchandise in the listings, its ability to determine whether a particular listing was for counterfeit goods was limited. Even had it been able to inspect the goods, moreover, in many instances it likely would not have had the expertise to determine whether they were counterfeit.

*Tiffany*, 600 F.3d at 98 (citations and quotes omitted). The inability of eBay to determine from the face of the listing whether a vendor was infringing led the Second Circuit to affirm the district court's conclusion that eBay lacked the requisite specific knowledge to be held liable for contributory trademark infringement. *Id*. at 109 ("Tiffany failed to demonstrate that eBay was

---

[8] Moreover, events that occurred after the Complaint was filed establish that Google is able to remove infringing apps – and has specifically done so – based solely on a non-specific complaint by Plaintiff its trademark is being infringed. (*See* Note 4 and Freeman Decl. Exhibits 1 and 2.) Should the Court find that allegations of Google's specific knowledge are not sufficiently pled in the Complaint, Plaintiff respectfully requests leave to amend its Complaint to include this new information. (*See* Point III, *infra*.)

supplying its service to individuals who it knew or had reason to know were selling counterfeit Tiffany goods").  By contrast here, none of the other developers were offering Plaintiff's App without authorization, but rather that they were offering their own apps using Plaintiff's trademark. (Complaint ¶¶ 82, 84.)  Thus, unlike eBay in the Tiffany case, Google can tell from the face of the listing whether there is direct infringement, which lends greater plausibility to Plaintiff's allegations that Google had actual knowledge of (or willfully turned a blind eye to) developers who were infringing Plaintiff's trademark.  *See Evans v. Hewlett-Packard Co.*, No. C 13-02477 WHA, 2013 WL 4426359 at *2 (N.D. Cal. Aug. 15, 2013) (refusing to dismiss claim for contributory trademark infringement at the pleadings stage where allegations "permit an inference that defendants knew, or could have reasonably deduced" that mark owner objected to infringer's use).

Google's argument (Mov. Br at 9) that it should not be held liable for contributory infringement because Plaintiff did not utilize Google's online trademark complaint form to notify Google of specific incidents of trademark infringement is likewise unavailing for at least two reasons.  First, Google's obligation to act in the face of known trademark infringement does not arise from the DDA or Google's internal procedures, but from the Lanham Act.  If, as Plaintiff has alleged, Google was aware of specific developers and apps that were infringing on Plaintiff's trademark, whether the result of a trademark complaint or due to a spyware complaint, Google had a legal duty to act, regardless of how Google learned about the infringing app.  Second, even if Google is correct that its duties and obligations vis-à-vis Plaintiff arise solely from its Google's developer policies and procedures, there is nothing in the DDA to suggest that Google's duty to take action against direct trademark infringers depends on the form of notice that it receives, be it a trademark infringement complaint, an anti-spyware complaint, or a complaint filed in federal district court.  Google's developer policies and procedures explicitly state Google will act against violators as to whom it is specifically notified "or otherwise becomes aware."  (Complaint ¶ 26.) Google has failed to explain how or why Plaintiff's decision to not always use Google's online

trademark complaint form changes Google's legal obligation to act if it has knowledge of infringement.

Finally, Google's reliance on *Tiffany* on a motion to dismiss is also misplaced because the procedural posture of the litigation in *Tiffany* was completely different from the one here.  The decision in *Tiffany* was rendered following both discovery and a bench trial, during which evidence of what the defendant's employees knew and did not know was explored extensively.  By contrast, this case is at the pleadings stage and Plaintiff has had no opportunity to test the allegations of its Complaint in discovery.  *See Rosetta Stone, Ltd. v. Google, Inc.,* 676 F.3d 144, 164 (4th Cir. 2012) (criticizing the district court's "heavy reliance" on *Tiffany* in deciding a motion for summary judgment, and observing that *Tiffany* was decided on appeal following a "lengthy bench trial").  Google's request to have this Court dismiss the action without providing Plaintiff an opportunity to take discovery is particularly inappropriate given that crux of Google's defense is that they lacked knowledge of actual infringement, a question ill-suited to resolution on a Rule 12(b)(6) motion.  *Gray v. BMW of North America, LLC*, No. 13–cv–3417 (WJM)(MF), 2014 WL 4723161 at *3 (D.N.J. Sep. 23, 2014) (questions concerning defendant's knowledge "are properly to be determined through discovery, not on a motion to dismiss").

