Neil A. Smith (SBN 63777)
RIMON P.C.
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Phone: (415) 377-9280
Fax: (800) 930-7271
Email: neil.smith@rimonlaw.com

Michael A. Freeman, *Pro Hac Vice*
GREENBERG FREEMAN LLP
110 East 59th Street, 22nd Floor
New York, NY  10022
Phone:  (212) 838-3121
Fax:  (212) 838-5032
Email: freeman@greenbergfreeman.com

Attorneys for Plaintiff  SPY PHONE LABS LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| SPY PHONE LABS LLC, | Case No.:  5:15-CV-03756-PSG |
| Plaintiff, | Honorable Paul Singh Grewal |
| v. | |
| GOOGLE INC., ANDREI CIUCA, d/b/a CAD DESIGN, and JOHN DOES 1-49, | **SECOND AMENDED COMPLAINT** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff Spy Phone Labs LLC ("Plaintiff"), by its undersigned attorneys, for its second amended complaint in this action against defendants Google, Inc. ("Google"), Andrei Ciuca ("Ciuca"), d/b/a Cad Design, and John Does 1-49 (the "Doe Defendants"), alleges as follows:

<u>INTRODUCTION</u>

1.     This action asserts claims under the Lanham Act arising from infringement and dilution by Ciuca and the Doe Defendants of Plaintiff's federally registered trademark SPY PHONE® and Google's contribution to such infringement by knowingly and intentionally allowing others to infringe on and dilute Plaintiff's trademark in an online marketplace operated and controlled by Google.

2.     This action also asserts common law claims against all defendants for tortious interference with contract and for tortious interference with Plaintiff's prospective economic advantage arising from defendants' intentional, unfair and unlawful acts intended to harm Plaintiff's business relationships by, among other things, the submission of false complaints about Plaintiff and its product, Plaintiff's unjustified suspension from Google's online marketplace in retaliation for Plaintiff having submitted legitimate complaints against other developers, and Google's refusal to allow Plaintiff to use its federally registered trademark to identify its product anywhere in the world while allowing other developers to use Plaintiff's trademark in countries where the mark is not registered.

3.     Finally, this action assert claims against Google for breach of the implied covenant of good faith and fair dealing in the parties' agreement and violations of Cal. Bus. and Prof. Code §§ 17200 *et seq* (also known as the California Unfair Competition Law or "UCL") arising from Google's abuse of the discretion afforded to it under the parties' agreement, which result in Plaintiff's product being removed by Google from Google's online marketplace without any justification.

<u>PARTIES</u>

4.     Plaintiff Spy Phone Labs LLC is a New Jersey limited liability company with its principal place of business in Wayne, New Jersey.

5.     Upon information and belief, defendant Google, Inc. is a Delaware corporation with its principal place of business in Mountain View, California.

1    6.    Upon information and belief, Ciuca, doing business as Cad Design, is a citizen

2    of Bucharest, Romania.

3    7.    Upon information and belief, the Doe Defendants are developers of software

4    applications used for mobile phones who have infringed upon Plaintiff's federally registered

5    trademark and/or taken action intended to interfere with Plaintiff's existing contracts and prospective

6    business relations.  Plaintiff does not know the true names or legal capacities of the Doe Defendants,

7    and therefore sues these defendants under fictitious names until such time as they can be identified

8    through discovery from Google.

9                                JURISDICTION AND VENUE

10    8.    This Court has subject matter jurisdiction over this action pursuant to 28

11    U.S.C. § 1331 insofar as this action asserts claims arising under federal law, namely the Lanham Act.

12    This Court has supplemental jurisdiction over state and common law claims pursuant to 28 U.S.C. §

13    1367.

14    9.    This Court has personal jurisdiction over all defendants in this action because

15    each either does business in the State of California and/or has sufficient minimum contacts with the

16    State of California such that maintaining this action in this Court will not offend traditional notions

17    of fair play and substantial justice.

18    10.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)

19    because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

20    judicial district. Intradistrict assignment has already been determined in this transferred case.

21                                FACTS ALLEGED

22                              Google and Google Play

23    11.   Rather than simply provide telephone service, today's mobile "smart" phones

24    offer many features and can perform numerous functions.  Some of these functions and features are

25    installed on the phone by the manufacturer, but many more can be added by the consumer based on

26    his or her needs and interests.

27    12.   Functions and features can be added to a smart phone by installing or

28    downloading a software application, more commonly known as an "app."

13.     Google owns and operates Google Play (or the "Store" or the "Market"), an app distribution platform and online marketplace for smart phones and other electronic devices that operate on the Android® operating system, the operating system installed on over 60% of all mobile devices in use today.

14.     Google Play enables owners and users of smart phones that operate on the Android® operating system to download apps as well as other electronic media onto their phones.

15.     Google Play also enables a consumer who downloads an app to post a rating of one to five stars and to provide specific comments about his or her experience using the app.

16.     Upon information and belief, more than 90% of all Android®-based apps that are downloaded onto a mobile phone are downloaded through Google Play, making Google Play, far and away, the most dominant and important marketplace for any developer of Android®-based apps.

17.     The easiest and most common way for consumers to locate an app on Google Play is by entering one or more words into Google Play's search field, which, using an algorithm developed and applied by Google, will generate a list that ranks the located apps in order of relevance.

18.     Upon information and belief, the name (or title) and description of an app are significant factors in determining the ranking of each app in response to a search for a specific word or phrase.

19.     Upon information and belief, the number and quality of consumer reviews that are posted on Google Play are also significant factors in determining the ranking of each app in response to a specific search for a word or phrase.

20.     Apps that rank higher on the list for a particular search word or phrase are more likely to be downloaded than lower ranking apps because these are the first apps that consumers see and are likely the most relevant for the consumer.

21.     An app developer who wishes to offer an app for download on Google Play is required by Google to agree to abide by the terms and conditions mandated by Google, which are incorporated into Google Play's Developer Distribution Agreement ("DDA").  (A copy of the DDA in effect as of August 2012, when first agreed to by Plaintiff, is attached hereto as Exhibit 1.)

22.     Section 4 of the DDA describes the terms and conditions governing a developer's use of Google Play and includes, among other things, a prohibition against a developer from offering a product that: (a) interferes with, disrupts, damages or accesses in an unauthorized manner the device of any third party; and (b) does not adhere to any of Google Play's "Developer Program Policies."

23.     Google Play's Developer Program Policies currently include or have included, among others, rules and policies that prohibits a developer from offering an app on Google Play that: (a) constitutes "spyware" because it collects information (such as the user's location or behavior) without the user's knowledge or consent; (b) impersonates other entities, brands, or otherwise infringes on intellectual property rights of others, including trademark and other proprietary rights; (c) "spams" users or the Store; and (d) offers the same function or service under different names.

24.     In or about March 2016, Google Play added a new Developer Program Policy specifically applicable to apps that monitor or track a user's behavior and activity on a device, which requires that such apps:  (a) must not present themselves as a spying or secret surveillance solution; (b) must not hide or cloak tracking behavior or attempt to mislead users about such functionality; (c) present users with a persistent notification and unique icon that clearly identifies the app on the device; and (d) do not provide any means to activate or access functionality that violate these terms (collectively, the "March 2016 Monitoring App Requirements").

25.     Section 7.2 of the DDA provides for "takedowns" of apps by Google  from Google Play if Google determines "in its sole discretion" that an app or other product offered by a developer violates, among other things, applicable law, the terms of the DDA or any of Google Play's Developer Program Policies.

26.     At the time Plaintiff agreed to the terms of the DDA, § 7.2 of the DDA provided as follows:

> Google Takedowns. While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features; (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized

Carriers; (f) is deemed by Google to have a virus or is deemed to be malware, spyware or have an adverse impact on Google's or an Authorized Carrier's network; (g) violates the terms of this Agreement or the Developer Program Policies for Developers; or (h) the display of the Product is impacting the integrity of Google servers (i.e., users are unable to access such content or otherwise experience difficulty), Google may remove the Product from the Market or reclassify the Product at its sole discretion. Google reserves the right to suspend and/or bar any Developer from the Market at its sole discretion.