For all of these reasons, Google's motion to dismiss Plaintiff's contributory trademark infringement claim should be denied.[9]

---

[9] On reply, Google may cite to *Free Kick Master LLC v. Apple Inc.,* No. 15-CV-03403-PJH, 2015 WL 6123058 (N.D. Cal. Oct. 19, 2015), a case decided by this Court since Google submitted its motion to dismiss, which granted Google's motion to dismiss a claim for contributory trademark infringement (with leave to amend) for failing to plead that Google had specific knowledge of the infringement.  The Court found that the plaintiff's complaint "allege[d] no facts showing that . . . Google . . . knew that the third-party developers' apps/games were infringing plaintiff's mark but continued to allow the infringing apps/games to remain available in the application stores."  *Id.* at *6.  The Court also held that the plaintiff had not alleged that "Google had notice from plaintiff of its trademark infringement claims  . . . or even that either knew of plaintiff's mark and knew that the third parties' use of the mark was unauthorized."  *Id.*  Here, of course, Plaintiff has alleged both Google's specific knowledge of its trademark and direct infringement by other developers, which make the facts alleged here easily distinguishable from those alleged in *Free Kick Master.*

**B.** **The Complaint States a Claim For Tortious Interference With Prospective Economic Advantage, and This Claim is Not Subject To Dismissal Based Upon An Affirmative Defense Arising Under The CDA**

Google next contends, with respect to Plaintiff's claim for tortious interference with prospective economic advantage, that it is entitled to immunity under § 230(c)(2)(A) of the CDA and/or that Plaintiff has failed to allege facts sufficient to state a claim. Both of these contentions lack merit. First, CDA immunity is not an issue properly decided on a Rule 12(b)(6) motion, but even if it were, this affirmative defense is not available to Google where the Complaint adequately alleges that Google's conduct in removing Plaintiff's App from Google Play was not taken in good faith. Second, contrary to Google's contention, Plaintiff has adequately pled all elements of this cause of action.

1. *CDA Immunity Is Both Unripe For Determination on a Rule 12(b)(6) Motion and Unavailable To Google*

Section 230(c)(2)(A) of the CDA, codified at 47 U.S.C. 230(c)(2)(A), provides that no civil liability may be imposed against an interactive computer service for

> any action voluntarily <u>taken in good faith</u> to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected.

47 U.S.C. § 230(c)(2)(A) (emphasis added); *see also Holomaxx Technologies v. Microsoft Corp.*, 783 F. Supp. 2d 1097, 1104 (N.D. Cal. 2011) ("To assert an affirmative defense under § 230(c)(2)(A), a moving party must qualify as an "interactive computer service," that voluntarily blocked or filtered material it considers "to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable," and did so in "good faith").

As a threshold matter, this Court must decide whether CDA immunity, an affirmative defense, can even be raised on a Rule 12(b)(6) motion. *Perfect 10, Inc. v. Google, Inc.,* 2008 WL 4217837 at *8 (C.D. Cal. 2008) ("preemption under the CDA is an affirmative defense that is not proper to raise in a Rule 12(b)(6) motion."); *accord Swift v. Zynga Game Network, Inc.,* No. C 09-

05443 SBA, 2010 WL 4569889 at *6 (N.D. Cal. Nov. 3, 2010); but *see Holomaxx*, 783 F. Supp. 2d at 1103 ("an affirmative defense properly may be considered on a Rule 12(b)(6) motion where the defense is 'apparent from the face of the [c]omplaint'").  If the Court decides it this defense may not be considered on a pre-answer motion to dismiss, it need go no further in denying this prong of the motion.

Even if the Court were to consider whether Google is entitled to CDA immunity on this motion, Google's motion should still be denied.  Even assuming that Google can show that Google Play is an interactive computer service and that Plaintiff's App falls within the scope of "otherwise objectionable" content that may be removed, as Google readily acknowledges (Mov. Br. at 12-13), to obtain CDA immunity, Google must also establish that it has acted in "good faith" in removing Plaintiff's App from Google Play.[10]  Accepting the allegations in the Complaint as true, Google cannot meet its burden as a matter of law.  Plaintiff has alleged that Plaintiff's App fully complied with all Google's policies and procedures and that there was no justification to remove Plaintiff's App from Google Play or suspend its developer account.  (Complaint ¶¶ 63, 95.)  Plaintiff further alleges that it received a letter from a Google employee confirming Plaintiff's own belief that Google had "no real justification" for the adverse actions taken against Plaintiff in 2013 and 2014, and that such actions were taken in the personal interest of Google employees to punish Plaintiff for submitting complaints to enforce its legitimate trademark rights.  (*Id*. at ¶ 104.)  The Complaint further alleges that Google has no actual policy against using the word "spy" in the name of an app,