Google enters into distribution agreements with device manufacturers and Authorized Carriers to place the Market software client application for the Market on Devices. These distribution agreements may require the involuntary removal of Products in violation of the Device manufacturer's or Authorized Carrier's terms of service.

In the event that your Product is involuntarily removed because it is defective, malicious, infringes intellectual property rights of another person, defames, violates a third party's right of publicity or privacy, or does not comply with applicable law, and an end user purchased such Product within a year before the date of takedown,: (i) you must refund to Google, all amounts received, plus any associated fees (i.e. chargebacks and payment transaction fees), and (ii) Google may, at its sole discretion, withhold from your future sales the amount in subsection (i) above.

(Exhibit 1, ¶ 7.2)

27.     In the current version of the DDA, which was most recently updated in May 2015, § 7.2 of the DDA currently provides as follows (underlines and strikethroughs show changes):

**Google Takedowns.** While Google does not undertake an obligation to monitor the Products or their content, if Google is notified by you or otherwise becomes aware and determines in its sole discretion that a Product or any portion thereof or your Brand Features; (a) violates the intellectual property rights or any other rights of any third party; (b) violates any applicable law or is subject to an injunction; (c) is pornographic, obscene or otherwise violates Google's hosting policies or other terms of service as may be updated by Google from time to time in its sole discretion; (d) is being distributed by you improperly; (e) may create liability for Google or Authorized Carriers; (f) is deemed by Google to have a virus or is deemed to be malware, spyware or have an adverse impact on Google's or an Authorized Carrier's network; (g) violates the terms of this Agreement or the Developer Program Policies for Developers; or (h) the display of the Product is impacting the integrity of Google servers (i.e., users are unable to access such content or otherwise experience difficulty), Google may remove the Product from the ~~Market~~Store or reclassify the Product at its sole discretion. Google reserves the right to suspend and/or bar any Developer from the ~~Market~~Store at its sole discretion. If your Product contains elements that 7.2 could cause serious harm to user devices or data, Google may at its discretion disable the Product or remove it from devices on which it has been installed. Google may suspend or terminate distribution of your Products if you materially breach the terms of any non-disclosure agreement or other agreement relating to the Store or the Android platform.

Google enters into distribution agreements with device manufacturers and Authorized Carriers to place the ~~Market~~Store software client application for the ~~Market~~Store on Devices. These distribution agreements may require the involuntary removal of

Products in violation of the Device manufacturer's or Authorized Carrier's terms of service.

In the event that your Product is involuntarily removed because it is defective, malicious, infringes intellectual property rights of another person, defames, violates a third party's right of publicity or privacy, or does not comply with applicable law, and an end user purchased such Product within a year before the date of takedown,: (i) you must refund to Google, all amounts received, plus any associated fees (i.e. chargebacks and payment transaction fees), and (ii) Google may, at its sole discretion, withhold from your future sales the amount in subsection (i) above.

28.    While the DDA provides that Google "does not undertake an obligation to monitor" the products and apps offered by a developer on Google Play or the content of such products and apps, Google does, in fact, regularly and routinely conduct independent monitoring of the apps listed on Google Play to ensure compliance with the DDA and Google Play's Developer Program Policies.

29.    This monitoring and investigation of apps is performed by a group of Google employees known as the "Google Play Team."

30.    In addition, since at least January 2015, the monitoring and investigation by the Google Play Team includes "human reviews" of each new app to ensure compliance with Google Play's Developer Program Policies before the app is listed in the Store.

31.    In addition to independently monitoring apps listed in Google Play, the Google Play Team investigates specific complaints lodged against a particularly app or developer.

32.    The Google Play Team also determines what action, if any, should be taken in response to a complaint about an app or developer.

33.    Before an app can be listed on Google Play, the developer must incorporate source code provided by Google that enables the apps to access and interact with a phone's Android® operating system.

34.    In this respect, Google provide a portion of the content for all apps listed on Google Play.

35.    When an app is listed on Google Play, it is available to all consumers in all countries throughout the world with access to the Internet unless the developer expressly restricts the availability of the app to certain countries.

36. Currently, approximately 86.5% of all apps classified by Google as "tools" – which is the category in which the app that is the subject matter of this action belongs – are downloaded by consumers located outside of the U.S., while the remaining 13.5% of tool apps are downloaded by consumers located within the U.S.

Plaintiff's Trademark, Domain Name and App

37. Plaintiff is the owner of the registered U.S. trademark SPY PHONE®, Registration Number 3948486, for computer application software for mobile phones in International Class 09, first used in commerce on September 1, 2010.

38. After July 2013, Plaintiff's SPY PHONE® trademark was also registered in Turkey, Mexico, South Korea and Australia under International Registration Number 1169007.

39. Plaintiff sought to register its trademark in other countries, including those included within the European Union, but those registrations were denied.

40. Plaintiff also owns the domain name <spyphone.com>.

41. Plaintiff is the developer of an app that can be downloaded on a mobile phone that operates on the Android® operating system ("Plaintiff's App").

42. Plaintiff's App is what it commonly known as a "monitoring app."

43. When downloaded on a mobile phone, Plaintiff's App allows the user or an authorized third party to monitor or track a user's behavior and activity, including the location of the phone through GPS tracking, the telephone number of the sender or recipient of incoming and outgoing messages, the content of messages and Internet usage.

44. Monitoring apps such as Plaintiff's App are particularly useful on phones used by minors because it allows the minor's parent or guardian to track the child's activities and location.

45. The information obtained from a mobile phone by Plaintiff's App is transmitted from the mobile phone to a secure server maintained by Plaintiff, and can be accessed only through a private account established via a website operated by Plaintiff that is associated with Plaintiff's domain name <spyphone.com>.

46. To ensure compliance with Google's Play's anti-spam policy, the data obtained from a mobile phone is not sent to any other device and can only be viewed through the

1   private account on Plaintiff's secure server established by the person who downloaded Plaintiff's

2   App on the mobile device.

3          47.    To ensure compliance with Google's anti-spyware policy and protect against

4   Plaintiff's App being misused by someone attempting to obtain information from a mobile device

5   without the owner's knowledge, Plaintiff's App causes a unique icon to periodically appear on the

6   mobile device on which Plaintiff's App is downloaded, which notifies the user that Plaintiff's App

7   has been installed on that mobile device.

8          48.    Although the specific requirements contained in the March 2016 Monitoring

9   App Requirements were not promulgated by Google until just recently, Plaintiff's App has complied

10  with all of the March 2016 Monitoring App Requirements since at least June 2013.

11         49.    Plaintiff's App is free to download, but generates revenue through advertise-

12  ments placed on the website associated with <spyphone.com> through a program operated by Google

13  known as Adsense®.

14         50.    Google's Adsense® program enables website owners, such as Plaintiff, to

15  earn revenue from advertisers who bid for the right to place advertisements on a website through an

16  auction process operated by Google.  The advertiser with the highest bid earns the right to post an

17  advertisement on the website.

18         51.    Since the amount that an advertiser is willing to pay is driven primarily by the

19  number of people who may potentially view an advertisement, the amount of advertising revenue

20  earned under Google's Adsense® program is determined primarily by the amount of traffic that is

21  driven to a particular website.

22         52.    Thus, in the case of the website associated with Plaintiff's <spyphone.com>

23  domain name, the more people who download Plaintiff's App, the more people who will need to visit

24  Plaintiff's website to view the information sent to their private accounts, and the more money

25  advertisers will pay to advertise on Plaintiff's website, which means more revenue generated by from

26  Plaintiff's App.

27  ///

28  ///

53.     From April 2013 through December 2015, during which time Plaintiff maintained two paid advertisements on its website, Plaintiff earned an average of 45¢ in revenue through the AdSense® program for each download of Plaintiff's App on Google Play.