---

[10] If the Court finds that allegations in the Complaint are insufficient to demonstrate that Google lacked the requisite good faith required for CDA immunity, Plaintiff requests leave to amend the Complaint (*see* Point II.C, *infra*) to allege that Google is not merely an interactive computer service, but is actually an information content provider not entitled to CDA immunity because Google provides code that all apps must incorporate in order to access Android® phones and be listed on Google Play.  *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 987 (N.D. Cal. 2015) (rejecting Apple's assertion of CDA immunity on a Rule 12(b)(6) motion based on allegations that Apple "contributed to the creation of the offensive content" by providing app developers with instructions and code required to access a user's address book data without prior permission).

and that Plaintiff was the only developer that Google had ever prevented from using the word "spy" in the name of its app (*Id*. at ¶ 105), an allegation that Plaintiff supports with a partial list of apps that contained the word "spy" in the name that were allowed to remain listed on Google Play after Plaintiff's App had been removed.  (*Id*. at ¶ 83.)  Plaintiff also alleges that Google's employees orchestrated the removal of Plaintiff's App from Google Play not because the content or functionality was "objectionable," but because they had a financial incentive to do so.  (*Id*. at ¶ 106.)  These allegations are more than sufficient to survive a motion to dismiss.  *Moving and Storage, Inc. v. Panayotov*, No. 12–12262–GAO, 2014 WL 949830 at *2 (D. Mass. Mar. 12, 2014) (if bad faith is adequately pled, availability of CDA immunity defense "cannot be appropriately decided" on a Rule 12(b)(6) motion absent "a developed factual record").

The upon which Google most heavily relies in arguing that Plaintiff has failed to sufficiently allege that Google has not acted in good faith is readily distinguishable.  In *e360Insight, LLC v. Comcast Corp.,* 546 F. Supp. 2d 605 (N.D. Ill 2008) (cited in Mov. Br. at 13), the plaintiff, who the court described as a "spammer," sued Comcast for failing to allow it to deliver bulk email messages through Comcast's servers.  The plaintiff alleged that Comcast had unfairly "singl[ed] out" plaintiff, and that others behaving in a like manner were treated differently. Id. at 609.  Here, by contrast, while it is true that Plaintiff claims that has been treated differently than other developers who use are allowed to use the word "spy" in the name of their app (Complaint ¶¶ 81-84), Plaintiff's Complaint goes much further.  Plaintiff alleges not only disparate treatment, but that Google's employees orchestrated the removal of Plaintiff's App from Google Play for their own personal financial gain.  (*Id*. at ¶ 106.)  *See also Smith v. Trusted Universal Standards in Electronic Transactions, Inc.*, Civ. No. 09–4567, 2010 WL 1799456 at * 7 (D.N.J. May 4, 2010) (allegation that defendant blocked email for financial motive, namely to encourage plaintiff to upgrade his service plan, satisfies the requirement of pleading bad faith).  In addition, while the district court in e360Insight found that "a mistaken choice to block [the plaintiff's

emails], if made in good faith, cannot be the basis for liability" in light of the immunity afforded by

§ 230, *e360Insight*, 546 F. Supp. 2d at 609, Plaintiff here does not just allege that Google made a

mistake. Rather, Plaintiff asserts that Google knew, directly or through its employees, that "there

was no real justification" for removing Plaintiff's App from Google Play and/or suspending

Plaintiff's developer account, but did these anyway. (Complaint at ¶ 104.) This is the very

definition of bad faith behavior.

2.    *Tortious Interference With Prospective Economic Advantage Has Been Adequately Pled*

Alternatively, Google contends that Plaintiff's Complaint fails to state a claim for tortious

interference with prospective economic advantage. (Mov. Br. 13-15.) This is not correct.

The elements of a cause of action for interference with prospective economic advantage are:

"(1) an economic relationship between the plaintiff and some third party, with the probability of

future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3)

intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual

disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the

acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)

(quoting *Westside Center Associates v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521–522

(1996)). In addition, a plaintiff must plead that the defendant's conduct was "wrongful by some

legal measure other than the fact of interference itself." *Id.* (citing *Della Penna v. Toyota Motor

Sales, U.S.A., Inc.,* 11 Cal. 4th 376, 393 (1995)). An act is "independently wrongful if it is

unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or

other determinable legal standard." *Id.* at 1159.[11]

---

[11] Google also cites New Jersey law in arguing that Plaintiff has failed to state a claim for tortious interference. (Mov. Br. at 14.) However, given that the DDA provides that California law governs "any legal matter arising from this [DDA]" (Dkt # 35-5) and in ordering a transfer of this action to this court, expressly held that Plaintiff's claim for "tortious

(Continued...)