54.     From December 2015 to date, during which time Defendant has maintained only one paid advertisement on its website, Plaintiff earned an average of 22.5¢ in revenue through the AdSense® program for each download of Plaintiff's App on Google Play.

55.     At all relevant times herein, all defendants had knowledge of Plaintiff's participation in Google's AdSense® program.

56.     Upon information and belief, Google operates the AdSense® program through a business unit that is separate and independent from the business unit responsible for Google Play and that employs the Google Play Team.

Plaintiff's App Is Listed on Google Play Under the SPY PHONE® Brand Name

57.     In or around August 2012, Plaintiff established a developer account for Google Play.

58.     As part of establishing its developer account, Plaintiff and Google agreed to be bound by the terms of the DDA, which is a valid and binding agreement between Plaintiff and Google.

59.     At the time Plaintiff established its developer account and at all relevant times since then, there have been dozens of monitoring apps created by different developers listed for download on Google Play that perform the same or similar functions as Plaintiff's App.

60.     After establishing its developer account, Plaintiff initially listed Plaintiff's App for download under the name "SPY PHONE® Phone Tracker," which corresponded with Plaintiff's federally registered trademark.

61.     By obtaining a trademark registration for the name SPY PHONE®, Plaintiff sought to identify distinguish its monitoring app from similar apps offered by other developers, while preventing other developers from copying or infringing upon its trademarked name, which Plaintiff expected would provide Plaintiff's App with a competitive advantage over other monitoring apps.

1    At its peak about 8000 apps a day were downloaded under the Spy Phone® trademark, making it

2    believed to be based upon public reporting one of the highest downloaded tools apps worldwide in

3    the Google Play store

4            62.    Between August 2012 and June 2013, Plaintiff's App, under the brand SPY

5    PHONE® was one of the most popular apps downloaded from Google Play, with over 1.1 million

6    downloads.

7            63.    The popularity of Plaintiff's App on Google Play resulted in increased traffic

8    at Plaintiff's <spyphone.com> website, which elevated the price that advertisers were willing to pay

9    to advertise on Plaintiff's website, and which, in turn, together with the added traffic, increased

10   Plaintiff's advertising revenues.

11

12                         Plaintiff's Attempts To Enforce Its Trademark Rights

13           64.    If the holder of a registered trademark discovers that an app or other product

14   listed on Google Play is infringing on its trademark, under Google's policies, the trademark holder

15   can submit an online complaint to the Google Play Team requesting that the infringing app be

16   removed from the Store for violating the trademark infringement policy contained in Google Play's

17   Developer Program Policies.

18           65.    Upon receipt of a trademark infringement complaint, under Google's policies,

19   one or more members of the Google Play Team will review it and, if determined to be valid, the

20   Google Play Team will take down the infringing app from the Store, but only in the countries where

21   the trademark is registered.

22           66.    Thus, for example, if, in response to a trademark complaint, the Google Play

23   Team takes down an app that infringes upon a U.S. trademark, consumers in the U.S. will be not be

24   able to view or download the infringing app from the version of Google Play available in the U.S.

25   ("Google Play U.S."), but consumers outside of the U.S. (who are responsible for downloading over

26   86% of all the tool apps downloaded from Google Play) will still be able to view and download the

27   infringing app.

28

67.     Upon removal of an infringing app from the Store in response to a complaint from a trademark holder, the Google Play Team sends a notice to the developer of the infringing app stating, among other things, why its app has been removed from Google Play, together with the identity of the trademark that has been infringed and the name and email address of the person or party who filed the infringement complaint.

68.     Starting in or around November 2012, Plaintiff discovered that other developers, including some of the Doe Defendants, were attempting to trade on the success and reputation of Plaintiff's App by offering apps for download on Google Play under names that copied or incorporated Plaintiff's registered SPY PHONE® trademark and that performed the same or similar functions as Plaintiff's App.

69.     In response to the other developers' infringement upon its SPY PHONE® trademark on Google Play, Plaintiff submitted trademark infringement complaints against these developers to the Google Play Team using Google Play's online complaint form.

70.     Upon information and belief, the same employee or small group of employees on the Google Play Team were responsible for handling all of the trademark infringement complaints relating to Plaintiff's Spy Phone® trademark and/or monitoring apps and, therefore, Google was specifically aware of all Plaintiff's efforts to enforce its trademark rights.

71.     From approximately November 2012 through May 2013, in response to Plaintiff's trademark complaints, Google removed apps listed on Google Play U.S. under names that either copied Plaintiff's trademark verbatim, or incorporated Plaintiff's trademark in the name, including: (a) "Galyum Spy Phone;" (b) "Spy Phone Camera"; and (c) "Spy Phone Android."

72.     These takedowns were effective only with respect to Google Play U.S.  In other words, consumers outside the U.S. who could access Google Play were still able to view and download the infringing apps.

73.     In addition to removing the infringing app from the Store, § 7.2 of the DDA also authorizes Google, in its sole discretion, to suspend and/or bar any developer from the Store who violates any of the terms of the DDA or any of Google Play's Developer Program Policies.

74. Upon information and belief, none of the developers whose apps were removed from the Store in response to Plaintiff's trademark infringement complaints in 2012 and 2013 were barred from Google Play or had their developer account suspended.

<strong>Without Warning, Google Removes Plaintiff's App From<br><u>Google Play and Terminates Its Developer Account Without Cause</u></strong>

75. In or around May 17, 2013, Plaintiff filed a complaint using Google's online trademark infringement complaint form against a developer doing business under the name Cad Design, which had listed a monitoring app on Google Play under the name "Spy Phone App."

76. Despite actual notice of direct infringement of Plaintiff's Spy Phone® trademark on May 17, 2013, Google took no action to stop this infringement by Cad Design until on or about June 13, 2013, 27 days later.

77. On or about June 13, 2013, the Google Play Team took down Cad Design's infringing app from Google Play U.S. in response to Plaintiff's claim of trademark infringement.

78. Upon information and belief, the Google Play Team sent Cad Design a takedown notice identifying Plaintiff as the complaining party.

79. On June 13, 2013, Plaintiff received an email from defendant Ciuca, who identified himself as an app developer doing business on Google Play under the name Cad Design.

80. Ciuca's email complained that his monitoring app had been removed from Google Play as a result of a complaint filed by Plaintiff and asked for an explanation.

81. Plaintiff responded by email that the name Ciuca was using for his app infringed on Plaintiff's SPY PHONE® trademark, and that if Ciuca wanted to offer a monitoring app to U.S. consumers on Google Play, he must do so under a name that does not infringe on Plaintiff's SPY PHONE® trademark.

82. Almost immediately following this exchange of emails, Google started taking actions to prevent Plaintiff from exercising and enforcing its trademark rights as well as other actions that had an adverse effect on Plaintiff's business, as described further below.

83.     Although Plaintiff did not realize it at the time, Plaintiff now believes that the actions were orchestrated by Ciuca, members of the Google Play Team and possibly other Doe Defendants acting in concert against Plaintiff as a result of the success of Plaintiff's App.

84.     On or about June 24, 2013, Plaintiff submitted an online trademark complaint form to Google against a developer who had listed a parental monitoring app on Google Play named "Reptilicus.net Brutal Spy Phone."

85.     Although the Google Play Team had previously taken down apps with similarly infringing names – such "Galyum Spy Phone" – in response to Plaintiff's trademark complaints, the Google Play Team informed Plaintiff that, this time, Google would take no action, stating:

> As a preliminary matter, please note that Google is not in a position to mediate trademark disputes between developers and trademark owners. As a courtesy we have considered your claim, but are unable to determine its merits at this time.