Google contends that Plaintiff has not adequately pled an independently wrongful act by Google because the DDA vests Google with the "sole discretion" to remove an app that Google has found to have violated its developers policies, and that, in removing Plaintiff's App from Google Play, Google did nothing more that "exercise its contractual rights under the DDA – 'superior' rights that cannot be the basis for the finding of malicious or tortious conduct."  (Mov. Br. at 14.) This does not fairly characterize the allegations in the Complaint.  Plaintiff's Complaint alleges acts that, if proven, would establish that Google engaged in conduct that violates California Business & Professions Code § 17200 (California's "Unfair Competition Law" or "UCL"), which prohibits, inter alia,  any "unfair ... business act or practice."  The Unfair Competition Law "was intentionally framed in its broad, sweeping language" to provide recourse for persons injured by unlawful or unfair business practices that might not be covered by traditional torts.  *Holomaxx*, 783 F. Supp. 2d at 1107 (N.D. Cal. 2011) (citing *Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 181 (1999)). "To support liability under the 'unfair' prong, the conduct must either 'offend[ ] an established public policy or [be] immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers' or be 'tethered to specific constitutional, statutory or regulatory provisions.'" *Id.* at 1108 (citing *Bardin v. Daimlerchrysler Corp.*, 136 Cal. App. 4th 1255, 1274 (2006)).

Here, Plaintiff alleges that, even though Plaintiff's App complied in all respects with Google Play's policies and procedures, Google terminated and suspended Plaintiff's developer account in 2013 and 2014 with "no real justification" for doing so because Plaintiff submitted

---

(...Continued)

interference originates from the DDA," (Dkt. # 21 at p. 6), it is law of the case that California law governs.  Even without that prior determination, California law would apply.  *Cannon v. Wells Fargo Bank N.A.*, 917 F. Supp. 2d 1025, 1051 (N.D. Cal. 2013) ("Under California law, '[a] valid choice-of-law clause, which provides that a specified body of law 'governs' the 'agreement' between the parties encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationship it creates'").

legitimate complaints about apps posted by other developers.  (Complaint ¶¶ 63, 95, 104-106.)[12]

Although the "sole discretion" language in the DDA may allow Google to remove an app that

violates one of Google's developer policies, this language does not immunize Google from liability

if, as Plaintiff has alleged, Plaintiff's App did not violate any of Google's policies, but was taken

down by Google employees who were advancing their own secret deals with other developers.  (*Id.*

at ¶¶ 104- 106.)  *See Carma Developers (Cal.), Inc. v. Marathon Dev. California, Inc.,* 2 Cal. 4th

342, 372 (1992) (party that retains a discretionary power to act under a contract still must exercise

that discretion in good faith and in accordance with the parties' expectations); *see also Perez v. Van

Groningen & Sons, Inc.,* 41 Cal. 3d 962, 969 (1986) (employer can be held liable for employee's

actions under doctrine of respondeat superior, regardless of whether employee's act benefits the

employer).  Plainly, not enforcing its own rules and providing preferential treatment to other

developers constitutes "unfair" conduct by Google within the broad scope of § 17200, and not

simply an exercise of rights under the DDA.  *Sybersound Records, Inc. v. UAV Corp.,* 517 F.3d

1137, 1152 (9th Cir. 2008) ("[A] breach of contract may form the predicate for a section 17200

claim, provided it also constitutes conduct that is unlawful, or unfair, or fraudulent," citing *Nat'l

Rural Telecommunications Co-op. v. DIRECTV, Inc.*, 319 F. Supp. 2d 1059, 1074 (C.D. Cal.

2003)); *see generally Saunders v. Superior Court*, 27 Cal. App. 4th 832, 839 (1994) ("'Unfair'

simply means any practice whose harm to the victim outweighs its benefits'"); *Allied Grape

Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432, 452 (1988) (holding that "manifestly unfair"

conduct by defendant violates the UCL, even absent proof that practice was deceptive or

fraudulent).  The Ninth Circuit has held that alleging a violation of California's Unfair Competition

---

[12] The Complaint's citation to specific instances in which Google violated its own rules (Complaint ¶¶ 63, 95, 104-106) overcomes Google's inaccurate contention that Plaintiff has merely alleged bad faith conduct is a "conclusory" or "formulaic" fashion.  (Mov. Br. at 14.)  If necessary to correct a pleading deficiency, Plaintiff can amend its Complaint to add examples of other violations, including Google's refusal of Plaintiff's request to remove reviews of Plaintiff's App that violate Google's profanity rules.  (*See* Point II.C, *infra*.)