86.     On June 28, 2013, the Google Play Team sent Plaintiff a notice stating that, in response to a complaint that it had received about Plaintiff's App, Plaintiff's App had been removed from Google Play and Plaintiff's developer account had been terminated.

87.     The reason given by the Google Play Team for the removal of Plaintiff's App from Google Play was that it violated Google's anti-spyware policy.

88.     Plaintiff was not provided with a copy of the complaint that was supposedly filed nor the identity of the complaining party.

89.     Plaintiff was given no prior notice, warning or opportunity to correct any alleged problems with Plaintiff's App before the takedown and termination of its developer account.

90.     At the time of Plaintiff's App was removed from Google Play and its developer account was terminated, Plaintiff was in full compliance with all terms and conditions of the DDA.

91.     At the time of Plaintiff's App was removed from Google Play and its developer account was terminated, Plaintiff's App complied in all respects with Google Play's extant Developer Program Policies, including its anti-spyware policy.

92.   The alleged complaint asserting that Plaintiff's App violated Google Play's Developer Program Policies was false and was known by the members of the Google Play Team who reviewed the complaint to be false.

93.   Upon information and belief, the false complaint that led to the removal of Plaintiff's App from Google Play was submitted by or at the behest of Ciuca, one or more of the Doe Defendants and/or one or more members of the Google Play Team, who were retaliating against Plaintiff for filing trademark infringements complaints against competing apps and/or sought to eliminate Plaintiff as a competitor.

94.   Although unknown to Plaintiff at the time of the June 2013 takedown and termination, Plaintiff subsequently learned (as described below) that Google and its employees on the Google Play Team knew that there was no real justification to take down Plaintiff's App from the Store or the termination of Plaintiff's developer account.

### Google Eventually Agrees to Reinstate Plaintiff's Developer Account and Plaintiff's App, But Only After Plaintiff Is Compelled to Stop Using Its Registered Trademark

95.   At the time Plaintiff's developer account was terminated in June 2013, Google Play permitted a developer whose account was terminated to submit an online appeal explaining in 500 words or less why the developer believed that its termination was unjustified.

96.   Under Google's appeal procedure, a developer may not view any of the complaints that have been filed against it, may not speak to a live person, and may not submit any supporting information beyond the 500-word explanation.

97.   Plaintiff submitted an appeal in compliance with Google Play's online appeals procedure.

98.   Google denied Plaintiff's online appeal and refused to reinstate Plaintiff's developer account without providing Plaintiff an explanation.

99.   Following the denial of its online appeal, Plaintiff filed a lawsuit against Google in New Jersey federal court demanding reinstatement of Plaintiff's App and Plaintiff's developer account (the "First Lawsuit").

100.    After Plaintiff filed the First Lawsuit, its counsel was able to speak to a live person employed by Google (an in-house lawyer), and requested an explanation as to the reasons for the takedown of Plaintiff's App and the termination of Plaintiff's developer account.

101.    After numerous back-and-forth communications between Plaintiff's counsel and Google's in-house lawyer, the Google Play Team finally acknowledged that none of the functions or features of Plaintiff's App violated Google's extant anti-spyware policy or any of Google's other Developer Program Policies.

102.    Nonetheless, Google still refused to reinstate Plaintiff's App because, according to the Google Play Team, Plaintiff's use of its registered trademark SPY PHONE® to identify Plaintiff's App violated the extant anti-spyware policy:

> . . . While providing additional disclosure in the app description and regular notification to targeted phones are crucial steps to accomplishing policy compliance, the Google Play Team believes the app is still in violation of policy because of the app's title. App titles should not be misleading or represent the product as being spyware and/or capable of surreptitious tracking [emphasis added]. . . .

(A copy of the email from the Google Play Team, dated September 20, 2013, provided by Google's in-house counsel, is attached as Exhibit 2.)

103.    Plaintiff's counsel responded by email, observing that not only does Plaintiff have a federally registered trademark for the brand name SPY PHONE®, there were currently dozens of other apps listed on Google Play performing similar functions as Plaintiff's App that contained the word "spy" in the title against which no action was being taken and that Plaintiff was being unfairly singled out as compared to other developers:

> We do not understand Google Play's concern over the name of my client's app when there are dozens of other apps that perform the same or a similar function on Google Play that use the word "spy" in its name, including several that use my client's trademarked phrase "spy phone."  I invite you do to as I did just a few minutes ago and enter the phrase "spy phone" into the Google Play search bar and you will see what I mean.

104.    In response, Google's in-house stated that the Google Play Team had informed her that, going forward, the Google Play Team intended to prohibit all developers from using the

word "spy" in the title an app listed on Google Play, and stated definitively that Plaintiff must stop using its SPY PHONE® trademark if Plaintiff wanted to have Plaintiff's App listed on Google Play anywhere in the world.

105.    Given the options of not being permitted to list Plaintiff's App on Google Play (from which over 90% of all Android®-based apps are downloaded) or no longer being able to list Plaintiff's App under the SPY PHONE® trademarked brand, Plaintiff was compelled to capitulate to Google's demand and discontinue use of its SPY PHONE® trademark to identify Plaintiff's App.

106.    At the same time, based on Google's representation that no developers were going to be permitted to use the word "spy" in the title of an app, Plaintiff believed that the harm to its business resulting from not being able to use its SPY PHONE® to identify Plaintiff's App on Google Play would be diminished because there would effectively be a level playing field.

107.    Plaintiff also relied on Google's representation that all developers were going to be prohibited from using the word "spy" in the title of an app in agreeing to dismiss the First Lawsuit without prejudice.

### While Plaintiff was Forced To Change the Name of Plaintiff's App, Other Developers Were Allowed To Operate as Usual and Use Plaintiff's Trademark Worldwide

108.    In or about October 2013, Google reinstated Plaintiff's developer account, but only after deleting the content relating to all versions of Plaintiff's App, including all the consumer reviews and records of downloads for Plaintiff's App appearing under the brand name SPY PHONE®, which had previously contributed to Plaintiff's App achieving a top ranking on Google Play and the concomitant financial benefit.

109.    Plaintiff objected to the deletion of the customer reviews for Plaintiff's App, but Google refused to reinstate those reviews.

110.    Soon after its developer account was reinstated, Plaintiff began offering Plaintiff's App for download on Google Play under the name "Phone Tracker."

111.    For the ten-month period between October 2013 and July 2014, the number of downloads for Plaintiff's App under the name "Phone Tracker" plummeted to approximately

1   260,000, as compared to more than 1.1 million for the ten-month period between August 2012 and

2   June 2013 when Plaintiff's App had offered Plaintiff's App under the SPY PHONE® brand.

3         112.   To this day, as compared to the monthly rate of downloads for Plaintiff's App

4   when listed on Google Play under the trademarked name SPY PHONE®, Plaintiff has never achieved

5   anything close to the same number of downloads for Plaintiff's App under the name Phone Tracker.

6         113.   The steep reduction in the number of downloads resulted in a steep reduction

7   in Plaintiff's advertising revenue through Google's Adsense® program.

8         114.   Meanwhile, contrary to Google's representation that it was instituting a policy

9   to prevent all developers from using the word "spy" in the title of an app listed on Google Play –

10  which necessarily would also have prevented developers from using names that infringed on

11  Plaintiff's SPY PHONE® trademark – dozens and dozens of other developers, including Ciuca and

12  the Doe Defendants, continue to list monitoring and other apps on Google Play under titles that

13  contained the word "spy."