1   Law is sufficient to meet the requirement of pleading an independent wrong giving rise to a claim

2   for interference with prospective economic advantage.  *CRST Van Expedited, Inc. v. Werner*

3   *Enterprises, Inc.*, 479 F.3d 1099, 1110 (9th Cir. 2007).  Having adequately alleged an act or

4   practice that may constitute unfair competition under the UCL, the question of whether Google

5   actually violated the UCL cannot be resolved on a Rule 12(b)(6) motion.  *Watson Labs., Inc. v.*

6   *Rhone-Poulenc Rorer, Inc.*, 178 F. Supp. 2d 1099, 1117 (C.D. Cal. 2001) ("Whether a business act

7   or practice constitutes unfair competition within Section 17200 is a question of fact").

8          As a second line of attack, Google contends that Plaintiff's claim for tortious interference is

9

10  barred by the contractual limitation on liability contained in § 12 of the DDA, which provides that

11  Google may not be held liable ". . . under any theory of liability for any direct, indirect, incidental,

12  special consequential or exemplary damages that may be incurred . . . ."  (Mov. Br. at 15.)   This

13  argument should be rejected because the limitations of damages clause in the DDA is

14  unconscionable as applied between Google and Plaintiff.  *Rodman v. Safeway Inc.,* No. 11-CV-

15  03003-JST, 2015 WL 5117616 at *4 (N.D. Cal. Aug. 31, 2015) ("limitation of liability clauses are

16

17  enforceable unless they are unconscionable, that is, the improper result of unequal bargaining

18  power or contrary to public policy," quoting *Food Safety Net Servs. v. Eco Safe Sys. USA, Inc.,* 209

19  Cal. App. 4th 1118, 1126 (2012)); *Clark v. LG Electronics U.S.A., Inc.*, No. 13-CV-485 JM JMA,

20  2013 WL 5816410 at *15 (S.D. Cal. Oct. 29, 2013) (contractual provision precluding recovery of

21  consequential damages not enforceable against weaker party where parties do not have equal

22  bargaining power negotiation and the weaker party has no meaningful choice); *see generally*, Cal.

23  Com. Code § 2719 (West) ("Consequential damages may be limited or excluded unless the

24  limitation or exclusion is unconscionable"); Cal. Civ. Code § 1668 (West) ("All contracts which

25

26  have for their object, directly or indirectly, to exempt anyone from responsibility for his . . .

27  violation of law, whether willful or negligent, are against the policy of the law").  Enforcement of

28  the limitation of damages clause here would be particularly anomalous since it would effectively

1   insulate Google, the dominant player in the market for Android® apps (Complaint ¶ 15), not just

2   from claims for consequential damages, but from liability under any circumstances, regardless of

3   the nature of the conduct alleged.  Moreover, the DDA limitation should be interpreted to protect

4   Google only from good faith acts taken in its own interest, not the self-interested acts of its

5   employees.

6

7          C.     If Any Element of Plaintiff's Claims Has Not Been Properly Pled, Plaintiff Requests
                  Leave To Amend

8

9          If the Court finds that any element of Plaintiff's claims has not been adequately pled,

10  Plaintiff respectfully requests leave to amend its Complaint.  "Leave to amend must be granted

11  unless it is clear that the complaint's deficiencies cannot be cured by amendment."  *Holomaxx*, 783

12  F. Supp. 2d at 1102 (citing *Lucas v. Department of Corrections*, 66 F.3d 245, 248 (9th Cir. 1995));

13  *see also id.* at 1105 (dismissing plaintiff's claims based on CDA § 230, but granting leave to re-

14  plead for plaintiff to allege additional facts supporting its assertion that defendant's actions were

15  not taken in good faith); *Free Kick Master*, 2015 WL 6123058, at *6 (granting plaintiff leave to re-

16  plead clam for contributory trademark infringement since "this is the first time a court has ruled on

17  the adequacy of plaintiff's claims").

18

19

20

21

22

23

24

25

26

27

28  / / /

III.    <u>CONCLUSION</u>

For the foregoing reasons, Google's motion should be denied in all respects and the action should proceed to discovery.


                                              GREENBERG FREEMAN LLP
                                              RIMON P.C.
Dated: November 5, 2015


                                         By: _____/s/  Neil  A. Smith
                                              Neil A. Smith
                                              Attorneys for the Plaintiff
                                              SPY PHONE LABS LLC.

CERTIFICATE OF SERVICE

I, Neil A. Smith, hereby certify that on November 5, 2015 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.


By: _____/s/  Neil  A. Smith
Neil A. Smith