14        115.   Google's practice of allowing apps with the word "spy" in the title has

15  continued even with respect to new apps listed after January 2015, despite the fact that, since at least

16  January 2015, all new apps are subject to a "human review" to ensure compliance with all of Google

17  Play's extant Developer Program Policies.

18        116.   Many of the monitoring apps listed on Google Play that used the word "spy"

19  in the name after Google supposedly established a policy to prohibit developers from being permitted

20  to use the word "spy" in the title of an app have actually copied or incorporated verbatim Plaintiff's

21  SPY PHONE® trademark.

22        117.   While the full list can only be obtained through discovery, the following is a

23  partial list of the apps that have been listed on Google Play since Google supposedly established a

24  policy to prohibit developers from being permitted to use the word "spy" in the title of an app:  (a)

25  "Phone Spy:  Call, SMS"; (b) "Ear Spy"; (c) "Phone Spy: GPS, SMS"; (d) "CPU Spy"; (e) "Spy

26  Message"; (f) "Cell Spy"; and (g) "Spy Camera."

27        118.   While the full list can only be obtained through discovery, the following is a

28  partial list of additional apps that contain the word "spy" in the title and which were first made

1   available for download on Google Play after January 2015, the date from which all new apps listed

2   on Google Play have supposedly been subject to a "human review" to ensure compliance with all of

3   Google Play's extant Developer Program Policies: (a) "spyphone on your phone" (b) "spy secret

4   video camera"; (c) "Drone Spy"; (d) "Domain Spy"; (e) "Phone Spy simulated"; and (f) "Spy mobile

5   prank," which uses "Spy Phone" as its logo.

6        119.   While the full list can only be obtained through discovery, the following is a

7   partial list of the apps made available for download on Google Play since October 2013, when Google

8   supposedly established a policy to prohibit developers from being permitted to use the word "spy"

9   in the title, with titles that actually copied or incorporated verbatim Plaintiff's SPY PHONE®

10   trademark: (a) "Spy Phone"; (b) "SpyPhone 1.0"; and (c) "spyphone on your phone".

11        120.   Notably, even if Plaintiff had submitted online trademark complaints to the

12   Google Play Team about an app that actually copied verbatim Plaintiff's SPY PHONE® trademark

13   and those complaints were deemed valid, Google would only take down those apps in the countries

14   where Plaintiff's trademark is registered – the U.S. and, after July 2013, Turkey, Mexico, South

15   Korea and Australia.

16        121.   In other words, while Plaintiff, since October 2013, has been prohibited from

17   using its SPY PHONE® trademark on Google Play worldwide due to Google having forced Plaintiff

18   to stop using its mark as a condition for the reinstatement of Plaintiff's developer account, other

19   developers not subject to the same restriction can list their apps under the name "spy phone" in

20   countries where Plaintiff's trademark is not registered, and Plaintiff cannot stop it by filing a

21   trademark complaint.

22        122.   For example, while Google has previously removed "SpyPhone 1.0" from

23   Google Play U.S. in response to Plaintiff's complaint that this app infringed on its trademark, that

24   exact same app is available on the version of Google Play accessible to consumers in the United

25   Kingdom, where it currently appears as the top-ranked app for a search of the phrase "spy phone,"

26   while Plaintiff's App, which Plaintiff has listed as Phone Tracker because Google has prohibited

27   Plaintiff from using its trademark SPY PHONE® on Google Play worldwide, is currently ranked

28   sixth for the same search. (A copy of a screen shot, taken on April 7, 2016, for the results of a search

conducted for the phrase "spy phone" on the version of Google Play accessible in the United Kingdom, is attached as Exhibit 3.)

123.    Through the Google Play Team's "human review" of new apps, its independent monitoring of existing apps on Google Play and its investigation of complaints, Google is and has been aware that, since at least January 2015, apps have been listed on Google Play using the word "spy" in the title even though Google supposedly established a policy to prohibit such practice.

124.    Upon information and belief, Plaintiff was and is the only app developer who has ever been subjected to Google's supposed policy prohibiting developers from using the word "spy" in the title of an app listed on Google Play and the only developer against whom this supposed policy has been made a condition of maintaining a developer account.

Plaintiff's Additional Complaints Lead To a Second Suspension From Google Play

125.    After realizing that Google did not actually have or was not enforcing its supposed policy prohibiting developers from using the word "spy" in the title of an app listed on Google Play (except as it applied to Plaintiff), starting in or around January 2014, Plaintiff began submitting complaints to Google about certain apps that were using the word "spy" in the title, asserting that these apps were violating the anti-spyware policy in Google Play's extant Developer Program Policies.

126.    In response to these complaints, Google removed some apps from Google Play, but other apps with the word "spy" in their title were not taken down by the Google Play Team.

127.    Upon information and belief, none of the developers whose apps were taken down in response to Plaintiff's spyware complaints had their developer accounts suspended or terminated.

128.    Further, in many instances, apps that were taken down as a result of Plaintiff's complaints were re-listed in Google Play by the developer after the takedown.

129.    On July 2 and 10, 2014, Plaintiff's representative submitted complaints to the Google Play Team against a monitoring app listed on Google Play that used the word "spy" in its title.

130.    Upon information and belief, the developer of the app about which these complaints were lodged was Ciuca, the same developer against whom Plaintiff had submitted a trademark infringement complaint shortly before Plaintiff's developer account was terminated in June 2013.

131.    On or around July 16, 2014, Plaintiff was notified by the Google Play Team that its developer account was being suspended and that Plaintiff's App had been removed from Google Play for violation of the "spam" policy contained in Google Play's Developer Program Policies.

132.    Plaintiff was not provided with a copy of the complaint that was supposedly filed nor the identity of the complaining party.

133.    Plaintiff was given no prior notice, warning or opportunity to correct any alleged problems with Plaintiff's App before the takedown and suspension of its developer account.

134.    At the time Plaintiff's App was removed from Google Play and its developer account was suspended, Plaintiff was in full compliance with all terms and conditions of the DDA.

135.    At the time of Plaintiff's App was removed from Google Play and its developer account was suspended, Plaintiff's App complied in all respects with Google Play's extant Developer Program Policies, including the anti-spam policy.

136.    The alleged complaint asserting that Plaintiff's App violated Google Play's Developer Program Policies was false and was known by the members of the Google Play Team who reviewed the complaint to be false.

137.    Upon information and belief, the false complaint that led to the removal of Plaintiff's App from Google Play was submitted by or at the behest of Ciuca, one or more of the Doe Defendants and/or members of the Google Play Team, who sought to retaliate against Plaintiff for filing anti-spyware complaints against competing apps and/or sought to remove Plaintiff as a competitor.

138.     Shortly after Plaintiff's suspension, as if to demonstrate his ability to act with impunity, Ciuca listed a monitoring app in Google Play under the name "Spy Phone App Parental Control," which incorporates and infringes upon Plaintiff's SPY PHONE® trademark.

139.     At or around the same time that Ciuca listed "Spy Phone App Parental Control" on Google Play, Ciuca also listed four other monitoring apps for download on Google Play under four different aliases:  (a) "Mobile tracker Whatsapp tracer"; (b) "Cell Phone tracker spy"; (c) "Cell tracker | Phone tracer"; and (d) "GPS tracker Family finder."

140.     Ciuca's connection to each of those parental monitoring apps is established by the fact that each of the domain names for the websites associated with those apps is registered to Ciuca, according to the "Who Is" domain registration directory.

141.     It was a violation of Google Play's extant Developer Program Policies for a developer to list multiple apps of Google Play that perform the same function under different names.

142.     The Google Play Team took no action against Ciuca for listing multiple apps that perform the same function under different names.

143.     Following the removal of Plaintiff's App for supposedly violating Google Play's anti-spam policy, to test whether the anti-spam policy was being applied uniformly to all developers, Plaintiff lodged complaints using Google's online form against other monitoring apps that were transmitting and collecting data in the same manner as Plaintiff's App.

144.     The Google Play Team took no action against the other monitoring apps against which complaints were filed and those apps remained available for download on Google Play.

Plaintiff Receives a Letter Confirming Its Suspicions That
Google's Actions Against It Were Taken Knowingly and In Bad Faith

145.     Given that Plaintiff's App was taken down and his developer account was suspended or terminated twice within days of lodging complaints against apps listed on Google Play by Ciuca, Plaintiff suspected that Ciuca or some outside motivation or interest somehow exerted influence over one or more members of the Google Play Team, but lacked any concrete evidence.

146.    Then, approximately a month after its developer account was suspended in July 2014, Plaintiff received an anonymous letter in the mail from a "Concerned Google Play Member" who confirmed Plaintiff's suspicions that members of the Google Play Team gave preferential treatment to certain app developers.   (A copy of the anonymous letter received by Plaintiff is attached hereto as Exhibit 4.)

147.    The author of the letter confirmed Plaintiff's belief that "there was no real justification" for the adverse actions taken against Plaintiff in 2013 and 2014, and that Plaintiff was being singled out for unfair treatment in retaliation for its success and for filing complaints seeking to enforce its rights in the SPY PHONE® trademark:

> To Spy Phone Labs management;
>
> I am uneasy with treatment of your company by other Google Play team members. I want to share with you the reasons.
>
> When you put in those Trademark Takedown notices you beacame [sic] a pariah around here. A small company like you should have known better than to send those notices in as you angered many people. Small companies like yours are not supposed to be wasting our time with your trademark notices.
> We all thought you were gone last year but we did not anticipate you filing a lawsuit last year as everyone else we get rid of goes away quietly.
>
> The only reason you were brought back was that there was no real justification to get rid of you. They did not want thaT TO COME OUT [sic]. They just made the excuse up that you were using the spyphone name as they needed a cover for thier [sic] actions. There is no formal policy aginst [sic] using spyphone except against your company.
>
> Many of the people in the store enchance [sic] their income by making their own apps or helping out other apps in the store.   The problem you have is that your app is sucessfull [sic] and it costs those apps money and downloads.
>
> When you sent in your last takedown noticeyou [sic] needed to be taken out. They just got someone to send in a complaint aginst [sic] your app and then you are instantly gone. Someone needs to do something or things will just get worse.
>
> Concerned Google Play Member

(Exhibit 4.)

148.    The letter that Plaintiff received establishes that Plaintiff's SPY PHONE® trademark, and Plaintiff's efforts to enforce its U.S. trademark rights, were well-known to members of the Google Play Team.

149.    The letter that Plaintiff received establishes that Google had specific knowledge of the activities of Ciuca and the Doe Defendants, including the filing of false complaints and Ciuca listing the infringing app "Spy Phone App Parental Control" in the Store shortly after Plaintiff's App was taken down and Plaintiff's developer account was suspended in July 2014.

150.    The letter that Plaintiff received establishes that Google was specifically aware (or was willfully blind to the fact) that other developers were listing apps in Google Play U.S. that infringed upon Plaintiff's SPY PHONE® trademark, but Google took no action to take down those infringing apps.

151.    The letter that Plaintiff received establishes that the Google Play Team had had no justification for taking down Plaintiff's App for violating Google Play's Developer Program Policies and that Google acted in bad faith and abused its discretion under the DDA in taking down Plaintiff's App.

Google's Actions After This Lawsuit Was Filed Further Demonstrate Its Complicity
In and Acquiescence To Other Developers' Infringement of Plaintiff's Trademark

152.    Plaintiff commenced this action in the United States District Court for the District of New Jersey on or about October 22, 2014.

153.    On or about January 23, 2015, Plaintiff filed an amended complaint, which was served on Google's counsel via the ECF system that same date.

154.    The amended complaint (at ¶ 120) identified a monitoring app that was then available for download on Google Play U.S. under the name "SpyPhone 1.0" as an app that was actually infringing on Plaintiff's Spy Phone® trademark.

155.    Despite actual notice of direct infringement of Plaintiff's Spy Phone® trademark on January 23, 2015, Google took no action stop "SpyPhone 1.0" from infringing on Plaintiff's mark in the U.S. or the other countries where Plaintiff's mark was registered until on or about February 10, 2015, 18 days after Google first received notice.

156.    On or about February 10, 2015, the Google Play Team sent Plaintiff's representative a notice stating that SpyPhone 1.0 had been taken down from Google Play within the jurisdictions in which plaintiff had registered its SPY PHONE® trademark in response to Plaintiff's

1   assertion of trademark infringement in the amended complaint.  (A copy of the notice received from

2   the Google Play Team is attached as Exhibit 5.)

3            157.    On February 17, 2015, Plaintiff's representative received another notice from

4   the Google Play Team stating that a monitoring app listed for download on Google Play by a

5   developer named Maco under the name "Spy Phone 2" had been removed from Google Play in the

6   jurisdictions where Plaintiff's Spy Phone® trademark is registered.  (A copy of the notice received

7   from the Google Play Team is attached as Exhibit 6.)

8            158.    Prior to this takedown by the Google Play Team, Plaintiff had not identified

9   "Spy Phone 2" in its amended complaint, nor had Plaintiff lodged an online trademark complaint

10   with Google requesting a takedown of the "Spy Phone 2" app.

11            159.    On Google's motion, this action was transferred from the United States

12   District Court for the District of New Jersey to this Court on August 13, 2015.

13            160.    After transfer, Google moved to dismiss the amended complaint.

14            161.    On March 21, 2016, this Court granted Google's motion to dismiss, but

15   granted Plaintiff leave to amend its amended complaint within 21 days.

16            162.    During the 21-day period between the time the Court granted Plaintiff leave

17   to amend its amended complaint and the date this second amended complaint was filed, upon

18   information and belief, Google independently took down at least four apps that had been available

19   for download on Google Play U.S. for at least 30 days prior to the takedown and that directly

20   infringed on Plaintiff's Spy Phone trademark:  (a) "Spy  Phone 2.0 by Magma"; (b) "Epf Spy Phone";

21   (c) "MySpyPhone"; and (d) "Spy Phone - Aplikacije za Android."

22            163.    Prior to the removal of these four apps from Google Play, Plaintiff had not

23   identified any of them in its amended complaint, nor had Plaintiff lodged an online trademark

24   complaint with Google requesting their takedown.

25            164.    Google's actions in independently taking down several apps that infringed on

26   Plaintiff's SPY PHONE® trademark without a specific complaint or request from Plaintiff

27   demonstrates that Google has the ability to independently monitor apps for trademark infringement

28   on Google Play and actually performs such independent monitoring.

165.     The statements in the letter from the "Concerned Google Play Member" (Exhibit 4), which establish, among other things, that Google was aware, through its employees on the Google Play Team, of Plaintiff's efforts to enforce its rights in its SPY PHONE® trademark and repeated infringement by other developers, when combined with evidence that the Google Play Team can and does independently monitor apps listed on Google Play for instances of trademark infringement, establish that Google actually knew of (or was willfully blind to) instances where Plaintiff's trademark was being infringed by other developers since at least June 2013, but continued to permit such developers to list infringing apps on Google Play.

Google Continues To Apply Its Supposed Policy Prohibiting
App's With the Word "Spy" in the Title Only To Plaintiff

166.     On April 1, 2016, Plaintiff's representative lodged online complaints against five highly-ranked apps with the word "spy" in the title:   (a) a monitoring app with similar functionality to Plaintiff's App called "Text Spy + FB, Line, Location"; (b) "Spy Camera HD," a camera app with over 10 million downloads; (c) "Wifi Spy," an app with 5 million downloads that claims it can detect authorized wireless users; (d) "Ear Spy – Super Hearing," an app that claims it can turn a phone into a device for eavesdropping; and (e) "Spy Net Lie Detector," an app that claims it can simulate a lie detector.

167.     Google has taken no action to remove any of these apps from Google Play as of the date of this second amended complaint.

AS AND FOR A FIRST CAUSE OF ACTION
(Trademark Infringement/Trademark Dilution Against Ciuca and the Doe Defendants)

168.     Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

169.     Under § 32(a) of the Lanham Act, 15 U.S.C. § 1114(a), any person who uses in commerce any word, term or name or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association

1    of such person with another person, or as to the origin, sponsorship, or approval of his or her goods,

2    services, or commercial activities by another person, shall be liable in a civil action by any person

3    who believes that he or she is or is likely to be damaged by such act.

4              170.    Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), any person who, in

5    connection with any goods or services, uses in commerce any word, term, name, symbol, or device,

6    or any combination thereof, or any false designation of origin, false or misleading description of fact,

7    or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake,

8    or to deceive as to the affiliation, connection, or association of such person with another person, or

9    as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by

10   another person shall be liable in a civil action by any person who believes that he or she is or is likely

11   to be damaged by such act.

12             171.    Since at least May 2013, Ciuca and the Doe Defendants, individually and/or

13   collectively, have offered and continue to offer apps for download on Google Play under the name

14   SPY PHONE®.

15             172.    The acts of Ciuca and the Doe Defendants, as described above, infringe on

16   and diluted Plaintiff's federally registered SPY PHONE® trademark in violation of § 32(a) of the

17   Lanham Act, 15 U.S.C. § 1114(a) and § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

18             173.    As a proximate result of the infringing actions taken by Ciuca and the Doe

19   Defendants, Plaintiff has suffered and will continue to suffer damage to its business, goodwill,

20   reputation, profits and the strength of its SPY PHONE® trademark.

21             174.    An award of monetary damages alone cannot fully compensate Plaintiff for its

22   injuries and Plaintiff lacks an adequate remedy at law.

23             175.    The acts of infringement and dilution by Ciuca and the Doe Defendants have

24   been and continue to be deliberate, willful and wanton, making this an exceptional case within the

25   meaning of 15 U.S.C. § 1117.

26             176.    Plaintiff is entitled to a preliminary and permanent injunction against Ciuca

27   and the Doe Defendants, as well as all other remedies available under the Lanham Act, including,

28

but not limited to statutory damages, compensatory damages, treble damages, disgorgement of profits, costs and attorneys' fees.

### AS AND FOR A SECOND CAUSE OF ACTION
(Contributory Trademark Infringement Against Google)

177.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

178.    Google has direct control over the operations of Google Play.

179.    Google has the ability to monitor the content posted on Google Play and does, in fact, regularly monitor the content posted on Google Play to ensure compliance with Google's Developer Program Policies.

180.    Since at least January 2015, Google has conducted "human reviews" of all new apps listed for download on Google Play to ensure compliance with Google's Developer Program Policies.

181.    At all relevant times since at least June 2013, Google has been aware of Plaintiff's SPY PHONE® trademark and Plaintiff's efforts and intention to enforce its trademark rights.

182.    Ciuca and the Doe Defendants have utilized Google Play to infringe on and dilute Plaintiff's federally registered SPY PHONE® continuously and repeatedly since at least June 2013 .

183.    Since at least June 2013, as a result of complaints lodged against specific apps as well as Google's independent monitoring of the content on Google Play, Google has had actual knowledge of particular apps posted by Ciuca and the Doe Defendants on Google Play that infringe on and diluted Plaintiff's registered SPY PHONE® trademark, or has turned a blind eye to the presence of such infringing apps on Google Play with knowledge that of the infringement in the countries where Plaintiff's mark is registered.

184.    Even in instances where Google has taken down apps that Google knew to be infringing on and diluting Plaintiff's Spy Phone® trademark, Google failed to act in a timely and reasonable manner to remove infringing apps from Google Play, thereby permitting such infringing

1   apps to remain available for download and for infringement to continue for an unreasonable period

2   of time after Google had actual notice of infringement.

3       185.   Google has continued to supply its services to Ciuca and the Doe Defendants

4   with knowledge that they are offering apps for download on Google Play with names that infringe

5   on Plaintiff's registered SPY PHONE® trademark.

6       186.   Google's actions are willful and with actual knowledge that Ciuca and the Doe

7   Defendants have used and are continuing to use Google Play as an instrumentality to engage in direct

8   trademark infringement and dilution of Plaintiff's SPY PHONE® trademark.

9       187.   Google's acts and omission as described above constitute contributory

10  trademark infringement.

11      188.   As a proximate result of the Google's actions or failure to act, Plaintiff has

12  suffered and will continue to suffer damage to its business, goodwill, reputation, profits and the

13  strength of its SPY PHONE® trademark.

14      189.   An award of monetary damages alone cannot fully compensate Plaintiff for its

15  injuries and Plaintiff lacks an adequate remedy at law.

16      190.   Google's acts of contributory infringement have been and continue to be

17  deliberate, willful and wanton, making this an exceptional case within the meaning of 15 U.S.C. §

18  1117.

19      191.   Plaintiff is entitled to a preliminary and permanent injunction against Google,

20  as well as all other remedies available under the Lanham Act, including, but not limited to statutory

21  damages, compensatory damages, treble damages, disgorgement of profits, costs and attorneys' fees.

22

23  <u>AS AND FOR A THIRD CAUSE OF ACTION</u>

24  (Tortious Interference With Contract Against All Defendants)

25      192.   Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if

26  fully set forth herein.

27  ///

28

193.   Plaintiff, at all relevant times, has had a contract with Google through its AdSense® program under which Plaintiff earns revenue from advertising placed on Plaintiff's website at <spyphone.com>.Plaintiff has at all times complied with the terms of this contract.

194.   Under the terms of Plaintiff's contract with Google under the AdSense® program, the revenue that Plaintiff earns increases based on the number of visitors to Plaintiff's website, which, in turn increases based on the number of consumers that download Plaintiff's App.

195.   All defendants are aware that Plaintiff generates revenue through the AdSense® program and, therefore, had and has knowledge of Plaintiff's contract with Google under the AdSense® program.

196.   The acts of Ciuca and the Doe Defendants, which include infringing on Plaintiff's Spy Phone® trademark, causing Plaintiff to be removed from Google Play by the filing of false complaints against Plaintiff's App and/or actively encouraging members of the Google Play Team to take adverse action against Plaintiff to remove Plaintiff's App from Google Play, were intended to disrupt Plaintiff's contractual relationship under the AdSense® program.

197.   The acts of Google, acting through the Google Play Team without the knowledge or consent of the employees in the business unit that operates Google's AdSense® program, which include, abusing its discretion to take down non-compliant apps under § 7.2 of the DDA, violating the implied covenant of good faith and fair dealing contained in the DDA, prohibiting Plaintiff from offering Plaintiff's App for download on Google Play under the brand name SPY PHONE® without justification while allowing other developers to list apps using the word "spy" and the phrase "spy phone," terminating and/or suspending Plaintiff's developer account without justification or contractual basis, and taking adverse action against Plaintiff at the behest of developers who compete with Plaintiff, were intended to disrupt Plaintiff's contractual relationship under the AdSense® program.

198.   The acts of defendants described herein caused an actual disruption of Plaintiff's contractual relationship under the AdSense® program because the unjustified removal of Plaintiff's App from Google Play reduced the number of consumers that downloaded Plaintiff's App

1    which, in turn, reduced the number of visitors to Plaintiff's website at <spyphone.com> and

2    decreased Plaintiff's revenue.

3         199.    The acts of defendants caused Plaintiff to suffer damages in the form of

4    decreased advertising revenue under the AdSense® program.

5         200.    Plaintiff is entitled to damages for past and present harm as well as injunctive

6    relief to restrain defendants from interfering with its contractual relationship.

7

8                          AS AND FOR A FOURTH CAUSE OF ACTION
            (Tortious Interference With Prospective Economic Advantage Against All Defendants)

9         201.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if

10   fully set forth herein.

11        202.    Plaintiff earned an average of 45¢ in advertising revenue per download of

12   Plaintiff's App from April 2013 through December 2015 and has earned 22.5¢ per download of

13   Plaintiff's App thereafter, establishing an economic relationship with the probability of future

14   economic benefit between Plaintiff and the owners of Android®-based mobile devices who wish to

15   download Plaintiff's App on Google Play.

16        203.    All defendants were aware of the prospective relationship between Plaintiff

17   and the owners of Android®-based mobile devices who wish to download Plaintiff's App on Google

18   Play.

19        204.    Ciuca and the Doe Defendants, intentionally and without justification or

20   excuse, interfered with Plaintiff's economic relationship with owners of Android®-based mobile

21   devices who wished to download Plaintiff's App on Google Play by taking the actions described

22   above, which include, among other things, offering apps for download on Google Play with names

23   that infringe on Plaintiff's SPY PHONE® trademark, submitting false complaints to the Google Play

24   Team about Plaintiff's App with the intention of having Plaintiff's App removed from Google Play,

25   and actively encouraging members of the Google Play Team to take adverse action against Plaintiff

26   to prevent him from engaging in fair business competition.

27        205.    Google, acting by and through its employees on the Google Play Team,

28   intentionally and without justification or excuse, interfered with Plaintiff's economic relationship

with owners of Android®-based mobile devices who wished to download Plaintiff's App on Google Play by taking the actions described above, which include, among other things, abusing its discretion to take down non-compliant apps under § 7.2 of the DDA, violating the implied covenant of good faith and fair dealing contained in the DDA, prohibiting Plaintiff from offering Plaintiff's App for download on Google Play under the brand name SPY PHONE® without justification while allowing other developers to list apps using the word "spy" and the phrase "spy phone," terminating and/or suspending Plaintiff's developer account without justification or contractual basis, and taking adverse action against Plaintiff at the behest of developers who compete with Plaintiff.

206.   The actions of defendants described above actually interfered with the economic relationship between Plaintiff and the owners of Android®-based mobile devices who wish to download Plaintiff's App on Google Play because Plaintiff's App could not be downloaded at all during the periods that Plaintiff's App had been removed from Google Play and Plaintiff's App was downloaded less frequently than it would have had Plaintiff been permitted to identify Plaintiff's App using its SPY PHONE® trademark instead of being forced to use the name Phone Tracker.

207.   The actions of all defendants described above, including violations of the Lanham Act, the filing of false complaints by Ciuca and the Doe Defendants, and Google's breach of the implied covenant of good faith and fair dealing in the DDA in removing Plaintiff's App from Google Play and terminating or suspending Plaintiff's developer account, each constitutes an act that is independently wrongful apart from the interference with Plaintiff's economic relationships.

208.   As a proximate result of defendants' interference with Plaintiff's relationship economic with the owners of Android®-based mobile devices who wish to download Plaintiff's App on Google Play, Plaintiff suffered a loss of advertising revenue.

209.   In addition to economic damages, Plaintiff has suffered and will continue to suffer irreparably harm to its business that is being proximately caused by defendants' actions as described above, for which Plaintiff has no adequate remedy at law.

210.   Plaintiff is entitled to damages for past and present harm as well as injunctive relief to restrain defendants from interfering with its business.

///

1

2

### AS AND FOR A FIFTH CAUSE OF ACTION
(Breach of Contract and the Covenant of Good Faith and Fair Dealing Against Google)

3

4

211.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

5

6

212.    Plaintiff and Google are parties to the DDA, which is a valid and binding contract.

7

8

213.    The DDA contains an implied covenant of good faith and fair dealing in its performance and its enforcement.

9

214.    Plaintiff fully performed its obligations under the DDA.

10

11

12

13

14

15

215.    Google breached the implied covenant of good faith and fair dealing in the parties' agreement, by removing Plaintiff's App from Google Play in bad faith and without justification, by abusing the discretion afforded to Google with respect to app takedowns under § 7.2 of the DDA, by abusing the discretion afforded to Google under § 7.2 of the DDA, and through its bad faith and unjustified determination that Plaintiff's use of it SPY PHONE® trademark to identify Plaintiff's App violated one or more of Google Play's Developer Program Policies.

16

17

18

216.    Google further breached the parties' agreement by deleting and refusing to allow Plaintiff to re-post customer reviews of Plaintiff's App after Plaintiff's developer account was reinstated after being unjustifiably terminated and suspended in 2013 and 2014.

19

20

217.    Plaintiff is entitled to damages proximately caused by Plaintiff's breach in an amount to be proven at trial.

21

22

218.    Plaintiff is entitled to a declaration that the use of its SPY PHONE® trademark to identify Plaintiff's App does not violate the terms of the DDA.

23

24

### AS AND FOR A SIXTH CAUSE OF ACTION
(Violation of Cal. Bus. and Prof. Code §§ 17200 *et seq.* Against All Defendants)

25

26

219.    Plaintiff repeats and realleges the foregoing paragraphs of the complaint as if fully set forth herein.

27

28

220.    The California UCL prohibits a person from engaging in an unlawful, unfair or fraudulent business act or practice.

221.    Defendants' actions as described above, which include infringement on Plaintiff's SPY PHONE® trademark, submitting false complaints to the Google Play Team about Plaintiff's App, violating the implied covenant of good faith and fair dealing contained in the DDA and otherwise breaching the DDA, and/or suspending Plaintiff's developer account without justification, each constitute an act prohibited by the UCL.

222.    Plaintiff is entitled to injunctive relief restraining defendants from taking any action to harm or interfere with Plaintiff's business, and, in particular, restraining defendants from taking any action to interfere with Plaintiff's lawful and legitimate right to use its SPY PHONE® trademark to identify Plaintiff's App.

WHEREFORE, Plaintiff demands judgment as follows:

A.    on all counts, awarding Plaintiff a preliminary and permanent injunction: (i) that restrains and enjoins defendants, their agents, servants, employees, and all other persons in privity or acting in concert, from engaging in any conduct that infringes on Plaintiff's SPY PHONE® trademark, contributes to the infringement of Plaintiff's SPY PHONE® trademark by others and/or interferes with Plaintiff's rights to do business with prospective customers, and (ii) that compels Google to allow Plaintiff to use its SPY PHONE® trademark on Google Play and restore all deleted customer reviews and other information associated with Plaintiff's App;

B.    on all counts except the Sixth Count, awarding Plaintiff damages that it has sustained as a consequence of defendants' conduct as described herein and, with respect to any damages awarded under claims brought under the Lanham Act, the trebling of all such damages pursuant to 15 U.S.C. § 1117 or, alternatively and at its election, an award of statutory damages pursuant to 15 U.S.C. § 1117 of up to $2,000,000 for willful infringement and/or contributing to the willful infringement of Plaintiff's SPY PHONE® trademark;

C.    on all claims brought under the Lanham Act, awarding Plaintiff reasonable attorneys' fees pursuant to 15 U.S.C. § 1117;

D.    awarding Plaintiff the costs of this action and pre-judgment interest;

1  and

2            E.      for such other and further relief as the Court deems just and proper.

3  **JURY DEMAND**

4      Plaintiff demands a trial by jury on all issues so triable.

5  Dated: April 11, 2016

                                        RIMON P.C.

6

7                                          By: _____ /S/   Neil  A. Smith

8                                          Neil A. Smith

9                                          GREENBERG FREEMAN LLP

10

11                                          By: _____ /S/   Michael A. Freeman

                                        Michael A. Freeman (*pro hac vice*)

12

                                        Attorneys for the Plaintiff

13                                          SPY PHONE LABS LLC.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2          I, Neil A. Smith, hereby certify that on April 11, 2016 the within document was filed with the

3  Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of

4  record in this case.

5   Date:  April 11, 2016                              RIMON PC

6

7                                                      /s/ Neil A. Smith
                                                       NEIL A. SMITH
8                                                      Attorneys for SPY PHONE LABS LLC

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28